## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN DOE, *an individual*,

     Plaintiff,

vs.

**UNIVERSITY OF MICHIGAN** (as to Title IX violations), **BOARD OF REGENTS OF THE UNIVERSITY OF MICHIGAN**, *a constitutional corporate body* (as to Title IX & ELCRA violations), **ELIZABETH SENEY**, **TAMIKO STRICKMAN**, **LAURIE MCCAULEY**, **ERIK WESSEL**, **LAURA BLAKE JONES, MARTINO HARMON, CONOR CAPLIS, MICHAEL MAIDEN, MAUREEN MUYSENBURG, JEFFREY LANGE, MICHAEL RYANS** and **PAUL ROBINSON**, *employees of the University of Michigan, sued in his or her personal and official capacities, jointly and severally*,

     Defendants.

Case No.
Hon.
Mag.

---

Maura B. Battersby (P79089)
FLOOD LAW, PLLC
Attorneys for Plaintiff
155 W. Congress, Suite 350
Detroit, MI 48226
(248) 547-1032
mbattersby@floodlaw.com

---

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff John Doe, by and through his attorneys Flood Law, PLLC, complains against Defendants as follows:

**Introduction**

Plaintiff, John Doe, is an ungraduated student who, until February 19, 2026, was enrolled in the Bachelor of Business Administration program in the Ross School of Business at the University of Michigan. He was to graduate with his B.B.A. in May 2026. Plaintiff was simultaneously working towards his Masters of Business Administration, which would be completed by May 2027.

Plaintiff was notified that a Formal Complaint had been filed against him with the Equity, Civil Rights & Title IX ("ECRT") Office on February 24, 2025, regarding an incident that allegedly occurred with a fellow student, off-campus, on October 10, 2024. Plaintiff was provided information on the process, which included the University's assurances that any proceedings, including appeals, would be concluded within 180 days. What followed was a series of delays by the ECRT Office and evidenced lack of diligence in the investigation. By the time the University completed its "investigation," it had been 366 days since the Complaint was filed, and 497 days since the alleged incident occurred.

The ECRT frequently cited "high investigator workload" for routinely taking weeks and months to complete investigation components that were to

be completed within three days, by its own Policy. Additionally, the University failed to gather important evidence. When Plaintiff requested the University obtain records, he was dismissed and told that the Complainant could not be compelled to produce the requested evidence "because it was a voluntary process." During the pre-hearing conference, Plaintiff's evidence was given no weight by the Hearing Officer. The rational was because Plaintiff's evidence was brought to light *after* the final investigation report, it must have been incredible. However, the reason for this was due to the ECRT's blatant lack of care during the investigation. Plaintiff and Plaintiff's witnesses were not interviewed until several months after Complainant and Complainant's witness, thus only allowing for one narrative to run the investigation.

Finally, after failing to gather the evidence Plaintiff requested, and not permitting Plaintiff to obtain the evidence on his own, the University rubber-stamped the Complainant's version of events, despite glaring credibility issues.

When Complainant first submitted text messages with Plaintiff, she initially provided their text history from September 22, 2024 through October 18, 2024. Yet later, she provided a screen recording of the text thread, which demonstrated that she had omitted September 28, 2024 through October 5, 2024 text messages. The omitted messages established Complainant's continued initiation of contact with Plaintiff, including two requests to spend

time together, both of which Plaintiff turned down. This fact also establishes Complainant's willingness to lie by omission and greatly damages her credibility.

Additionally, the second text message production, this time purportedly of the full messages, had different time stamps than the first. For instance, text messages that showed they were sent on September 29, 2024 at 3:18 a.m. in the first set, were now showing they were sent on September 28, 2024 at 3:18 p.m. This once again demonstrates Complainant's ability and willingness to manipulate evidence to fit her alleged narrative.

The Complainant made claims regarding vaginal bleeding that were not reflected in her medical records. The Complainant alleged to have bruises/hickeys on her neck and chest following the alleged incident. Yet, the examination notes by the UHS physician, who provided a full gynecological examination, *including* breast examination, on October 11, 2024 failed to note any markings or bruises, despite Complainant reporting concern about vaginal trauma. The Complainant testified she never removed her shirt during that examination, as an explanation for the lack of documentation of the bruises by UHS. This explanation was accepted despite it relying on the UHS physician to have falsified the examination records, a felony.

Finally, the University noted that it gave more weight to Complainant's

version of events because her testimony had stayed the most consistent. The University entirely overlooked that Complainant was interviewed two and a half months sooner than Plaintiff. Further, the University failed to investigate the veracity of Complainant's claims. Her maintaining the same claims was not an indication that the claims were true. The University continued to overlook discrepancies by ignoring the fact that Complainant and her witnesses had different accounts during their initial interviews, which suddenly changed to align in the final investigation report.

The University's "investigation" was in name only. Multiple investigators let the matter stagnate, and after a delay of 366 days suspended Plaintiff from the University, just eight weeks shy of graduation. The University's handling of this matter did not comply with its own policies. In doing so, it deprived Plaintiff of his Due Process rights.

The Due Process Clause guarantees fundamental fairness to state university students facing long-term exclusion from the educational process. In matters involving "he said/she said" scenarios, credibility of each is at issue. This matter was decided on a credibility determination without any effort to verify the allegations made against Plaintiff, and while preventing Plaintiff from obtaining and presenting evidence to challenge the allegations. Plaintiff was disciplined without due process. This is clearly unconstitutional.

In addition, Defendants are discriminating against Plaintiff on the basis of his gender in violation of federal and state law.

## **Jurisdiction and Parties**

1.      This is an action for due process violations under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983.

2.      This Court has federal subject matter jurisdiction over Plaintiff's 42 U.S.C. § 1983 claims pursuant to 28 U.S.C. § 1331 and § 1343.

3.      Plaintiff John Doe ("Plaintiff") is or was a student at the University of Michigan (the "University"). Plaintiff's claims arise out of actions taken against him by Defendants for alleged violations of the University's Policy on Sexual and Gender-Based Misconduct ("the Policy").

