## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN DOE, *an individual*,

    Plaintiff,

vs.

**UNIVERSITY OF MICHIGAN** (as to Title IX violations), **BOARD OF REGENTS OF THE UNIVERSITY OF MICHIGAN**, *a constitutional corporate body* (as to Title IX & ELCRA violations), **ELIZABETH SENEY, TAMIKO STRICKMAN, LAURIE MCCAULEY, ERIK WESSEL, LAURA BLAKE JONES, MARTINO HARMON, CONOR CAPLIS, MICHAEL MAIDEN, MAUREEN MUYSENBURG, JEFFREY LANGE, MICHAEL RYANS** and **PAUL ROBINSON**, *employees of the University of Michigan, sued in his or her personal and official capacities, jointly and severally*,

    Defendants.

Case No. 26-10768-MFL-APP
District Judge Terrence G. Berg
Magistrate Judge Kimberly G. Altman

---

### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

NOW COMES, Plaintiff John Doe ("Plaintiff"), by and through his attorneys,

Flood Law PLLC, and for his Motion for Preliminary Injunction states as follows:

    1.    Plaintiff hereby moves this Court for a preliminary injunction pursuant

to the authority of Fed. R. Civ. P. 65(a), immediately enjoining Defendant Regents of the University of Michigan from depriving Plaintiff of his education by allowing Plaintiff to rejoin his scheduled classes in order to completed his Bachelors of Business Administration, which he is set to finish in May of this year, 2026.

2.     The factual and legal arguments in Plaintiff's Brief in Support of His Motion for Preliminary Injunction ("Brief in Support"), which is filed contemporaneously herein, are incorporated herein as if they were fully restated.

3.     As more fully stated in Plaintiff's Brief in Support, Plaintiff has a strong likelihood prevailing on the merits of his claims against Defendant for its violations of Plaintiff's Due Process Rights.

4.     Unless Defendant is restrained or enjoined by order of this Court, Plaintiff will suffer immediate and irreparable injury, loss, and damages, as set forth more fully in the Brief in Support.

5.     The granting of injunctive relief will not cause greater harm to the Defendant than to Plaintiff.

6.     It is in the public interest to enjoin Defendant from continuing to violate fundamental Due Process norms.

7.     Plaintiff sought concurrence from Defendants, which included conferences discussing the details and support of the relief sought, in compliance with Local Rule 7.1(a)(1), and Local Rule 7.1(a)(2)(A). Defendants did not concur

2

in Plaintiff's Motion.

WHEREFORE, this Court should enter a preliminary injunction immediately allowing Plaintiff to return to his classes at the University of Michigan Ross School of Business so that he may graduate with his B.B.A. in May of this year 2026; allow Plaintiff to continue his pursuit of his Masters of Business Administration, set to be completed in May of 2027; and set aside Defendant's decision to suspend Plaintiff as a result of a multitude of Due Process violations.

Dated: March 20, 2026          Respectfully submitted,

By: */s/ Maura B. Battersby*
    Maura B. Battersby (P79089)
    FLOOD LAW, PLLC
    Attorneys for John Doe
    155 W. Congress, Suite 350
    Detroit, MI 48226
    (248) 547-1032
    mbattersby@floodlaw.com

## PLAINTIFF'S BRIEF IN SUPPORT OF HIS MOTION FOR PRELIMINARY INJUNCTION

### STATEMENT OF ISSUES PRESENTED

Plaintiff, John Doe (hereinafter "Plaintiff"), was enrolled in the Bachelor of Business Administration program in the Ross School of Business at the University of Michigan until February 19, 2026. He was to graduate in May 2026. Plaintiff was simultaneously working towards his Masters of Business Administration (completion May 2027). A fellow student filed a Formal Complaint against Plaintiff with the Equity, Civil Rights & Title IX ("ECRT") Office.