4.      Defendant Elizabeth Seney is the University's Director of Gender Equity serves as the University's Title IX Coordinator.

5.      Defendant Tamiko Strickman is the University's Executive Director and Special Advisor to President which office is responsible for oversight of the Equity, Civil Rights, and Title IX Office.

6.      Defendant Laurie McCauley is the University's Provost and Executive Vice President for Academic Affairs, which office is responsible for oversight of the Vice Provost for Equity and Inclusion and Chief Diversity Officer.

7.      Defendant Erik Wessel is the University's Director of Student Resolution Resources. ("SRR").

8.      Defendant Laura Blake Jones is the University's Dean of Students.

9.      Defendant Martino Harmon is the Vice President for Student Life at the University, which office is responsible for oversight of OSCR and the Dean of Students.

10.     Defendant Conor Caplis was the ECRT investigator assigned to investigate the complaint made against Plaintiff, and who carried out the investigation without due process of law, including but not limited to failing to abide by important deadlines, failing to conduct any investigation, prior to taking leave of her position entirely.

11.     Defendant Michael Maiden was the ECRT Senior Investigator that was assigned to investigate the complaint made against Plaintiff in addition to Conor Caplis, who was aware of Caplis's failure to investigate, and who failed to investigate the complaint, and carried out any investigation without due process of law.

12.     Defendant Maureen Muysenberg, Investigator, ECRT, was assigned to investigate the complaint made against Plaintiff in addition to Conor Caplis, who was aware of Caplis's failure to investigate, and who failed to investigate the complaint, and carried out any investigation without due process of law.

13.     Defendant Jeffrey Lange, was Deputy Title IX Coordinator, ECRT, assigned to oversee the proceedings involving the complaint made against Plaintiff who was who failed to investigate the complaint, and carried out any investigation without due process of law.

14.     Defendant Michael Ryans, was OSCR Associate Director who deprived Plaintiff of his property right to education without due process of law, by imposing a two-year suspension alleging safety concerns of the Complainant after the University permitted Plaintiff and Complainant to remain on University campus for 366 days without "safety" protections in place, and without a resulting issue between Plaintiff and Complainant. It should be noted, Plaintiff requested a mutual no contact order for his protection and safety once he was notified of the complaint against him.

15.     Defendant Paul Robinson is the University's Associate Vice Provost and University Registrar.

16.     The above-named individual Defendants are sued both in their personal and official capacities.

17.     Defendant University of Michigan is a public university, with its main campus located in Ann Arbor, MI. Through the ECRT, the University has a stated goal of promoting federal and state laws regarding nondiscrimination, such as Title IX and the Elliot Larsen Civil Rights Act.

18.     Defendant Board of Regents of the University of Michigan (hereinafter, "Defendant Board of Regents") is a constitutional corporate body operating and governing the University of Michigan, within this District.

19.     Defendant Board of Regents of the University of Michigan (hereinafter, "Defendant Board of Regents") is a constitutional corporate body operating and governing the University of Michigan, within this District.

## **Background**

20.     In August, 2022, Plaintiff enrolled at the University of Michigan as an undergraduate student.

21.     As of February 2026, Plaintiff was on track to complete his Bachelor's Degree of Business Administration from the University's Ross School of Business in April 2026.

22.     Plaintiff was also working towards his Masters of Business Management program, to be completed by April 2027. This program allowed him to complete his MBA in one year, instead of two.

23.     Furthermore, Plaintiff was given a $10,000 scholarship from the University to pursue his Masters of Business Management.

24.     The cost of the Bachelor's degree was approximately $275,000.

25.     The cost of the Master's degree was approximately $160,000.

26.     On February 18, 2025, a complaint was filed against Plaintiff with

the Equity, Civil Rights, and Title IX ("ECRT") office by a female student ("Complainant") alleging that a non-consensual sexual encounter had occurred four months earlier, on October 10, 2024. There were no witnesses to the encounter, which occurred in Complainant's off-campus apartment.

27.    The complaint is false; the sexual encounter did not occur, and Complainant confirmed the kissing was consensual.

28.    The parties met sometime in August 2024. They lived in the same apartment complex, which had an outdoor pool.

29.    Complainant met Plaintiff and his roommates at the complex's pool. Plaintiff and his roommates invited Complainant to come up to their apartment.

30.    While at his apartment, Plaintiff lent Complainant a crewneck sweatshirt so that she would not be cold. Complainant asked Plaintiff's roommate if Plaintiff liked her when Plaintiff stepped out of the room. Plaintiff then returned to the group and walked Complainant back to her apartment.

31.    At Complainant's apartment, Complainant asked Plaintiff if he liked her. Plaintiff admitted he liked her. Complainant asked Plaintiff if he wanted to be her boyfriend. Plaintiff responded that was "a lot to ask really fast." Complainant was upset at his response and did not communicate or see Plaintiff for a period of several weeks.

32.    In September 2024, Complainant came to Plaintiff's apartment.

While there, Complainant and Plaintiff watched television in the living room area. Complainant then kissed Plaintiff on the lips, with her hands on the back of his neck. Complainant admitted she initiated the kissing. She alleged it was consensual, though she did not ask for Plaintiff's consent.

33.     A few days later, Plaintiff went to Complainant's apartment. They were on the couch in the living room area. Complainant put her hands up Plaintiff's shirt. Complainant then put her hand on his genitals from outside of his pants. Complainant then rubbed her hand on Plaintiff's genitals to stimulate orgasm for approximately 1-2 minutes. Complainant then began to grind her body on Plaintiff's body and kiss Plaintiff.

34.     Plaintiff asked Complainant to stop grinding on him because he did not "want to go that far that fast." Complainant stopped.

35.     On October 10, 2024, Complainant invited Plaintiff to her apartment.

36.     Complainant appeared happy to see Plaintiff when he arrived. She led him to her bedroom and closed the door.

37.     Complainant put her hands around Plaintiff's neck, pulled his head towards her, and kissed Plaintiff. They kissed for a while and then Complainant put her hands on Plaintiff's shirt, encouraging him to remove his shirt. This made Plaintiff feel uncomfortable, but he removed his shirt.