The University, and its employees, neglected to follow its own policy in conducting an investigation including violation of time standards, refusing to investigate and/or obtain corroborating evidence, and truncating Plaintiff's time to investigate and prepare a defense, while allowing Complainant three times as long to prepare, permitting Complainant's refusal to provide requested information/evidence. Further, the University failed to object to the External Reviewer's recommendation of a reduction in sanction within 72 hours. Instead, the University waited six weeks yet maintains its right to object was not waived after 72 hours, in contradiction to its own policy.

The University's investigation was in name-only. Its failure in procedure denied Plaintiff his Due Process rights.

4

**Controlling Authority for Relief Sought:**

Fed. R. Civ. P. 65(a)

*Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017)

*PACCAR Inc. v. Telesca Techs., L.L.C.*, 319 F.3d 243 (6th Cir. 2003)

*Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015)

*Jones v. City of Monroe*, 341 F.3d 474 (6th Cir. 2003)

*Certified Restoration Dry Cleaning v. Tenke Corp.*, 511 F.3d 535 (6th Cir. 2007)

*Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310 (6th Cir. 1998)

*Abney v. Amgen, Inc.*, 443 F.3d 549 (6th Cir. 2006)

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566 (6th Cir. 2002)

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012)

*Connection Distrib. Co. v. Reno*, 154 F.3d 281(6th Cir. 1998)

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1994)

*AT&T Co. v. Winback & Conserve Program*, 42 F.3d 1421 (3d Cir. 1994)

*Hillside Prods. Inc. v. Duchane*, 249 F. Supp. 2d 880 (E.D. Mich. 2003)

*Conn v. Bd. of Ed. of the City of Detroit*, 586 F. Supp. 2d 852 (E.D. Mich. 2008)

5

**INTRODUCTION**

Plaintiff was notified that a Formal Complaint had been filed against him with the Equity, Civil Rights & Title IX ("ECRT") Office on February 24, 2025, regarding an incident that allegedly occurred with a fellow student, off-campus, on October 10, 2024. Plaintiff was provided information on the process, which included the University's assurances that any proceedings, including appeals, would be concluded within 180 days. What followed was a series of delays by the ECRT Office and evidenced lack of diligence in the investigation. By the time the University completed its "investigation," it had been 366 days since the Complaint was filed which is 186 days longer than the maximum investigation length permitted by University Policy, and 497 days since the alleged incident occurred.

The University's "investigation" was in name only. Multiple investigators let the matter stagnate, and after a delay of 366 days suspended Plaintiff from the University, just eight weeks shy of graduation. The University's handling of this matter did not comply with its own policies. In doing so, it deprived Plaintiff of his Due Process rights.

Throughout the course of the investigation, Conor Caplis and Michael Maiden prevented Plaintiff from obtaining crucial evidence necessary to defend himself, delayed important dates, and failed to establish any credibility in the Complainant. Instead, these investigators overlooked glaring inconsistencies and conflicting

6

testimonies. The Sixth Circuit Court of Appeals has addressed this very issue and has made it clear that where credibility of the parties is at stake, cross examination is required:

> The Due Process Clause guarantees fundamental fairness to state university students facing long-term exclusion from the educational process. Here, the University's disciplinary committee necessarily made a credibility determination in finding John Doe responsible for sexually assaulting Jane Roe given the exclusively "he said/she said" nature of the case. Defendants' failure to provide any form of confrontation of the accuser made the proceeding against John Doe fundamentally unfair.

*Doe v. Univ. of Cincinnati*, 872 F.3d 393, 396 (6th Cir. 2017).

Despite this clear, and binding, precedent, the University of Michigan and its Board of Regents has deemed Plaintiff is not entitled to constitutional protections, despite the "he said/she said" nature of the allegation.