38.     Plaintiff then placed his hands on the small of Complainant's back, underneath her shirt. Complainant indicated she was not comfortable with his hand on her back and Plaintiff instantly removed his hand. Complainant told Plaintiff she did not want to have sex. Plaintiff responded that was "perfect" and that he "wasn't planning on it." Complainant then pulled Plaintiff into her bed.

39.     Complainant again commented that she wanted Plaintiff to be her boyfriend and wanted to be in a relationship with Plaintiff. Plaintiff was scheduled to study abroad the next semester and did not want to commit to a relationship. Plaintiff was uncomfortable with Complainant's continued insistence on a relationship and felt Complainant had "thrown a lot on" him.

40.     Plaintiff wanted to leave, but was being pressured by Complainant to stay overnight. Plaintiff told Complainant he wanted to "take time and think through things," but she continued to pressure him to stay. He wanted to "get out and think about it."

41.     Plaintiff exited Complainant's bedroom to find Complainant's roommate setting up a bed on the couch in the living room. Plaintiff said he did not want to force someone to sleep on the couch instead of her bed.

42.     Complainant walked Plaintiff to the door, reiterated he was welcome to stay overnight. Plaintiff told Complainant he wanted to leave and left.

43.     Plaintiff thought about what had been said the next day and it made him uncomfortable. He would be leaving in less than three months and starting a relationship only to end it in three  months would create an "awkward situation." He also felt uncomfortable with how Complainant had spoken about a male in her past, but then admitted she was "never really involved with [the male]." Plaintiff felt Complainant was moving too fast with wanting to be in a serious relationship.

44.     Plaintiff texted Complainant at 9:51 a.m. that same day to ask if he had left his wallet in her room.

45.     At 12:36 p.m. Complainant responded "I don't think so".

46.     Also at 12:36 p.m., Plaintiff asked if Complainant had finished her Starbucks from the night before. Plaintiff did not respond until 3:06 p.m. and said she had thrown out the Starbucks. Then Complainant said:

> about last night i think we were moving too fast for me and i just didn't think that you were that respectful of my boundaries and i don't think it's fair that you only come over when you're drunk. im not mad I just wanna talk abt it

47.     Plaintiff was uncomfortable after receiving Complainant's text message and wanted to wait a day or two to respond.

48.     On or about October 17, 2024, Complainant went to Plaintiff's apartment before Plaintiff returned home. She knocked on the door of his

apartment until someone came to the door. She blocked the keyhole so that she would not be identified without opening the door. She then entered the apartment and went towards Plaintiff's bedroom, presumably looking for him. She then went back to the living room and sat on the couch and informed Plaintiff's roommate that she would not leave until she spoke with Plaintiff.

49.    Plaintiff's roommate called Plaintiff to tell him what was going on. Complainant remained at Plaintiff's apartment for over an hour.

50.    Complainant texted Plaintiff again on saying "you should come out with us tonight we're going to skeeps".

51.    Plaintiff did not respond until October 15, 2024 at 1:36 a.m. and said "I wish I saw this lol" and "Apparently skeeps was dead, no?"

52.    Complainant did not respond until 10:28 p.m. that evening and said "idk it was freezing so we didn't go".

53.    Complainant texted again at 11:45 p.m. asking "if you were to live in any time period what time period would you live in".

54.    Plaintiff responded on October 17, 2024 at 8:21 p.m. He then said "Isaac told me you were at the place, I'm gonna be out for a bit. Text me when you're free." Complainant responded "just text me when you get back i can go down."

55.    Plaintiff texted Complainant at 10:18 p.m. and said "Hey my

roommates told me what you did. You cannot come over here and invite yourself in like that. It's midterm season and that's unacceptable." Complainant responded, "i can't tell if you're joking or not."

56.     On October 18, 2024 Complainant texted "if you were being serious abt that last text, i didn't let myself in, issac did cause I knocked so idk what ur problem is."

57.     Complainant again came to Plaintiff's apartment and began knocking on the door. Again, she blocked the keyhole with her finger so that the occupants could not see who was knocking. Plaintiff's roommate and his roommate's girlfriend opened the door, and Complainant entered the apartment uninvited. Plaintiff's roommate was able to put his arm out and block Complainant from entering further and asked her to return to the entrance area of the apartment.

58.     Complainant appeared "manic." She was shouting, extremely irritated, and her eyes were "darting back and forth." Complainant alleged Plaintiff had blocked her on iMessage. She then alleged Plaintiff had come to her apartment and 'did some things she was not okay with.'" Plaintiff's roommate and girlfriend asked Complainant if she had reported anything and she replied that "police or University would not be able to do anything about it." Plaintiff's roommate was able to move Complainant toward the exit and assured her they

would speak to Plaintiff. She then left.

59.     Plaintiff's roommate spoke to him about what had occurred and the allegations Complainant had implied. They also expressed concern that Complainant would continue to come back to their apartment. Plaintiff promised he would address this.

60.     Later that day, Plaintiff having finished his midterms texted Complainant that he was available to meet and talk. He wanted to meet with Complainant because he was afraid she would come to his apartment and behave erratically.

61.     When Plaintiff arrived, Complainant began yelling at him. She said, "you think because you're tall, you're white, you're blonde, you have blue eyes, you can do whatever you want to me?" Later she said, "do you know you gave me a UTI??" Plaintiff was in disbelief and reminded Complainant he had "never even touched [her] anywhere near there."

62.     Complainant then apologized and said, "oh my god, you must think I'm so crazy." She then wanted to know if Plaintiff thought there was "any chance [they] could be together." Plaintiff was frightened by Complainant's behavior and did what he could to appease her. Complainant asked Plaintiff not to speak to his roommate about what she told his roommate as she had "said some crazy things." One of the many things she had said to Plaintiff's roommate was her

allegation that Plaintiff had done things to her against her will.