The Due Process Clause guarantees fundamental fairness to state university students facing long-term exclusion from the educational process. In matters involving "he said/she said" scenarios, credibility of each is at issue. This matter was decided on a credibility determination without any effort to verify the allegations made against Plaintiff, and while preventing Plaintiff from obtaining and presenting evidence to challenge the allegations. Plaintiff was disciplined without due process. This is clearly unconstitutional. As a result, Plaintiff has been forced out of school a mere 8 weeks from graduation. Plaintiff has worked immeasurably hard to obtain his Bachelors degree and his Masters degree, only for such accomplishments to be

7

ripped away by a lengthy botched investigation.

## STATEMENT OF FACTS

In August of 2022, Plaintiff enrolled at the University of Michigan as an undergraduate student. As of February 2026, he was on track to complete and graduate with a Bachelors Degree in Business Administration in April of this year, 2026. Plaintiff was working towards a Masters degree during this time, also for Business Administration, which he was granted a $10,000 scholarship for. However, these plans were derailed by a false allegation and a lengthy and poor investigation which resulted in a 2-year suspension a mere 8 weeks before he is set to graduate.

On February 18, 2025, a complaint was filed against Plaintiff with the Equity, Civil Rights, and Title XI ("ECRT") office by a female student ("Complainant"). The complaint alleged a non-consensual encounter between Complainant and Plaintiff occurred four months prior on October 10, 2024, at Complainants apartment. There were no other witnesses to the counter. Despite Complainants allegation of a non-consensual encounter, Complainant admitted and confirmed the kissing shared between Plaintiff and Complainant was consensual.

Previously, Plaintiff and Complainant met at the pool in the apartment complex they both lived in. The day they met, Complainant asked Plaintiff if he liked her and if he wanted to be Complainant's boyfriend. Plaintiff responded that was "a lot to ask really fast," which deeply upset Complainant. Plaintiff and Complainant

did not speak for several weeks.

Later, in September 2024, Complainant sought out Plaintiff in Plaintiff's apartment, where Complainant kissed Plaintiff and admitted the kiss was consensual on her end. However, Complainant did not ask for Plaintiff's consent to kiss him.

A few days later, Plaintiff went to Complainant's apartment. They were on the couch in the living room area. Complainant put her hands up Plaintiff's shirt. Complainant then put her hand on his genitals from outside of his pants. Complainant then rubbed her hand on Plaintiff's genitals to stimulate orgasm for approximately 1-2 minutes. Complainant then began to grind her body on Plaintiff's body and kiss Plaintiff.  Plaintiff asked Complainant to stop grinding on him because he did not "want to go that far that fast." Complainant stopped.

On October 10, 2024, the reported incident allegedly occurred. Complainant invited Plaintiff over to her apartment, where she was happy to see Plaintiff. She led him to her bedroom and proceeded to close the door. Complainant placed her hands on the back of Plaintiff's neck, pulled his head down towards her, and kissed him. Once again, Complainant did not ask Plaintiff for his consent to kiss her. From their Complainant continued to kiss Plaintiff and happily encouraged Plaintiff to remove his shirt. This made Plaintiff rather uncomfortable, but he removed it. As they continued kissing, Plaintiff placed his hands on the small of Complainants back, underneath her shirt. Complainant expressed that action made her uncomfortable, so

9

Plaintiff immediately removed his hands. Complainant stated she did not want to have sex with Plaintiff, which Plaintiff responded he "wasn't planning on it" either. Complainant pulled Plaintiff onto her bed and commented, again, that she wanted a relationship with Plaintiff. Plaintiff was to study aboard the next semester and wasn't ready to commit to a relationship. Complainant's continued insistence left Plaintiff uncomfortable and he attempted to leave the bedroom. Complainant asked Plaintiff several times to stay the night, even after Plaintiff said no. Plaintiff told Complainant he wanted to "take time and think through things." Plaintiff left the room and as he was exiting the apartment, Complainant once again asked him to stay. Plaintiff, still feeling pressure, said no and left.