63.    The next day, Complainant texted Plaintiff:

> hi!!! ik i already said this but I am really sorry that I
> went crazy on grant and issac. but i'm glad we were
> able to talk and im not upset anymore because i know
> where you were coming from! and I don't want you to
> think you have to distance yourself from me. im okay
> with the fact that you don't want a relationship i just
> like spending time with you if that's still what you
> want!

64.    Plaintiff responded October 20, 2024 at 10:02 p.m. with "Bro aired me" and a laughing emoji. He then wrote "I enjoy spending time with you as well, but I thought about it more and I'm going to need a bit of time and space before doing anything major. You can say hi in the elevator next time though ..."

65.    Plaintiff ended that discussion with "Have a great Monday and gn". Complainant tagged that message with the "thumbs down" reaction. Then on October 21, 2024 at 12:16 a.m. she sent a lengthy, incoherent text message:

> i really appreciate that you say this after everything you
> did knowing that I've never done anything like that . . .
> that's really nice jack. and idk what you mean by
> scheduling anything in the future because our only
> form of hanging out since the pool closed has been you
> drunk texting or calling me. and I doubt you would ever
> actually plan something in advance because 'you can't
> see that far into the future". for a guy who has had 4
> girlfriends you'd think you would know how to treat
> women but clearly they didn't work out because you
> are so incredibly immature and egocentric. i can only
> imagine how you treated them considering how you've

treated me in the span of 2 months. It's not okay to call up a girl only when it's only convenient to you and then take days to respond or not even at all. you've probably never been held accountable a day in your life but your behavior is genuinely appalling. it's not normal jack and you should seek psychiatric help. you think of me only as some bitch that you can just call up or text whenever you wanna fuck so you can feel better about yourself and the path you are headed down of being forced into a career you don't want. and what do you mean by a lot on your plate . . . you play with legos for your exams. i actually have a lot of shit on my plate and im not gonna let you keep me in your back pocket for when things get better for you so you could come back into my life. everything that has happened between us has only been on your terms and that's not okay. you have no regard for how I feel or responsibilities i have because you know ill drop everything for you in that moment. if we see each other, don't say hi. idc anymore jack. i give up. just fuck some other bitch while you're here and then go do god knows what while you're in spain. have a nice life.

66.    Plaintiff did not respond to the text message. He felt relief because he had been afraid of her and her aggressive and erratic behavior and believed that her text message meant she would no longer be contacting him, or showing up to his home unannounced and manic.

67.    Plaintiff did not have any further contact with Complainant. Plaintiff has not had any contact with Complainant since her October 21, 2024 text message.

68.    For the last two weeks of the term, Plaintiff commuted from home,

one (1) hour each way, to avoid unnecessary interaction with Complainant.

69.     Plaintiff was first advised of the allegations Complainant made against him when he received an email from ECRT on February 24, 2025 with notice that a formal complaint had been filed against him by Complainant.

70.     Complainant had first made an online inquiry on December 13, 2024 with ECRT. She set up a meeting for December 16, 2024. Complainant canceled the meeting and confirmed she did not want to file a report. On December 20, 2024, ECRT sent a letter confirming the matter was closed.

71.     On January 24, 2025, Complainant emailed ECRT again, this time indicating she wanted to file a complaint.

72.     During this time, Plaintiff received a text message from an unknown number which said, "Karma is going to come for you." He believed it to be from Complainant or her friends, as she was the only person he encountered who had behaved in that way.

73.     On February 4, 2025, Complainant emailed wanting to meet with an ECRT investigator prior to making her decision about filing a report.

74.     On February 14, 2025, Complainant met with investigator Conor Caplis. On February 18, 2025, she filed her Complaint.

75.     The University's Policy indicates that the "expected timeline for entire process (including appeals) is 180 days."

19

76.   Plaintiff's "investigation" lasted 366 days. 186 days longer than the maximum length permitted by the University's policy.

77.   The Policy requires:

i.   Complainant meets with ECRT for a recorded interview. "Complainant will have three calendar days to review statement summary and transcript. Complainant can provide evidence at or following this interview"

  i.   Complainant's recorded interview did not occur prior to her Formal Complaint.

  ii.   Complainant's interview occurred April 9, 2025. Two months after she filed her Formal Complaint.

  iii.   The University's excuse for the delay was that "due to limited UPA availability" a University Provided Advisor ("UPA") could not be provided until April 7, 2025.

  iv.   Complainant requested to be provided a UPA on February 27, 2025.

  v.   Complainant was not sent the transcript and draft summary until May 12, 2025. She was given until May 18th to respond. This was despite the University's policy of allowing just three days.

     vi.  Complainant was also able to provide evidence from the date of the interview through the close of the investigation.

ii.  Complainant files a Formal Complaint requesting Investigative Resolution. "Title IX Coordinator reviews ***within one business day***. Respondent is notified ***immediately*** upon receipt of a Formal Complaint and next steps." (emphasis added)

     i.  Complainant's Complaint was submitted February 18, 2025.

     ii.  Responded was not notified until February 24, 2025.

iii.  ECRT Meets with Respondent. "Respondent shares information about their experiences with investigator, and investigator asks questions. Respondent will have three calendar days to review statement summary and transcript. Respondent can provide evidence at this or following this interview."

     i.  Respondent was not interviewed until June 20, 2025. This delay permitted Complainant an ***additional 72 days to gather and provide evidence*** to the investigator. Respondent's ability to gather evidence and participation was held back an additional 72 days due to the University's delay due to insufficient staffing.

     ii.  The University falsely claimed the delay was due to Plaintiff's

work schedule. Respondent's representation diligently attempted contact with Conor Caplis via her work phone, cell phone, and email. Ms. Caplis became unresponsive. It was not until Plaintiff filed for a dismissal that anyone from ECRT responded. ECRT informed Plaintiff and Complainant that Ms. Caplis had left her position and a "new" investigator was appointed – Michael Maiden. This was another misrepresentation of the events. Mr. Maiden had been assigned this matter from the beginning, as evidenced by the email notification sent to Plaintiff on February 24, 2025.