After that day, Complainant showed up to Plaintiff's apartment on several occasions. She would cover the keyhole to ensure neither Plaintiff nor his roommates could see who was at the door. Complainant continued to text Plaintiff, requesting he go out the bars with her, asking random questions such as what time period Plaintiff would live in, and finally, requesting to talk. Complainant entered Plaintiff's apartment several times uninvited. During on of those instances, insinuated Plaintiff had done things she was not okay with, despite knowing this was false.

On October 18, 2024 when Plaintiff and Complainant did finally talk, Complainant yelled at him and once again insinuated he touched her genital area and

10

gave ger a UTI. Plaintiff knew that to be untrue as he never touched her anywhere near that private area. Plaintiff had to remind Complainant of that fact. Complainant apologized.

On October 20, 2024, Plaintiff texted Complainant asking for space and time before doing anything major. Complainant disliked the message and sent a lengthy and erratic response. Plaintiff did not have contact with Complainant from that day forward. After these events occurred, Plaintiff commuted roughly one (1) hour each way to avoid interaction with Complainant.

Complainant had first made an online inquiry on December 13, 2024 with ECRT. She set up a meeting for December 16, 2024. Complainant canceled the meeting and confirmed she did not want to file a report. On December 20, 2024, ECRT sent a letter confirming the matter was closed. Complainant later changed her mind and filed a report on February 18, 2025. Upon notification of the complaint, 6 days after it was filed, Plaintiff requested a mutual no contact order for his own protection.

Once a complaint is filed with the ECRT, University Policy indicates a 180-day investigation. Ex. 2. Plaintiff's investigation lasted 366 days, which is 186 days beyond the 180-day time frame. During the investigation, the investigators continuously delayed their evidence collection and patently ignored the blatant inconsistencies that came to light. Complainant was not interviewed until two

11

months after her complaint. Furthermore, Plaintiff was not notified of the complaint against him until nearly a week later, despite university policy requiring immediate notification to a Respondent.

Furthermore, the ECRT did not interview Complainants witnesses for nearly 3 months after the formal complaint was filed. Tamia was interviewed May 23, 2025, Carly was interviewed May 28, 2025, and Olivia was interviewed May 28, 2025. This delay allowed these three witnesses nearly 3 months to align their stories. This fact was overlooked by the Hearing Officer. All three witnesses brought up seeking hickeys and other marks on Complainants body, however, the location differed with each witness, hardly any testimony is consistent across the board. Because Complainant's witnesses were interviewed *before* Plaintiff, those witnesses were unable to be cross-examined about Plaintiff's recollection of events. Thus, their interviews are skewed in favor of Complainant and depraves Plaintiff of his constitutional right to due process.

Continuing the pattern of delays, Plaintiff was not interviewed until June, 20, 2025, notably after the interview of Complainants witnesses. This delay permitted Complainant an ***additional 72 days to gather and provide evidence*** to the investigator. Respondent's ability to gather evidence and participation was held back an additional 72 days. The University attempted to justify this delay by claiming the delay was due to Plaintiff's work schedule, this is patently untrue. Plaintiff

12

continuously tried to get into contact with the investigator via email, work phone, and cell phone but Conor Caplis was unresponsive. It was not until Plaintiff filed for dismissal that the University responded. ECRT informed Plaintiff and Complainant that Ms. Caplis had left her position and a "new" investigator was appointed – Michael Maiden. This was another misrepresentation of the events. Mr. Maiden had been assigned this matter from the beginning.

The Complainant made claims regarding vaginal bleeding that were not reflected in her medical records. The Complainant alleged to have bruises on her neck and chest following the alleged incident. Yet, the examination notes by the UHS physician, who provided a full gynecological examination, *including* breast examination, failed to note any markings or bruises, despite Complainant reporting concern about vaginal trauma. The Complainant testified she never removed her shirt during that examination, as an explanation for the lack of documentation of the bruises by UHS. This explanation was accepted despite it relying on the UHS physician to have falsified the examination records, a felony.