   iii.  Again, the University did not follow its timeline and in its own report noted "Due to high investigation workload, respondent was sent the interview transcript and draft summary for edits/feedback on July 7, 2025"

iv.  ECRT interviews witnesses and gathers additional information. **<u>Timing ranges from 1 week to 6 weeks</u>**. Each witness has two business days to respond to statement summary and transcript." (emphasis added)

   i.  Complainant's witnesses were interviewed *before* Respondent was interviewed. They were interviewed April 9

(along with Complainant), May 23, and two were interviewed on May 28, 2025.

ii. As a result, Complainant's witnesses were only questioned about Complainant's narrative. No questions about Plaintiff's recollection were asked because, contrary to protocol, Plaintiff had not been interviewed.

iii. This is a direct violation of the policies and procedures promised by the University to its students.

iv. The University was claiming understaffing as the excuse for preventing Plaintiff from participation in the investigation for 72 days, while the same staff was able to accomplish *four* witness interviews.

v. Plaintiff was significantly prejudiced by the University interviewing Complainant *and* all of her witnesses prior to his interview.

   1. First, Complainant and her witnesses were interviewed much closer to the events, while those events were fresh in their minds. This was crucial because later, they were found more credible because of the details they recalled.

2. Second, because they were interviewed prior to Plaintiff, the investigators did not have any indication of facts that were in dispute, or were agreed upon, to inform their questioning of these witnesses.

3. Finally, Plaintiff was delayed in participating in the events, and his own defense, while the University gave total deference to Complainant and her girlfriends.

vi. Further, the University abided by its promise of completing the additional interviews of witnesses in 1-6 weeks _for Complainant_, but not for Plaintiff. A clear indication of its preferential treatment for the Complainant and prejudicial treatment to Respondents to accusations.

v. Preliminary Report and Evidence File Review. "ECRT provides Complainant and Respondent with preliminary report, which includes all relevant information **gathered by the investigator**. Parties have **10 calendar days** to respond. Investigator reviews new information provided by parties and incorporates as appropriate." (emphasis added)

i. Plaintiff was notified on July 17, 2025, that the ECRT intended to submit its Preliminary Report on July 24, 2025, and

informed him that he needed to submit any feedback, evidence, and/or additional witnesses names by then. He was informed that any evidence received after July 24th could be "given less evidentiary weight than materials received before the PIR was issued."

1. Plaintiff had not even had his draft statement for ten calendar days when the University arbitrarily limited his ability to investigate and defend himself to one week.

2. Complainant had been permitted to gather evidence and provide witnesses names from April 9, 2025 through July 24, 2025.

ii. Plaintiff requested the investigator obtain records to verify Complainant's claims. Plaintiff requested:

1. Complainant's academic records. She alleged the incident had caused her to be unable to focus on school and resulted in her being placed on academic probation. She attributed her difficulty in her program with this incident. Only at the hearing did she admit she had only narrowly avoided academic probation

after her first semester at the University. Meaning, she had been near or on probation due to poor grades 2 of 3 semesters of her enrollment.

2. Complainant's medical records. Complainant's statement and testimony was wildly inconsistent.

    a. The only records provided, were provided *by* Complainant, not obtained by the investigator, and were incomplete records for a visit to UHS just hours after the alleged incident. Complainant attributed heavy bleeding to Plaintiff's alleged digital penetration of her. Yet the limited records demonstrate she had irregular menstruation to account for a heavier period at the time. Further, the records demonstrated Complainant had a normal breast examination, an abdominal exam, and a vaginal examination and that the practitioner had not noted *any* bruising or markings of any kind on her body.

    b. Plaintiff also requested the University obtain

Complainant's mental health records, as she had alleged it was the psychological trauma of the incident that caused her continued suffering and academic struggles. Mike Smith requested a copy of her medical and mental health records, which was refused. Complainant did not deny having mental health records.

3. Plaintiff was told the University would not obtain and would not compel Complainant to provide the above evidence or witnesses. The University told Plaintiff it was a voluntary process and Complainant only had to provide what she wanted to provide. Plaintiff was prevented from obtaining and providing evidence to support his defense to Complainant's allegations, and the investigators refused to gather the information – as was required by its own policy.

iii. Mr. Maiden accepted feedback until July 28, 2025. On July 29, 2025, he asked "three clarification questions" of Plaintiff and required responses to those questions be provided by August 1st. Plaintiff had less than three days to provide additional

information, when Complainant had since April 9th.

iv.  Mr. Maiden sent the PIR on August 14, 2025. He permitted "up to ten (10) pages of feedback." Plaintiff did not need ten written pages of commentary in response, he needed the records previously requested and witnesses interviewed.

v.  Plaintiff again requested additional investigation and questions to include:

   1.  Complete text messages between the parties.

   2.  The *actual* photographs allegedly taken by Complainant.

   3.  Complainant's transcript to address whether her grades were impacted, or had simply remained poor.

   4.  Mental health records, in light of her allegations.

   5.  Emails from Complainant to the University's ECRT's office, particularly those beginning in December 2024 through February 14, 2025.

   6.  Plaintiff requested the University provide the specific sections of the University's sexual and gender-based misconduct policy that he had allegedly violated, instead of the vague accusation he had violated "the

policy."