The University noted that it gave more weight to Complainant's version of events because her testimony had stayed the most consistent, despite the fact Plaintiff's version of events remained consistent. Furthermore, the Hearing Officer overlooked the inconsistencies in Complainant's interview and her witnesses' interviews. In Complainant's interview, she claimed Tamia knocked on her door,

13

Complainant told her to wait a second before coming in. Tamia then entered the room, asked "why are your pants off?," grabbed her water bottle and left. In Tamia's interview, she stated she knocked, Complainant told her to come in, and when she opened the door Complainant screamed at her to close the door and leave. Tamia claims she briefly saw Complainants pants off but did not ask Complainant anything or say anything to her. In Carly's initial statement, it was not Tamia who knocked on the door, rather it was Olivia who knocked. Olivia allegedly opened the door, heard Complainant shriek and promptly shut it. However, in Carly's final statement she suddenly changes her mind and states it really was Tamia who knocked, not Olivia. Finally, in Olivia's statement she claims Tamia knocked and *might* have opened the door. As for what Tamia/Olivia actually saw, Tamia claims she saw Plaintiff and Complainant standing at the front part of the bedroom, but Carly says Tamia saw them laying on the bed and Complainant as half dressed. At the time of the interviews, none of the statements align with another, however, in the final investigation report suddenly all witnesses were on the same page. Despite these inconsistencies and switch-ups, the Hearing Officer concluded Complainant's witnesses were more credible than Plaintiff. It should be noted Plaintiff's interview was the only interview the University conducted on behalf of Plaintiff.

The ETRC office neglected to interview Plaintiff's roommate until months after Complainant's roommates, despite both of which being present when

14

Complainant pushed into Plaintiff's apartment uninvited. Additionally, the Hearing Office deemed Complainant's witness testimony more credible and accurate than Plaintiff and Plaintiff's witness for the simple fact that Complainant's witnesses were interview before Plaintiff's. The entire reason Complainant's witnesses were interview first was because the ETRC office failed, at every turn, to follow their own procedure. Instead of interviewing Complainant and Plaintiff first, they interviewed Complainant and Complainant's witnesses first, in April and May and then in June and July, interviewed Plaintiff and Plaintiff's roommate. At the pre-hearing conference, the Hearing Officer gave no weight to Plaintiff's witnesses and evidence for the sole reason they were brought to light after the final investigation report was issued. This finding by the Hearing Officer is a blatant favoring of Complainant and constitutes a lack of respect for the due process that should have been afforded to Plaintiff. The only reason for the delay in Plaintiff's witness interviews and evidence was because the University, again, caused unnecessary and harmful delay.

The issue to be determined here is whether the sexual encounter between Plaintiff and the Claimant was consensual. Because there are no witnesses to the encounter itself, the findings will be based on a credibility determination. The Due Process Clause of the United States Constitution guarantees fundamental fairness to state university students facing exclusion from the educational process based on discipline. A student must be provided with notice and an opportunity to be heard.

15

*Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633-34 (6th Cir. 2017). The Sixth Circuit has clearly established that where, as here, credibility is at stake, in that one party maintains that the sexual encounter was consensual and the other says it was not, a live hearing in front of the ultimate fact finder, with some form of cross-examination is required. *Doe v. Miami Univ.*, 882 F.3d 579, 600 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 396, 401-02 (6th Cir. 2017). Here, the determination of credibility was skewed, and Plaintiff was not afforded the ability to properly and adequately defend himself against Complainant's accusations. He was denied evidence which would have been helpful, subject to baseless delays, and stripped of his education.

## LEGAL ARGUMENT

When considering a motion for a preliminary injunction, courts must balance: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *PACCAR Inc. v. Telesca Techs., L.L.C.*, 319 F.3d 243, 249 (6th Cir. 2003).