7. The University's only response was to request (not require) Complainant provide additional text messages. The University did not conduct any additional investigation, and it refused to obtain and provide the records and information requested by Plaintiff.

vi. Pre-Hearing Meeting. "Occurs approximately 1-2 weeks after final report completion. Complainant and Respondent meet separately with ECRT staff member and Hearing Officer to discuss the final report, logistics of the hearing, and remainder of the process."

vii. Hearing. The Hearing Officer and each party's advisor may ask questions of Complainant, Respondent, and/or witnesses. Complainants and Respondents never speak directly to one another."

i. The hearing did not take place until September 30, 2025. More delays caused by the University and its poor staffing.

viii. Hearing Outcome. "Communicated simultaneously to Complainant and Respondent within ideally within [sic] 30 days of the hearing."

i. A decision was not provided until November 4, 2025. Five

weeks after the hearing, well beyond 30 days.

ii. The Office of Student Conflict Resolution ("OSCR") did not issue its sanctions until November 13, 2025.

iii. The University's policy does not provide for a split timeline. This was yet another attempt for the University to avoid following its own policies.

iv. The sanction was a two-year suspension of Plaintiff from the University. OSCR Associate Director Michael Ryan imposed this severe sanction without any regard for the factors it was supposed to be based on, including: protection of the University Community, prior misconduct by [Plaintiff] prior to and while attending the University, maintenance of a safe and respectful environment, and preventing the same behavior from recurrence. In fact, Ryan only considered three. Plaintiff had no history of misconduct at any point in his life prior to or at the University. Complainant admitted she had never felt unsafe at any point following the alleged incident. Complainant had achieved a "black belt" and taught self-defense classes. Upon being asked, all of Complainant's roommates stated they were not afraid of Plaintiff. And

following Complainant's unhinged behavior, culminating in her 12:00 a.m. text message tirade, there had been no direct contact between Plaintiff and Complainant, even through the date of the sanction decision.

ix.  Appeal. "Either party may (but is not required to) submit an appeal within 14 calendar days of receipt of Hearing Outcome. Non-appealing party has 14 business days to respond. External reviewer makes determination, to be approved by Vice President of Student Life."

   i.  Plaintiff appealed the finding that he had violated the Policy and the sanctions imposed.

   ii.  In her response to Plaintiff's appeal, Complainant submitted new evidence which was readily available during the investigation but never provided to the Respondent.  Namely, an email sent to the complainant from DPSS that indicates they were aware of her allegation and advising her of services and options available to her.

   iii.  Defendant objected to the submission of new evidence and requested the University alert the External Reviewer that the evidence was to be excluded.

31

iv. Elizabeth Seney who wrote "rest assured the external reviewer is aware this is new evidence."

v. Plaintiff was correct to be concerned, the External Reviewer relied on "a screen shot of the email she received from the DPSS outreach . . ." (new evidence) to conclude "thus appears that ECRT notified DPSS of the allegations in the complaint."

vi. Plaintiff submitted new photos taken in November that clearly show the sun shining on the opposite wall and proving that the submitted photos by the complainant were taken in April/May. The external reviewer should have recognized the new photos as new evidence rather than dismissing them as already considered.

vii. The External Reviewer dismissed new evidence submitted by Plaintiff and accepted and relied on new evidence submitted by Complainant. Once again, preferential treatment for Complainant which hindered Plaintiff's ability to defend himself.

viii. By disregarding Plaintiff's new evidence but allowing the Complainant to submit new evidence in her response to the appeal (which was impermissible and in violation of the

Policy), Plaintiff was unfairly prejudiced.

ix.  The appeal decision was largely a rubber stamping of the University's decisions. The reviewer did not take note of the timing issues (the violation of the time-standards, the length of time Complainant could seek and provide input, the lack of time provided to Plaintiff, or the incorrect order in which the University conducted interviews). The reviewer also criticized and penalized Plaintiff for failing to produce and/or address evidentiary issues until July 2024, but he was not permitted to obtain or participate in his defense until June 20, 2024. Finally, the reviewer dismissed the impact of the delay on Plaintiff's recollection of events as being true for Complainant, finding "Complainant's version of events remained consistent, as did her roommates' accounts of what they observed length of time of the investigation," which entirely disregards the actual timeline of events.

x.  The reviewer did find that the two-year suspension was "inappropriate and out of proportion to the circumstances of the violation." He reduced the suspension to one year.

xi.  This opinion was issued and sent on January 26, 2026.

xii. Pursuant to the University's Policy, the External Reviewer sends the decision directly to the Vice President of Student Life. The Vice President then has 72 hours from the sending time to modify the decision before it becomes final. Failure to object results in the Decision being confirmed. The University's response was due on January 29, 2026.

xiii. Laura Jones (VPSL) performed the "Appeal Review" on February 13, 2026. In it, she disagreed with the Appeal Decision and returned the sanction to a two-year suspension. Ms. Jones' signature and written decision was not dated. On February 18th Plaintiff was unenrolled from classes and cut off from any University networks/accounts without warning.

xiv. Plaintiff sought to have the Appeal Review waived, pursuant to the University's own policy, and was told the 72 hour requirement "refers to the time period between the ECRT sending the External Reviewers appeal outcome to the VPSL or designee, and the VPSL or designee returning their determination to ECRT."

xv. In other words, the University Office of ECRT can take as long as it wants to send the External Reviewer's appeal to the

University's VPSL. According to this absurd explanation, the ECRT office could hold on to the appeal indefinitely before sending it to *another* University department/employee for review, and as long as that employee returns it to ECRT within 72 hours, the University could again hold on to the response indefinitely, because the only timeline that matters is the length it was *actually physically with* VPSL. This interpretation renders any timeline useless.

78.     The University's failure to follow its own policies deprived Plaintiff of the due process of law.

79.     Plaintiff was prevented from obtaining or presenting any evidence the Complainant did not want to provide.

80.     The University interviewed Complainant and her witnesses much sooner than Plaintiff and his witnesses, and Complainant and her witnesses were interviewed within days of each other. The University then found Complainant and her witnesses as more credible because of the accuracy of their testimony. However, the University failed to consider the ample time given to Complainant's witnesses to align their stories. The Hearing Officer acknowledged this fact but dismissed it only because they all discussed the possibility of a hickey. These statements were taken

at face value and out of context. The University's failure to follow its own policies provided Complainant a strategic advantage and then rewarded Complainant for that advantage. Conversely, the University tied Plaintiff's hands and penalized him by finding him less credible.