"The four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met." *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003), abrogated on other grounds, *Anderson v. City of*

16

*Blue Ash*, 798 F.3d 338 (6th Cir. 2015). Although it is "generally useful for the district court to analyze all four of the preliminary injunction factors," *Certified Restoration Dry Cleaning v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (internal citation omitted), a court is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issues. *Jones*, 341 F.3d at 476 *(citing Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 312 (6th Cir. 1998) (affirming the district court's grant of a preliminary injunction because the plaintiff had demonstrated a substantial likelihood of success on the merits)). The weight a district court gives to each of the four factors and resulting decision to grant or deny preliminary injunctive relief is examined under the abuse of discretion standard. *PACCAR*, 319 F.3d at 249; *see also N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162, 166 (6th Cir. 1989) (noting that a "district judge's weighing and balancing of the equities should be disturbed on appeal only in the rarest of cases").

I.     *Plaintiff Has a Strong Likelihood of Success on the Merits.*

At every turn, the University and the ERTC failed to adhere to the policies it has put in place. On February 18, 2025, Complainant filed her official complaint. As per the University's policy, Complainant was to be interviewed by the ECRT before the filing of the complaint. Complainant should have been given three calendar days to review the statement summary and transcript. Complainant's interview did not

occur before the filing of the complaint, rather it took place on April 9, 2025, nearly two months after the complaint was filed. The University's justification for the delay was due to limited University Provided Advisor ("UPA") availably. Complainant requested a UPA on February 27, 2025. One was finally provided to her on April 7, 2025. Further, Complainant was not sent a copy of the interview transcript until May 12, 2025, and was given until May 18, 2025, to respond. The University policy clearly states a transcript and summary will be provided three days after the interview has taken place. It took the school 33 days to provide Complainant with the transcript.

Another instance of the ECRT failing to follow their own policy is seen in when they notified Plaintiff of the complaint against him. University policy requires a Respondent to be notified *immediately* on receipt of a formal complaint. The complaint was filed on February 18, 2025, but Plaintiff was not informed of this until February 24, 2025. Nearly a week had passed before Plaintiff was even made aware of the claim made against him.

Next, the ECRT must meet with the Respondent (here Plaintiff) so that Respondent may share information about their experience with the investigator and allow for the investigator to ask questions. A Respondent may only provide evidence at the interview or following the interview. Instead of interviewing Plaintiff shortly after Complainant, the ECRT waited an additional 72 days to interview him. Plaintiff

was interviewed on June 20, 2025. Respondent's ability to gather evidence and participation was held back an additional 72 days, whereas Complainant was able to gather and bring evidence as soon as April 9, 2025. Due to the delay, Plaintiff's ability to bring evidence was greatly depreciated, it gave Complainant a two-month head start. The University falsely claimed the delay was due to Plaintiff's work schedule. However, Plaintiff's representation diligently attempted contact with Conor Caplis via her work phone, cell phone, and email. Ms. Caplis was unresponsive. It was not until Plaintiff filed for a dismissal that anyone from ECRT responded. ECRT informed Plaintiff and Complainant that Ms. Caplis had left her position and a "new" investigator was appointed – Michael Maiden, however, Maiden has been assigned to this investigation since the start.

The next steps in the process, after Complainant and Respondent are interviewed, is witness interviews. The ECRT is to provide both parties with a preliminary report that includes all relevant information gathered by the investigators before the commencement of these interviews. The parties are to have 10 calendar days to respond and add any information and evidence. The investigator is to review the information provided by the parties and incorporate it into the questions for witness interviews. This did not happen. The Complainants witnesses were interviewed *before* the Plaintiff ever got the chance to give testimony and *after* Complainant's interview. As a result, the witnesses were only asked about

19

Complainants experience, not Plaintiff's.

In the same vein, the ECRT waited two months after Complainants initial interview to interview any of Plaintiff's witnesses. By that time, the alleged incident occurred in October 2024, Plaintiff's witnesses were not interviewed until June 2025. This damaged their credibility in the Hearing Officer's eyes. Due to the unjustified delays by the ECRT, Plaintiff's witnesses were not afforded the same grace and understanding as Complainant's witness.