81.     The University also overlooked evidence that demonstrated Complainant was not being truthful.

    i.   Text Messages:

        i.  Complainant initially provided text messages between herself and Plaintiff. When Complainant was asked to verify the complete text messages, it was revealed she had provided text messages from September 22, 2024 to September 28, 2024 and then October 6, 2024 to October 18, 2024.

       ii.  When asked for the additional text messages, it demonstrated she had omitted text messages between the parties in the middle of the messaging (specifically on September 28th and September 29th). She had failed to include messages from August 29, 2024 through September 22, 2024. And she had failed to include text messages from October 18 to October 21, 2024.

      iii.  The content of the messages she omitted contained her

acknowledgment of her inappropriate behavior and apologizing *and* acknowledging there had been a misunderstanding regarding what had transpired and not an assault, and indicating she still wanted to spend time with him if "thats still what you want!"

iv. The omitted text messages also demonstrated Complainant continued to pursue Plaintiff after he said he wanted space, and only truly became belligerent after her told he needed "a bit of time and space."

v. Plaintiff's request for time and space was met with a written attack at 12:16 a.m., the timing and content of which suggested being under the influence of drugs and/or alcohol.

vi. The University gave no weight to Complainant's blatant omission of these text messages which supported Complainant being the aggressor and supported a theory that Complainant only made her allegations after she realized Plaintiff did not want to be her boyfriend. This is particularly glaring when the University directly told Plaintiff that Complainant could only provide evidence voluntarily. There was no consideration given to what she was withholding,

despite clear evidence of her shaping the evidence to fit her narrative.

vii. Beyond the withheld content, there were significant discrepancies in the time-stamps for the messages produced initially and then later. For example:

1. "if you were to live in any time period what time period would you live in" is time-stamped October 16 at 11:45 AM in the first set, and October 15 at 11:45 PM in the second set.

2. In the first set, Plaintiff allegedly responded on October 18 at 8:21 AM. In the second set, he responded on October 17 at 8:21 PM.

3. In one set, they exchanged messages on October 15th and 17th. On the other, it was October 16th and 18th.

viii. In other words, Complainant first provided cherry-picked text messages to support her own narrative. When asked for a complete submission she provided those that demonstrated she had manipulated the evidence. And even those text messages had significant irregularities.

ix. The withheld messages also demonstrated Plaintiff had been

telling the truth regarding Complainant being the aggressor in their interactions, that Complainant behaved erratically in their interactions and her interactions with others, that Complainant herself acknowledged her "crazy" behavior, that Complainant continued to pursue Plaintiff after the alleged incident, and that Complainant only cut off contact after Plaintiff asked for space. In short, Complainant withheld the messages that demonstrated Plaintiff was credible in his testimony, and the University permitted her to do so, and did not take issue with her credibility despite these manipulations.

ii.  Medical Records and Testimony

   i.  Complainant alleged that Plaintiff's "digital penetration" caused her to bleed heavily.

   ii.  This allegation was demonstrably false based on Complainant's text messages, what she told the care provider at UHS, and basic gynecological knowledge.

   iii.  Complainant's text messages to Plaintiff in late August demonstrated she had an irregular cycle and suffered from significant menstrual cramps. The same text messages that

were initially withheld. "hey my period cramps are really bad rn so i don't think ill be able to go to insomnia but we could go another time soon". (Aug 31, 2024 at 12:19 AM)

iv.  She reported to UHS she had not had a menstrual cycle from March through July, once in August, and not since. She also reported she had started her most recent period October 9, 2024. She reported she had heavy bleeding on October 9th (saturating a sanitary pad three times in one hour) before the alleged incident later that night, but attributed her heavy bleeding a day later to "digital penetration" and also expressed concern the bleeding she was experiencing was "due to a laceration."

v.  She reported to the University that she went to UHS because she was "bleeding excessively the same day [as the alleged incident], which was not normal for how much I would bleed during my period." Even the limited records she provided demonstrated that she had an irregular period and was experiencing heavy bleeding on October 9th and October 10th, before the alleged incident.

vi.  Complainant denied any history of sexual assault and

physical abuse. She denied any history of sexual activity. One day after allegedly being digitally penetrated without consent causing significant unexplained bleeding.

vii. Complainant had a full exam, including a breast and pelvic examination. The treatment notes indicated:

1. Skin: no rash, itching, or bruising.

2. Breast: Neg breast lumps.

3. Abdominal: Soft and non-tender.

4. Her blood pressure was taken with her in the seated position.

5. A pelvic exam was normal. "No cuts or vaginal lacerations. Blood in vaginal vault with no signs of lacerations . . . no gross lesions."

viii. The clinician determined her bleeding was "normal cycle bleeding."

iii. Medical Records Contradicts Complainant's "bruise" photographs

i. Complainant alleged the photographs she provided were taken on October 10th (approx. 2:00 a.m.) and October 11th (approx. 8:43 a.m.) a mere two hours before the UHS exam. The photos show dark markings beginning under

41

Complainant's eye, on her cheek and jawline, all over both sides of her neck (from her jaw to collarbone), on her collar bone, and all over her chest.

ii. Treatment records indicate Complainant was seen by the UHS clinician on October 11th at 11:04 a.m. and had a "chaperoned examination" at 11:20 a.m.

iii. As noted above, treatment notes specifically say there was no bruising or other documented skin markings.

iv. Complainant alleges she took the photographs she presented as evidence of a nonconsensual sexual encounter *two hours* before she had a full gynecological examination, where the clinician examined her breasts, abdomen, and performed a full pelvic examination, but did not notice large bruises all over her face, neck, and chest.

v. In fact, the medical records document she had *no* bruises or lacerations. Complainant's testimony requires a medical clinician to have falsified her medical records. And, the chaperone failing to observe or report significant signs of trauma.

vi. The University was provided these limited records by

Complainant and despite significant discrepancies *and* Plaintiff's continued pleas to interview this medical practitioner in its employ, refused to permit any investigation.

### COUNT I

42 U.S.C. § 1983—Fourteenth Amendment
Procedural Due Process
***Property and Liberty Interests***

82.    Plaintiff repeats and realleges all foregoing paragraphs as if they were set forth fully herein.

83.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

84.    It is uncontested that Plaintiff has a property interest in his education and that he cannot be deprived of that interest without due process. *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 396 (6th Cir. 2017).

85.    The Due Process Clause of the United States Constitution guarantees fundamental fairness to state university students facing exclusion from the educational process based on discipline. A student must be provided with notice and an opportunity to be heard. *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633-34 (6th Cir. 2017).