On appeal, the Judge decided to suspend Plaintiff for one-year. The ECRT ignored that decision. The University police required the Appeal Judge to directly send the verdict to the ECRT, who then has 72 hours to review and modify. If they do not modify within that 72-hour window, the decision is final. The verdict was sent to the ECRT at 8 a.m. on February 2, 2023, which gives the ECRT until 8 a.m. on February 8, 2026, to modify. On February 13, 2026, five days after the modification deadline, the ECRT entered their modification. This is another instance of the University disregarding its own policies.

When looking at the totality of the ECRT's behavior, it is clear to see proper due process was not afforded. There was no cross examination of Complainant's witnesses, as required by the Sixth Circuit. *See Doe v. Univ. of Cincinnati*, 872 F.3d 393, 396 (6th Cir. 2017). Further, the University's refusal to obtain, compel Complainant to provide, or allow Plaintiff/Respondent to obtain evidence to test the

veracity of Complainant's testimony, prevented any meaningful cross-examination from taking place.

Moreover, the University's disregard of its own policy wrongly deprived Plaintiff of his due process, his education, and of his future. Accordingly, Plaintiff is likely to succeed on the merits of his due process claim with regard to his deprivation of his education a mere eight weeks before his is set to graduate.

II.     *Plaintiff Will Suffer Irreparable Harm without Injunctive Relief.*

Generally, to show irreparable harm, a plaintiff must show "[he] will suffer actual and imminent harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 549, 552 (6th Cir. 2006). Harm is irreparable if it cannot be fully compensated by monetary damages. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Furthermore, irritable injury is presumed when constitutional rights are threatened or impaired, as seen here. *Univ. of Cincinnati*, 872 F.3d at 407 (emphasis added) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012. See also, e.g., *Hillside Prods. Inc. v. Duchane*, 249 F. Supp. 2d 880, 900 (E.D. Mich. 2003) (where a plaintiff's procedural due process rights were likely violated, a finding of irreparable harm should follow as a matter of law); *Conn v. Bd. of Ed. of the City of Detroit*, 586 F. Supp. 2d 852, 865 (E.D. Mich. 2008) (holding that the loss of constitutional rights, even for minimal periods, unquestionably constitutes irreparable injury).

21

When a student is confronted with and subject to removal from a university, irreparable harm is demonstrated with ease. *See, e.g., Univ. of Cincinnati*, 872 F.3d at 407 (affirming the grant of a preliminary injunction enjoining the university from suspending the plaintiff where the proposed suspension would cause the plaintiff "reputational harm both on and off campus based on a finding rendered at an unfair hearing").

Defendants' conduct has both threatened and impaired Plaintiff's constitutionally protected property interest in his education and future employment and thus, this Court presumes irreparable injury. *Univ. of Cincinnati*, 872 F.3d at 407. By depriving Plaintiff of his ability to complete his degrees, both Bachelors and Masters, Defendant has caused irreparable harm. Moreover, this transgression will appear of Plaintiff's educational record forever. It will prevent him from being able to continue his school elsewhere and attending a different Bachelors and Masters program to finish his education. Plaintiff will be left with a mountain of debt for a degree the University deprived him of and no way of obtaining such a degree, or one of comparable value in the future.

Moreover, due to the nature of academic calendars, if Plaintiff is not permitted to continue his schooling, he is facing a lengthier suspension than the University has

imposed[1], even if he prevails in establishing he was denied Due Process.

### III. *The Injunctive Relief Sought Will Not Harm Any Individual.*

No party will be harmed by this Court granting Plaintiff the injunctive relief sought. Plaintiff is nearly completed the work required for the Bachelors degree, he only had eight weeks of undergraduate left. If Plaintiff were to return to the University to complete his Bachelors and Masters degrees, Plaintiff does not have to step on campus to complete his coursework, he can participate online and complete coursework remotely. Plaintiff does not live in the same apartment complex as Complainant, he has moved. The likelihood of interacting or even seeing Complainant in that environment is moot.