86.    Fourteenth Amendment due process protections are required in higher education disciplinary decisions at public institutions.

87.    Plaintiff was entitled to notice and a meaningful opportunity to be heard, including a hearing and cross-examination, once a complaint was filed against him, and prior to the deprivation of his property interest in his education. He has been deprived of due process protections and is now potentially subject to expulsion.

88.    Plaintiff has a protected liberty interest in his good name, reputation, honor, and integrity which he cannot be deprived of by the state absent due process.

89.    Plaintiff has a protected liberty interest in pursuing his education at a public university, which the state cannot deprive him of absent due process.

90.    Plaintiff also has a protected liberty interest in his future educational and employment opportunities, which the state cannot deprive him of absent due process.

91.    Plaintiff is entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. Here the allegations are of the utmost seriousness, have lifelong ramifications, and are quasi-criminal in nature.

92.    Plaintiff has a significant interest in avoiding an adverse decision

against him based on a denial of due process protection.

93.    Defendants know that Plaintiff has a clearly established right to due process protections, and a reasonable person would know that failing to apply those standards of review would violate Plaintiff's due process rights.

94.    Defendants intentionally refused to provide Plaintiff with the required due process protections.

95.    Defendants refuse to provide any student accused of a violation of the Sexual Misconduct Policy with the required due process protections.

96.    Plaintiff was not given notice of the charges against him sufficient for him to be able to defend himself. Plaintiff specifically *requested* notice of the specific charges and the University *refused*.

97.    Plaintiff was prevented from investigating and defending the allegations against him by the University's failure to interview him until one month prior to the closing of the investigation, and providing Complainant three and a half months of additional investigation. The Policy does not permit participation in providing evidence until the interview.

98.    The University's failure to maintain adequate staff investigators denied Plaintiff due process.

99.    The University's delays, caused by its inability to maintain adequate staff, truncated Plaintiff's timeline and opportunity to obtain evidence

for his defense.

100.   The University's inability to maintain adequate staff, prevented the investigators from dedicating the time necessary to obtain additional records, interview Complainant's UHS practitioner, or otherwise complete any of the investigation requested by Plaintiff. This was in violation of the University's policies, and prejudiced Plaintiff in his defense of these serious allegations.

101.   The University's Policy that permits Complainants to maintain accusations of sexual misconduct, without permitting the accused to obtain documents, records, and testimony that would test the veracity of those accusations, deprives the accused of the ability to defend against the accusations.

102.   The University's Policy does not require Complainants to prove the allegations made, it requires the accused to prove the allegations did not occur.

103.   Providing a due process protection imposes no administrative burden on the University. It offers full due process to all students not accused of sexual misconduct.

104.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has and will suffer irreparable harm, injury, and damages, including but not limited to inability to complete his Bachelor's and Master's degrees, and a permanent record of misconduct; mental and emotional distress; humiliation

and embarrassment; and  loss of personal and professional reputation.

## RELIEF REQUESTED

Plaintiff demands judgment against Defendants as follows:

**A.    Equitable Relief:**

    1.    An injunction from this Court halting the investigation and decision-making process with regard to the OIE complaint against Plaintiff because the process is unconstitutional and deprives Plaintiff of due process;

    2.    An injunction from this Court prohibiting all Defendants from further use of the Sexual Misconduct Policy as to any student because it is unconstitutional and is a deprivation of due  process rights;

    3.    A ruling that, as a matter of law, Plaintiff's due process rights  were violated.

    4.    An award of interest, costs and reasonable attorney fees; and,

    5.    Whatever other equitable relief appears appropriate at the time of final judgment.  of final judgment.

**B.    Legal Relief**

    1.    Compensatory damages in whatever amount  Plaintiff is found to be entitled;

    2.    Exemplary damages in whatever amount he is found to be  entitled;

    3.    Punitive damages in whatever amount he is found to be  entitled; and,

4.      An award of interest, costs, reasonable attorney fees, and
        expert witness fees.


Dated:  March 6, 2026                          Respectfully submitted,

                                          By: */s/ Maura B. Battersby*
                                                Maura B. Battersby (P79089)
                                                FLOOD LAW, PLLC
                                                Attorneys for Plaintiff
                                                155 W. Congress, Suite 350
                                                Detroit, MI 48226
                                                (248) 547-1032
                                                mbattersby@floodlaw.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOHN DOE, *an individual*,

     Plaintiff,

vs.

**UNIVERSITY OF MICHIGAN** (as to
Title IX violations), **BOARD OF
REGENTS OF THE UNIVERSITY OF
MICHIGAN**, *a constitutional
corporate body* (as to Title IX &
ELCRA violations), **ELIZABETH
SENEY**, **TAMIKO STRICKMAN,
LAURIE MCCAULEY**, **ERIK WESSEL**,
**LAURA BLAKE JONES, MARTINO
HARMON, CONOR CAPLIS,
MICHAEL MAIDEN, MAUREEN
MUYSENBURG, JEFFREY LANGE,
MICHAEL RYANS** and **PAUL
ROBINSON**, *employees of the
University of Michigan, sued in his or
her personal and official capacities,
jointly and severally*,

     Defendants.

Case No.
Hon.
Mag.

---

Maura B. Battersby (P79089)
FLOOD LAW, PLLC
Attorneys for Plaintiff
155 W. Congress, Suite 350
Detroit, MI 48226
(248) 547-1032
mbattersby@floodlaw.com

---

## **JURY DEMAND**

Plaintiff JOHN DOE, by and through its attorneys at FLOOD LAW, PLLC, hereby demand for trial by jury.

Dated: March 6, 2026                              Respectfully submitted,

                                        By: */s/ Maura B. Battersby*
                                            Maura B. Battersby (P79089)
                                            FLOOD LAW, PLLC
                                            Attorneys for Plaintiff
                                            155 W. Congress, Suite 350
                                            Detroit, MI 48226
                                            (248) 547-1032
                                            mbattersby@floodlaw.com