Additionally, Complainant and Plaintiff have two very different majors. Complainant is on academic probation for her Aerospace Engineering degree at the François-Xavier Building (FXB) on North Campus, whereas Plaintiff is getting a degree in Business Administration at the Ross School of Business in Central Campus. These two buildings are 2.8 miles apart and a 12-minute drive from each other. As a result, Plaintiff is unlikely to interfere with Complainant's right to education.

Additionally, Plaintiff and Complainant have successfully avoided each other

---

[1] Plaintiff must complete a 3 credit "Capstone," which is *only* offered in Winter Term (Plaintiff was enrolled in this until February 19, 2026). Capstone is offered in-person, at the Ross School of Business.

on Campus from the date of the mutual no-contact order through Plaintiff's February 18, 2026, suspension. The University was not concerned with the Complainant's comfort and alleged security while it was delaying its own process by more than double the time. Nothing has changed with respect to Plaintiff and the Complainant that would impact Campus safety.

Similarly, the University and Defendant will not be harmed. Defendants will likely argue it has an interest in instituting its disciplinary policy without hinderance, however, the University fails to recognize they have failed to adhere to their own policy at every turn. If the University and Defendant want to enforce their own disciplinary action without hinderance, the University needs to adhere to the guidelines they write.

## IV.   The Public Interest Would be Served by Granting the Requested Injunctive Relief.

The determination of where the public interest lies is dependent on a determination of the likelihood of success on the merits of the party's constitutional challenge because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). The public interest almost always favors the applicant for injunctive relief if the applicant demonstrates both a likelihood of success on the merits and irreparable injury. *AT&T Co. v. Winback & Conserve Program*, 42 F.3d

24

1421, 1427 n.8 (3d Cir. 1994).

In this case, Plaintiff has a strong likelihood of success on the merits, given all the misgivings of the ECRT. The ECRT denied him proper due process by failing to follow its own guidelines. The waited two months to interview Complainant and waited two months after that to interview Plaintiff. The ECRT interviewed Complainants roommates before interview Plaintiff, thus they were only questioned about Complainant's version of events, not Plaintiff's. Additionally, the ECRT waited so long to interview Plaintiff's roommate and his girlfriend, which caused the Hearing Officer to rule their testimonies automatically incredible due to the lapse of time.

Plaintiff was only allowed to begin gathering evidence *after* his interview, which was 72 days after Complainant. This gave him a significantly shorter period of time to bolster his own credibility, as compared to Complainant who got a two-month head start. In addition, the ECRT did not provide Plaintiff with any of the requested documents as Complainant did not have to submit them due to the "voluntary" nature of the process. This left Plaintiff unable to refute Complainant's inconsistencies and resulted in removal from the University.

Further, Plaintiff has shown that he will suffer irreparable harm to his education and career if the requested injunctive relief is not granted. Moreover, the public interest would be served by granting the relief sought because it is always in

25

the public's interest to prevent a violation of constitutional rights.

## RELIEF REQUESTED

Based upon the foregoing, Plaintiff respectfully requests that this Court immediately enjoin Defendant from:

(1)     Preventing Plaintiff from completing his B.B.A. by allowing Plaintiff to return to his scheduled classes for the rest of this semester; and

(2)     Withholding Plaintiff's B.B.A upon his set graduation.

Dated:  March 20, 2026                    Respectfully submitted,

By: */s/ Maura B. Battersby*
     Maura B. Battersby (P79089)
     FLOOD LAW, PLLC
     Attorneys for John Doe
     155 W. Congress, Suite 350
     Detroit, MI 48226
     (248) 547-1032
     mbattersby@floodlaw.com

**PROOF OF SERVICE**
The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on March 20, 2026.

By: ☐ Overnight Courier     ☐ Facsimile     ☐ E-mail
     ☐ Hand Delivered        ☐ U.S. Mail      ☒ E-file
     ☐ Certified Mail

Signature:  */s/ Rosemarie L. Watt*
                 Rosemarie L. Watt