UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **JOHN DOE,** | **2:26-CV-10768-TGB-KGA** |
| Plaintiff, | |
| vs. | **OPINION & ORDER DENYING MOTION FOR A PRELIMINARY INJUNCTION (ECF NO. 15)** |
| **UNIVERSITY OF MICHIGAN et al.,** | |
| Defendants. | |

Plaintiff John Doe has filed a motion seeking a preliminary injunction to undo his two-year suspension imposed by the University of Michigan (the "University") based on its finding that he committed sexual misconduct. ECF No. 15. Doe, who was a senior in business school before his suspension, brings this action pursuant to 42 U.S.C. § 1983 against the University and other named Defendants, alleging violations of his Fourteenth Amendment procedural due process rights. ECF No. 7. Defendants have responded to the Motion for a Preliminary Injunction. ECF No. 33. The Court held an evidentiary hearing on the matter on April 10, 2026 and April 13, 2026. For the following reasons, Plaintiff's motion is **DENIED**.

## I.     BACKGROUND

### A.     Factual Background

The following facts are set forth in the parties' briefing, as supplemented by evidence presented at the hearing on April 10, 2026 and April 13, 2026.

Plaintiff John Doe enrolled at the University of Michigan as an undergraduate student in August 2022. ECF No. 7, PageID.119. He was enrolled in the Bachelor of Business Administration program in the Ross School of Business at the University of Michigan and had expected to graduate in May 2026. *Id.* Plaintiff was simultaneously working toward his Master of Business Administration degree, which he originally expected to complete by May 2027. *Id.*

Pursuant to the outcome of the University's Title IX disciplinary process, Plaintiff was suspended from the University of Michigan for two years. After appeal, the suspension became effective February 18, 2026. *Id.* at PageID.140, 144. However, because it was issued on November 1, 2025, it will expire as of November 1, 2027. ECF No. 34, PageID.642; ECF No. 39, PageID.944.

On March 6, 2026, Plaintiff filed this lawsuit, alleging that the University of Michigan's investigation and disciplinary process deprived him of his due process rights under the Fourteenth Amendment. ECF No.

7, PageID.115. The steps the University took in its disciplinary process are described below.

### 1. Investigation

The University of Michigan initiated a Title IX disciplinary process based on a complaint brought by a female student (the "Complainant") that Plaintiff engaged in a non-consensual sexual encounter with her on October 10, 2024. *Id.* at PageID.120. Plaintiff disputes that such an encounter occurred. *Id.*

Complainant made an online inquiry on December 13, 2024 with University of Michigan's Equity, Civil Rights & Title IX ("ECRT") office. *Id.* at PageID.129. At that time, Complainant declined to file a formal complaint. *Id.*

On February 4, 2025, Complainant requested a meeting with an ECRT investigator. *Id.* On February 14, 2025, Complainant met with ECRT investigator, Conor Caplis. *Id.* On February 18, 2025, Complainant filed the complaint, alleging that a non-consensual sexual encounter had occurred on October 10, 2024 between her and Plaintiff in Complainant's off-campus apartment. *Id.* at PageID.120, 129.

On February 24, 2025, Plaintiff Doe and Complainant were simultaneously notified of the ECRT investigation. *Id.* at PageID.131; ECF No. 33, PageID.417; ECF No. 33-5, PageID.532.

Plaintiff alleges that the delay between the date on which the complaint was filed and when he was notified violates the University's Policy on Sexual and Gender-Based Misconduct (the "Policy")[1], which, Plaintiff alleges, "provides that the Title IX Coordinator reviews within one business day. Respondent is notified immediately upon receipt of a Formal Complaint and next steps." ECF No. 7, PageID.131.

---

[1] The Complaint repeatedly cites the "University's Policy on Sexual and Gender-Based Misconduct" without distinguishing between that Policy, ECF No. 33-2 (filed by Defendants) and a separate policy document entitled "Student Procedures" ("Procedures"), ECF No. 33-3 (filed by Defendants). It is the Procedures document which governs the investigative process. Unfortunately, the Complaint sometimes conflates these distinct documents and paraphrases or synthesizes provisions from one of the documents as though they were direct quotations from the "Policy," without clear or accurate attribution.

For example, the Complaint states that "The University's Policy indicates that the 'expected timeline for entire process (including appeals) is 180 days.'" ECF No. 7, PageID.129. However, this sentence does not appear in either the Policy, ECF No. 33-2, or the Procedures, ECF No. 33-3. Nor is it clear what the Complaint purports to be citing. Instead, the Procedures reflect that "The University will strive to complete the investigative resolution (investigation, Hearing, finding, sanctions as applicable, and Appeals, if any) within 180 days." ECF No. 33-3, PageID.499.

In light of the Complaint's reliance on purported "Policy" quotations that do not appear in the governing documents filed with the Court, the Court will treat such references as Plaintiff's characterizations of the Policy rather than verbatim quotations.

On February 26, 2025, ECRT Investigator Caplis was notified that Plaintiff had retained an attorney, Michael Smith, as his advisor. ECF No. 33, PageID.418.

On March 19, 2025, Caplis met with Plaintiff's advisor to discuss ECRT's investigation process. *Id.*

Complainant was interviewed on April 9, 2025. ECF No. 7, PageID.130. Plaintiff appears to argue that the University's Policy dictates that an interview must occur *prior* to the filing of a formal complaint. *See id.* (alleging that the Policy states that "Complainant will have three calendar days to review statement summary and transcript. Complainant can provide evidence at or following this interview."). Defendants deny that the Policy contains such a requirement. ECF No. 33, PageID.426 (citing ECF No. 33-3, PageID.492).

Based on its review of the policies, the Court agrees with Defendants: neither the Policy nor the Procedures appear to contain such a requirement. Additionally, during the April 10, 2026 hearing, Caplis testified that no such requirement existed.

Complainant was sent a transcript and draft summary of the interview on May 12, 2025. ECF No. 7, PageID.130. Complainant was given until May 18, 2025 to respond. *Id.* Plaintiff argues that this was in violation of the University's Policy. *See id.* (alleging that the Policy states that "Complainant will have three calendar days to review statement

summary and transcript. Complainant can provide evidence at or following this interview.").

Complainant was also able to provide evidence from the date of the interview through the close of the investigation. *Id.* at PageID.131. According to testimony presented at the April 10, 2026 hearing, both the Complainant and the Respondent (here, Plaintiff Doe) were permitted to provide evidence to the investigator throughout the investigation, whether before or after their interview.

On May 5, 2025, the case was assigned to a new investigator, Michael Maiden. ECF No. 33, PageID.418. On May 8, 2025, Plaintiff's advisor requested that the case should be dismissed because Plaintiff's interview was delayed. *Id.* On May 9, 2025, the University's Title IX Coordinator informed Plaintiff's advisor that the case would not be dismissed and offered to meet with Plaintiff and his advisor. *Id.*

Plaintiff was interviewed on June 20, 2025. ECF No. 7, PageID.131. Plaintiff alleges that this delay occurred although he diligently attempted contact with Caplis to schedule an interview. *Id.* at PageID.132. Plaintiff alleges that he did not receive a response from ECRT until after he filed for dismissal. *Id.*

For their part, Defendants argue that the delay was a function of the fact that Plaintiff "was out of state for an internship and had limited availability." ECF No. 33, PageID.418. Plaintiff disagrees, characterizing the Defendants' position as "patently untrue" arguing that the delay

6

"evidenced lack of diligence in the investigation" by the University. ECF No. 15, PageID.306.

Based on the record evidence, the Court cannot agree that the University investigators were the primary cause in the delay in interviewing Plaintiff. At the April 10, 2026 evidentiary hearing, Caplis, the initial ECRT investigator, and Michael Maiden, the ECRT investigator who was appointed to the case, testified that the delay was a result of Plaintiff's lack of availability. Caplis and Maiden testified that they reached out to Smith on multiple occasions from February 26, 2025 to June 2, 2025 to schedule an interview with Plaintiff.

Although Smith testified that he had telephone conversations with the investigators indicating availability for an interview, at the April 10, 2026 and April 13, 2026 hearing, Defendants presented emails dating from February 26, 2025 to June 2, 2025 between Plaintiff's advisor, Michael Smith, and University administrators. Defendants' Exhibits Nos. 14–21. These emails reflect that University administrators reached out to Smith on multiple occasions, offering to meet with him and Plaintiff or to interview Plaintiff. University administrators presented multiple dates and offered remote interview opportunities. Although Smith maintains that he offered Plaintiff to be interviewed in telephone conversations, none of the emails indicate that Smith offered to schedule Plaintiff's interview at an earlier date and he failed to respond to administrators' requests for dates on which Plaintiff was available.

Next, Plaintiff argues that because the University's Policy states that the "Respondent can provide evidence *at this or following this* interview," ECF No. 7, PageID.131 (emphasis added), his "ability to gather evidence and participation was held back an additional 72 days due to the University's delay due to insufficient staffing." *Id.* Plaintiff argues that this delay gave Complainant 72 additional days to gather and provide evidence to the investigator. *Id.*

Defendants argue that the "Procedures *do not* prevent Plaintiff from gathering evidence between the receipt of notice and an interview." ECF No. 33, PageID.426. The Court agrees: neither the Policy nor the Procedures contain any language limiting the Respondent to gather or to "provide evidence *at this or following this* interview," ECF No. 7, PageID.131. ECF Nos. 33-2, 33-3. While the Procedures do state that "[t]he COMPLAINANT, the RESPONDENT, the WITNESSES and others sharing information in the process are expected to provide all relevant information *at the time of their interview, or as soon as otherwise possible*," ECF No. 33-3, PageID.500 (emphasis added), neither the Policy nor the Procedures limit the Respondent from gathering or from providing evidence *prior* to their interview. Instead, the Procedures explicitly state that "[t]he University will not restrict the ability of the parties to discuss the allegations at issue or gather evidence related to the matter." ECF No. 33-3, PageID.507. Indeed, during the April 10, 2026 evidentiary hearing, Maiden testified that parties and witnesses were

allowed to submit evidence prior to the interview and in fact frequently did so.

Plaintiff was sent the interview transcript and summary for edits/feedback on July 7, 2025. *Id.* Plaintiff appears to argue that this delay was in violation of the University's Policy. *Id.* at PageID.131–32 (citing the Policy as stating that "Respondent will have three calendar days to review statement summary and transcript.").

Plaintiff alleges that Complainant's four witnesses were interviewed on April 9, 2025, May 23, 2025, and May 28, 2025. *Id.* at PageID.132–33.[2] Plaintiff alleges that because Complainant's witnesses were interviewed before he was interviewed on June 20, 2025, "Complainant's witnesses were only questioned about Complainant's narrative. No questions about Plaintiff's recollection were asked because [he] had not been interviewed." *Id.* at PageID.132–33. Further, Plaintiff alleges that the timing of these interviews violates the University's Policy. *Id.* Defendants disagree. ECF No. 33, PageID.426.

Plaintiff argues that because the University interviewed Complainant and her witnesses prior to interviewing him, he was "significantly prejudiced." ECF No. 7, PageID.133. Specifically, Plaintiff argues that (1) "Complainant and her witnesses were interviewed much closer to the events, while those events were fresh in their minds. This

---

[2] The University states that *all* seven witnesses were interviewed between May 23, 2025 and July 18, 2025. ECF No. 33, PageID.418.

was crucial because later, they were found more credible because of the details they recalled."; (2) investigators did not have any indication of which facts were disputed at the time they interviewed Complainant and her witnesses; and (3) Plaintiff was delayed in formulating his defense. *Id.* at PageID.133–34.

Plaintiff also alleges that while "the University abided by its promise of completing the additional interviews of witnesses in 1-6 weeks for Complainant" the University failed to do so for Plaintiff. *Id.* at PageID.134 (emphasis removed).

On July 17, 2025, Plaintiff and Complainant were notified that the ECRT intended to issue a Preliminary Report on July 24, 2025. *Id.* at PageID.134–35; ECF No. 37, PageID.696. Plaintiff and Complainant were informed that they should submit remaining feedback to draft statements, evidence, and additional witness names before this date. ECF No. 37, PageID.696. Plaintiff and Complainant were informed that evidence submitted after July 24, 2025 may be "given less evidentiary weight than materials received before the [preliminary report] was issued." ECF No. 7, PageID.135; ECF No. 37, PageID.696. Plaintiff alleges that this time frame is in violation of University Policy, which states that "Parties have 10 calendar days to respond" to a preliminary report. ECF No. 7, PageID.134.

Plaintiff's counsel requested an extension to submit feedback. ECF No. 37, PageID.696. Michael Maiden, the ECRT investigator who was

appointed after Caplis left her position as investigator, agreed that Plaintiff would receive an extension until July 28, 2025 to submit feedback on the preliminary report. ECF No. 7, PageID.138; ECF No. 37, PageID.696.

In his comments on the draft of the preliminary report, Plaintiff requested that the investigator obtain Complainant's academic records, medical records, and mental health records. ECF No. 7, PageID.135–36. Plaintiff argues that these records were relevant to disproving Complainant's allegations. *Id.* at PageID.137. Plaintiff alleges that "the investigators refused to gather the information – as was required by its own policy." *Id.*

On July 29, 2025, Maiden asked Plaintiff "three clarification questions," to which Plaintiff was required to respond by August 1, 2025. *Id.*

On August 14, 2025, Plaintiff and Complainant were simultaneously sent the Preliminary Investigation Report. ECF No. 7, PageID.138; ECF No. 33, PageID.419. The University gave each of them until August 25, 2025 to provide feedback, limited to 10 pages. ECF No. 7, PageID.138; ECF No. 33, PageID.419.

Plaintiff "requested additional investigation and questions." ECF No. 7, PageID.138. Specifically, Plaintiff requested (1) the "[c]omplete text messages between the parties"; (2) photographs; (3) Complainant's transcript; (4) Complainant's mental health records; (5) emails from

Complainant to the University's ECRT office; and (6) "the specific sections of the University's sexual and gender-based misconduct policy that he had allegedly violated." *Id.* Plaintiff alleges that the University only responded by requesting additional text messages from the Complainant. *Id.* at PageID.139. He further alleges that the University "did not conduct any additional investigation, and it refused to obtain and provide the records and information requested by Plaintiff." *Id.*

A Final Investigation Report was issued on September 8, 2025 and the matter was referred for a hearing. ECF No. 33, PageID.419. Prior to the hearing, both Plaintiff and the Complainant and their respective advisors had meetings with the Hearing Officers. *Id.* Both parties submitted written feedback pertaining to the Final Investigation Report. *Id.*

A hearing was conducted on September 30, 2025. ECF No. 7, PageID.138. Defendants describe the hearing in the account that follows, which is not challenged by Plaintiff:

> Both parties made opening statements. Complainant, Plaintiff, and four witnesses testified. Each witness answered a series of questions from the Hearing Officer, after which the parties had an opportunity to cross-examine through their advisor. The Hearing Officer allowed nearly all questions, only making a handful of relevancy rulings disallowing some.
>
> Plaintiff's attorney advisor seized the chance to cross-examine Complainant. Mr. Smith asked over 90 cross-examination questions. The cross-examination

consisted of varied topics including the night in question, her previous interactions with Plaintiff, her sexual history, her grades, her menstrual cycle, and her decision to report the allegations. The Hearing Officer deemed only one question not relevant. Only three questions were viewed as having already been asked and answered. Complainant answered every single question, except for one question about her grades.

Although the Procedures state that hearings are typically limited to evidence obtained or provided by the investigator during the investigation, the Hearing Officer allowed Plaintiff to provide new evidence. Plaintiff was able to present sun calculator evidence which attempted to attack the date and time of certain photographic evidence submitted by Complainant.

ECF No. 33, PageID.419–20. Plaintiff did not contradict this summary description, and it is consistent with the Court's review of the transcript of the hearing.

On November 4, 2025, the Hearing Officer issued a 42-page decision. ECF No. 38, Exhibit 7, PageID.140; ECF No. 33, PageID.420. The decision concluded that Plaintiff sexually assaulted Complainant in violation of the University's Policy. ECF No. 33, PageID.420.

Plaintiff alleges that the University's Policy requires that any decision be communicated "ideally within [sic] 30 days of the hearing." ECF No. 7, PageID.140.

On November 13, 2025, the Office of Student Conflict Resolution ("OSCR") issued a sanction of a two-year suspension of Plaintiff from the

13

University. *Id.* Plaintiff argues that this sanction was imposed without regard to the factors that are required to be considered. *Id.*

### 2. Appeal

Subsequently, Plaintiff submitted an appeal. *Id.* at PageID.141. In connection with the appeal, Complainant submitted additional evidence which had never been provided to the Plaintiff. *Id.* Although Plaintiff objected to the submission of new evidence, the external reviewer responsible for making a determination of the appeal relied on this newly submitted evidence. *Id.* at PageID.141–42.

Plaintiff also submitted new evidence. *Id.* at PageID.142. The external reviewer dismissed Plaintiff's new evidence as having been "already considered." *Id.*

On January 26, 2026, the external reviewer issued an opinion. *Id.* at PageID.143. The external reviewer found that Plaintiff had "not articulated any procedural irregularity that occurred during this process, let alone an irregularity that materially impacted the outcome of this matter." ECF No. 39, PageID.939. However, the external reviewer also found that the two-year suspension was "inappropriate and out of proportion to the circumstances of the violation." ECF No. 7, PageID.143; ECF No. 39, PageID.940.

Plaintiff alleges that the external reviewer failed to consider the ways in which procedural deficiencies in the evidentiary process

14

prejudiced his ability to defend against the allegations. ECF No. 7, PageID.143.

The review of the appeal was concluded on February 13, 2026 by the Vice President of Student Life Laura Jones. ECF No. 7, PageID.144. Jones disagreed with the decision of the external reviewer "and returned the sanction to a two-year suspension." *Id.* Plaintiff argues that Jones's review of the appeal was untimely as per the University's Policy. *Id.* Defendants disagree. ECF No. 33, PageID.426.

As to Plaintiff's argument that Jones' decision was untimely, the record does not support that claim. At the hearing, Defendants presented email evidence indicating that Jones received the external reviewer's decision on February 2, 2026 at 8:00 am and responded by February 5, 2026 at 7:52 am. Defendants' Exhibit Nos. 10–11. This is within the 72-hour deadline provided in the Procedures. ECF No. 33-3, PageID.525.

On February 18, 2026, Plaintiff "was unenrolled from classes and cut off from any University networks/accounts without warning." ECF No. 7, PageID.144. Plaintiff argues that although the University's Policy states that the "expected timeline for the entire process (including appeals) is 180 days," his investigation lasted 366 days. *Id.* at PageID.129.

## B.     Procedural Background

On March 6, 2026, Plaintiff initiated suit. ECF No. 1. On the same date, Plaintiff filed a Motion for Temporary Restraining Order and Preliminary Injunction. ECF No. 2.

On March 9, 2026, the Honorable Matthew F. Leitman denied Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, finding that "Doe has neither attempted to nor satisfied [the] requirements" of Fed. R. Civ. P. 65(b)(1). ECF No. 3, PageID.78.

On March 13, 2026, Plaintiff filed an Amended Complaint, ECF No. 7, and a Motion for Temporary Restraining Order and Preliminary Injunction. ECF No. 8 (redacted version); ECF No. 10 (unredacted, filed under seal).

On March 16, 2026, Judge Leitman recused himself from the case and the case was randomly reassigned by the Clerk's Office to the undersigned. ECF No. 11. On the same date, Defendants filed a notice of appearance. ECF No. 12.

On March 18, 2026, the Court held a telephonic status conference with both parties. On the same date, the Court issued an Order construing the filing contained at ECF No. 8 as a Motion for a Temporary Restraining Order. *See* E.D. Mich. LR 65.1 ("Requests for temporary restraining orders and for preliminary injunctions must be made by a separate motion and not by order to show cause.").

16

On March 20, 2026, Plaintiff filed a Motion for a Preliminary Injunction. ECF No. 15.

On March 24, 2026, the Court issued an Order, denying Plaintiff's motions for an ex parte temporary restraining order. ECF No. 31.

On March 27, 2026, the Defendants filed a response to Plaintiff's Motion for a Preliminary Injunction. ECF No. 33.

On April 3, 2026, Plaintiff replied. ECF No. 44.

On the same date, Plaintiff and Defendants filed witness lists for the evidentiary hearing scheduled to begin April 10, 2026. ECF Nos. 43, 45.

On April 8, 2026, Defendants filed a "Motion to Quash Subpoenas and Preclude and/or Limit the Testimony of Plaintiff's Witnesses at Preliminary Injunction Hearing." ECF No. 47. Specifically, Defendants moved to quash the subpoenas served on Complainant and Carly Hadaway, and to "[p]reclude testimony by Complainant, Hadaway, Isaac Davis, and Grant Wu, Todd Eby, Bethany Atwell, and Dr. Gerald Shiener," and "[l]imit[] witness testimony to Plaintiff's efforts to demonstrate the applicable preliminary injunction factors and preclud[e] testimony that seeks to relitigate the underlying sexual misconduct hearing that led to Plaintiff's suspension." *Id.* at PageID.978.

On April 9, 2026, the Court held a status conference on the matter.

On April 10, 2026, the Court granted Defendants' motion to quash as to the subpoenas sought for the testimony of Complainant, Hadaway, Davis, and Wu. ECF No. 50, PageID.1011.

As to Dr. Shiener, Plaintiff stated during the April 9, 2026 status conference that he would not be called to testify. Thus, the Court denied Defendants' motion to quash his testimony as moot. *Id.* at PageID.1013.

The Court took the motion to quash under advisement as to Eby and Atwell. *Id.*

Plaintiff did not call Atwell as a witness during the April 10, 2026 and the April 13, 2026 evidentiary hearings.

On April 13, 2026, the Court granted Defendants' motion to quash Eby's testimony from the bench.

**C.     April 10, 2026 and April 13, 2026 evidentiary hearings**

On April 10, 2026 and April 13, 2026, the Court held an evidentiary hearing on the motion. Plaintiff called the following witnesses: Conor Caplis, the ECRT investigator who was first assigned to the case, Michael Maiden, the ECRT investigator who took over the investigation after Caplis left, Matthew Turner, an academic advisor at the Ross School of Business at the University, Anne Partington, the Managing Director at the Tauber Institute for Global Operations at the University, and Michael Smith, the attorney who represented Plaintiff as his advisor during the Title IX investigatory process.

Defendants called the following witness: Elizabeth Seney, Director of gender equity and Title IX coordinator at the University.

The Court briefly summarizes the topic areas and main points addressed in the witness testimony below based on its recollection and having reviewed rough transcripts of the proceedings. As well, when testimony directly relates to a material issue, it has been incorporated elsewhere in this Opinion.

Conor Caplis, the original ECRT investigator assigned to the case, testified about the investigation, her role in it, and the University's investigatory policy. Plaintiff asked Caplis whether she would close a case when a hypothetical complainant, who alleged that she was a victim of rape, withdrew her complaint. Caplis responded that it would depend on the specific case. Plaintiff also asked Caplis several questions about the University's Procedures and her interpretation of that document. For instance, Caplis testified that the 180-day timeline contained in the Procedures was a timeline that the University "strived" to meet, rather than a strict deadline.

Caplis testified that when she met with Plaintiff's advisor, Attorney Smith, she had not yet interviewed Complainant. Caplis also testified that when she met with Smith, she recalled that he requested "things" that aligned more with a "criminal process rather than the University investigatory process." Caplis testified that the University investigators worked on a shared database.

19

Caplis explained that she had reached out to Plaintiff and offered to interview him, either in-person or remotely. Caplis testified that she sent Smith multiple emails and eventually met with Smith.

According to her testimony, neither Smith nor Plaintiff ever provided Caplis with specific dates on which Plaintiff was available. Caplis also testified that she had never refused any interviews with Plaintiff and that if Plaintiff had given her available dates to conduct an interview, she would have made herself available to meet with Plaintiff.

Caplis testified that she discussed with Smith his intention to file a cease-and-desist. Caplis testified that she informed Smith that it was within his purview to do so, that she could not advise him on the matter, and that the Complainant might see such a decision as retaliatory.

Caplis also stated that if a complaint alleged conduct that would constitute a crime, she would notify law enforcement.

Michael Maiden, the ECRT investigator who was assigned to the case after Caplis, testified about the investigation, his role in it, and the University's investigatory policy. Maiden explained the role of investigators in the University's process. Maiden noted that students, with the approval of Title IX coordinators, could receive certain supportive measures, including assistance with academic matters.

Maiden testified that the Title IX disciplinary process is voluntary for all participants, but that there was an expectation that the parties submit all relevant information.

According to Maiden, the University had multiple conversations with Attorney Smith about setting up an interview with Plaintiff. Maiden testified that Smith informed him over the phone that Plaintiff had little availability to interview because he was participating in an internship program in Florida. Thus, Maiden testified, in the interest of expediting the process, he began to reach out to witnesses proffered by Complainant.

Maiden explained that all information that was gathered by the investigators was shared with the hearing officers.

Maiden was also asked about the interplay of police investigations and the University's own investigation. Maiden originally testified that he believed there had been a police report concerning this case, but, after his memory was refreshed on cross-examination, testified that there had been no police report.

Maiden also testified that the Complainant and the Plaintiff could submit evidence prior to their respective interviews, and that complainants and plaintiff frequently did so.

Matthew Turner, an academic advisor at the Ross School of Business at the University, testified about Plaintiff's courses. Specifically, he testified as to which courses were necessary for Plaintiff to be able to graduate and when each of the courses which Plaintiff was enrolled in was offered. Turner testified that if Plaintiff were to return to campus, his coursework would probably have to be taken in a winter semester. Turner also testified that some of the courses Plaintiff was

21

taking that were necessary for his graduation could be substituted with other courses.

Anne Partington, the Managing Director at the Tauber Institute for Global Operations at the University, testified about the Tauber Institute and its unique program. Partington testified that the Tauber Institute would work together with Plaintiff upon his return to ensure that he could continue with his studies.

Attorney Michael Smith, Plaintiff's advisor during the Title IX investigatory process, testified about the investigation and summarized what he considered its flaws. For example, Smith testified that Caplis informed him that if Plaintiff chose to file a counter-complaint, such an action might be seen as retribution.

Smith further testified that he was unable to reach Caplis and attempted to contact her through phone, email, and by showing up at a physical location that he believed Caplis frequented. Smith also testified as to an email he received from Caplis in which she stated that his "message got lost in my email." Smith acknowledged that University administrators had sent him multiple emails offering him dates to speak with Plaintiff and that he did not respond to these emails. Smith also testified that he followed up over phone.

According to Smith, Plaintiff was always available for an interview, even though he was outside of the state, and that Plaintiff was eager and awaiting the interview. Smith maintained that Caplis told him that he

couldn't do his own investigation, that he repeatedly requested but mostly did not receive certain materials, such as text messages, photographs, and Complainant's transcript, medical health records, and mental health records. Smith indicated that he was informed that the process was voluntary and that Complainant could provide him with the materials that she wished to provide to him.

The materials that requested but did not receive would have been helpful to Smith, he said, in cross-examining Complainant on her motive for filing the complaint. Smith testified that he believed that Complainant's motive in filing the complaint was to be able to get a deferment or some other kind of academic assistance. When asked whether he had the opportunity to freely cross-examine Complainant, Smith said no, because he did not have the evidence to be able to do so. Smith testified that he would have asked different questions had he been provided with the documents he requested.

However, Smith also acknowledged that he had the opportunity to cross-examine Complainant and the witnesses. Smith testified that he could have asked Complainant whether she was motivated by her desire to get accommodations, and about why she didn't file a formal complaint in December 2024 but he did not. Smith agreed that he was able to ask Complainant questions about certain photographs and their authenticity.

Smith testified that he asked Complainant multiple questions about her grades, whether she was on academic probation, Complainant's prior sexual history, Complainant's visit to a physician after the October 10, 2024 encounter. Smith also testified that he had access to some of Complainant's medical records prior to cross-examining her.

Elizabeth Seney, director of gender equity and Title IX coordinator at the University, testified about the University's process regarding sexual misconduct investigations. Seney testified concerning specific sections of the Procedures and the Policy, and indicated that the University's procedure is consistent with Title IX's regulation.

Seney pointed out that the University did not have subpoena power and that there is no compulsory process under Title IX and under the University's Procedures. Seney explained that the University did not have the authority to release a student's academic record without their permission.

According to Seney, compulsory process in sexual misconduct investigations would not be consistent with best practices. Under the University's procedures, if a party or a witness refuses to answer a question or produce requested evidence, they are aware that the University will draw a negative inference from such refusals.

Seney explained as to the interplay between the University's Title IX sexual misconduct investigations and their non-Title IX sexual misconduct investigations. Seney testified that the University had

"jurisdiction" over the October 10, 2024 incident, even though it did not fall under the scope of Title IX. Seney testified that the Policy covered conduct that occurs between students even if it occurs off-campus.

Seney also stated that an individual did not need to file a formal complaint alleging sexual misconduct in order to receive any academic supportive measures. Seney pointed out that the Procedures do not set out a firm timeline upon which the investigation must be completed, but that the University "strived" to complete the investigation in a certain time frame.

Seney testified that Complainant only filed one formal complaint. Seney testified that the initial email which provided the Vice President of Student Life included the wrong deadline for reviewing the external reviewer's opinion.

After the testimony closed, the Court heard oral argument on the present motion.

## II.   LEGAL BACKGROUND

Plaintiff filed this motion pursuant to Federal Rule of Civil Procedure 65, requesting that the Court grant a preliminary injunction, enjoining Defendants "from depriving Plaintiff of his education by allowing Plaintiff to rejoin his scheduled classes in order to complete[ ] his Bachelors of Business Administration, which he is set to finish in May of this year, 2026." ECF No. 15, PageID.302.

Courts consider four factors when determining whether to grant a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Int'l Union of Painters & Allied Trades Dist. Council No. 6 v. Smith*, 148 F.4th 365, 371 (6th Cir. 2025). The Sixth Circuit has "often cautioned that these are factors to be balanced, not prerequisites to be met." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) (citation omitted) ("*Univ. of Cincinnati*"). At the same time, the Sixth Circuit has "also held that a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed. And in the case of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Id.* (cleaned up).

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## III.   DISCUSSION

### A.   Whether Plaintiff Has a Strong Likelihood of Success on the Merits

The first factor that the Court must consider is whether Plaintiff "has demonstrated a strong likelihood of success on the merits." *Handel's Enters., Inc. v. Schulenburg*, 765 F. App'x 117, 121 (6th Cir. 2019) (citation omitted). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). To meet his burden, Plaintiff "must show more than a mere possibility of success." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (citation omitted).

Plaintiff brings suit under § 1983, alleging violations of his Fourteenth Amendment procedural due process rights, ECF No. 7, so the Court will review the law regarding what must be shown to establish a due process violation and discuss the evidence presented here.

### 1.   *Due Process Entitled to State University Students Facing Significant Disciplinary Actions*

"State universities must afford students minimum due process protections before issuing significant disciplinary decisions. Suspension clearly implicates a protected property interest, and allegations of sexual assault may impugn a student's reputation and integrity, thus

implicating a protected liberty interest." *Univ. of Cincinnati*, 872 F.3d at 399 (cleaned up).

> At a minimum, a student facing suspension is entitled to the opportunity to be heard at a meaningful time and in a meaningful manner. While the exact outlines of process may vary, universities must at least provide notice of the charges, an explanation of the evidence against the student, and an opportunity to present his side of the story before an unbiased decision maker.
>
> A student's opportunity to share his version of events must occur at some kind of hearing, though that hearing need not take on the formalities of a criminal trial.
>
> …
>
> Even in the case of a sexual assault accusation—where a finding of responsibility will have a substantial and lasting impact on the student—the protection afforded to him need not reach the same level that would be present in a criminal prosecution. Review under *Mathews* asks only whether John Doe had an opportunity to respond, explain, and defend, not whether a jury could constitutionally convict him using the same procedures.

*Id.* at 399–400 (cleaned up).

### 2. Discussion

Plaintiff identifies a number of alleged deficiencies in the University's Title IX process. However, Plaintiff does not show how those alleged deficiencies, either individually or collectively, actually deprived him of the minimum procedural protections guaranteed by the Due Process Clause.

Plaintiff's first ground of alleged due process violation is that "the University and the ERTC failed to adhere to the policies it has put in place." ECF No. 15, PageID.317. For instance, Plaintiff argues that according to the University's Policy, Complainant should have been interviewed before she filed her complaint, instead of two months after it was filed. ECF No. 15, PageID.318.[3] Similarly, Plaintiff raises the fact that "[i]t took the school 33 days to provide Complainant with the transcript," instead of the required three days. *Id.* Plaintiff also argues that he received the complaint six days after it had been filed even though "University policy requires a Respondent to be notified *immediately* on receipt of a formal complaint." *Id.* Plaintiff also argues that although the University's Policy states that the "expected timeline for the entire process (including appeals) is 180 days," his investigation lasted 366 days. ECF No. 7, PageID.129.[4]

Even if Plaintiff is correct that some of the University's procedures were not followed to the letter, such a deficiency would not necessarily amount to a deprivation of constitutional due process. "[A] mere failure by the University to follow its own internal guidelines does not give rise to a procedural-due-process violation." *Doe v. Miami Univ.*, 882 F.3d 579,

---

[3] Defendants argue, and the Court agrees, that the Policy does "not require that the Complainant be interviewed before filing an official complaint." ECF No. 33, PageID.426.

[4] The Procedure states that "The University will strive to complete an investigative resolution … within 180 days." ECF No. 33-3, PageID.495.

29

603 (6th Cir. 2018). In other words, "[w]hether [the University of Michigan] followed its own internal procedures … is not the proper inquiry." *JiQiang Xu v. Michigan State Univ.*, 195 F. App'x 452, 457 (6th Cir. 2006). "Violation of a state's formal procedure … does not in and of itself implicate constitutional due process concerns." *Purisch v. Tennessee Tech. Univ.*, 76 F.3d 1414, 1423 (6th Cir. 1996). Instead, "[a] school's departure from its own hearing rules amounts to a due process violation only when the departure results in a procedure which itself impinges on due process rights." *Univ. of Cincinnati*, 872 F.3d at 407 (citation omitted).

In other words, "[a] state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable." *JiQiang Xu*, 195 F. App'x at 457. Thus,

> It is not every disregard of its regulations by a public agency that gives rise to a cause of action for violation of constitutional rights. Rather, it is only when the agency's disregard of its rules results in a procedure which in itself impinges upon due process rights that a federal court should intervene in the decisional processes of state institutions.

*Bates v. Sponberg*, 547 F.2d 325, 329–30 (6th Cir. 1976).

In other words, for Plaintiff to succeed on the merits, it is not enough for Plaintiff to show that the University failed to strictly meet the letter of its own procedures. Instead, he must establish that the

procedure actually employed by the University—whether precisely consistent with its policies or not—lacked due process. *See Univ. of Cincinnati*, 872 F.3d at 407 ("Plaintiff's rights are dictated by the Constitution, not internal school rules or policies." (cleaned up)).

As is explained below, Plaintiff has failed to establish that the procedure employed by the University lacked due process. Instead, much of Plaintiff's Complaint and Motion for a Preliminary Injunction alleges only that the University purportedly violated its own Policy, *not* that such violations by themselves, in the absence of the Policy, establish a cognizable constitutional violation. Departures from the University's Policy, without a clear showing that such a departure deprives a plaintiff of fundamental due process rights, simply do not amount to cognizable constitutional violations.[5]

---

[5] Plaintiff, both in his Complaint and in his Motion for a Preliminary Injunction, raises numerous other purported violations of the University's Policy. Many of these purported violations are not shown to be cognizable constitutional violations. Accordingly, the Court will only address these instances insofar as Plaintiff appears to argue that "the departure [from the University's Policy itself] results in a procedure which … impinges on due process rights." *Univ. of Cincinnati*, 872 F.3d at 407 (citation omitted). Where the record is in dispute as to whether certain policy violations occurred or not, the Court need not resolve such disputes unless the alleged violation, in and of itself, would make out a due process violation. Nevertheless, the Court notes that some of Plaintiff's allegations of failures to abide by the University's policies are not supported by the record. Some rest on a misunderstanding of the Policy—for instance, contrary to Plaintiff's assertion, the Policy does not require that the Complainant be interviewed before filing an official

31

Second, Plaintiff alleges that the timing of certain steps in the investigation proceeded in a manner that substantially prejudiced Plaintiff. For example, Plaintiff alleges that

> Instead of interviewing Plaintiff shortly after Complainant, the ECRT waited an additional 72 days to interview him. Plaintiff was interviewed on June 20, 2025. Respondent's ability to gather evidence and participation was held back an additional 72 days, whereas Complainant was able to gather and bring evidence as soon as April 9, 2025. Due to the delay, Plaintiff's ability to bring evidence was greatly depreciated, it gave Complainant a two-month head start.

ECF No. 15, PageID.319.

Specifically, the Complaint alleges that Plaintiff was interviewed 72 days after Complainant, *see* ECF No. 7, PageID.131, and, as a result of the application of the University's Policy, *see id.* ("Respondent can provide evidence at this or following this interview."), was only permitted to begin submitting evidence 72 days later than the Complainant did, *see id.* at PageID.130 (the University Policy states that "Complainant can provide evidence at or following [their] interview").[6]

---

complaint. Others reflect a mischaracterization of the facts—for instance, contrary to Plaintiff's assertion, Vice President of Student Life Jones reviewed the external reviewer's decision within 72 hours, as required by the Procedures.

[6] The parties dispute whether the delay in interviewing Plaintiff was attributable to Plaintiff's lack of availability or to Investigator Caplis's failure to timely schedule an interview. As explained above, the Court concludes that the University was attempting to schedule an interview earlier with Plaintiff, and the delay that occurred is not due to any lack

However, as Defendants point out, *see* ECF No. 33, PageID.426 ("The Procedures do not prevent Plaintiff from gathering evidence between the receipt of notice and an interview." (emphasis omitted)), Plaintiff was not prevented from gathering evidence during the time period from when he was notified of the complaint and when he was interviewed on June 20, 2025. In fact, the Procedures explicitly state that "[t]he University will not restrict the ability of the parties to discuss the allegations at issue or gather evidence related to the matter." ECF No. 33-2, PageID.507. Indeed, during the April 10, 2026 evidentiary hearing, Maiden testified consistently with this understanding of the Procedures, explaining that parties and witnesses were permitted to submit evidence prior to the interview and frequently did so.

Thus, Complainant and Plaintiff had the same amount of time to gather evidence.

Next, Plaintiff contends that the University "gave more weight to Complainant's version of events because her testimony had stayed the most consistent. The University entirely overlooked that Complainant was interviewed two and a half months sooner than Plaintiff." ECF No. 7, PageID.114–15. At this stage, however, the record before the Court does not support the conclusion that the reason that Complainant's

---

of diligence by the University. In any event, as explained below, even if the delay were attributable to the University, it would not amount to a due process violation.

version of events stayed more consistent than Plaintiff's version was due to the fact that Plaintiff's interview was conducted later than Complainant's.

In any case, Plaintiff does not allege facts showing that any delay in interviewing Plaintiff and allowing him to begin submitting testimony—if in fact Plaintiff was delayed from being able to submit evidence—denied him an opportunity to "respond, explain, and defend" himself to such an extent that it would amount to a denial of due process. *Univ. of Cincinnati*, 872 F.3d at 400 (citation omitted).

Plaintiff raises a similar concern with regard to the delay in the interview of his witnesses:

> By that time, the alleged incident occurred in October 2024, Plaintiff's witnesses were not interviewed until June 2025. This damaged their credibility in the Hearing Officer's eyes. Due to the unjustified delays by the ECRT, Plaintiff's witnesses were not afforded the same grace and understanding as Complainant's witness.

ECF No. 15, PageID.320. The Hearing Officer's opinion does not reflect Plaintiff's contention, ECF No. 15, PageID.315, that Plaintiff's witnesses were deemed less credible by the "Hearing Officer" because they were interviewed later. Instead, the Complaint alleges that the "University … found Complainant and her witnesses as more credible because of the accuracy of their testimony." ECF No. 7, PageID.145. Again, the

34

Complaint does not explain how the fact that Plaintiff's witnesses were interviewed later undermined the credibility of Plaintiff's witnesses.

Absent any indication that the asymmetric timing of the proceedings prejudiced Plaintiff—or that any asymmetry was attributable to the University rather than Plaintiff—the Court concludes that the asymmetric timing of the proceedings did not violate due process.

Nor does Plaintiff allege that the delay in interviewing him, by itself, constituted a due process violation. In any case, the Court finds that the delays described in the present case do not amount to a due process violation in and of themselves. *Cf. Noakes v. Univ. of Cincinnati*, No. 24-3388, 2024 WL 4579453, at *3 (6th Cir. Oct. 25, 2024) (even a delay of five months from the filing of a formal complaint to when the respondent is notified does not, without more, amount to a due process violation).

Similarly, Plaintiff contends that the length of the investigation—366 days—violated the University's policy and therefore his due process rights. ECF No. 15, PageID.306. However, "even if that's true, [Plaintiff] must show that it resulted in a procedure which itself impinged on his due process rights." *Noakes*, 2024 WL 4579453, at *3 (citations removed). Plaintiff has not done so. Nor has Plaintiff identified any case law—and the Court is aware of none—holding that the length of an investigation alone constitutes a due process violation.

35

Third, Plaintiff raises numerous concerns with the fact that the Complainant's witnesses were interviewed after Complainant was interviewed but before Plaintiff was interviewed. ECF No. 15, PageID.319–20. Thus, Plaintiff argues "witnesses were only asked about Complainant's experience, not Plaintiff's." *Id.* at PageID.319–20. Plaintiff argues that, as a result "[t]here was no cross examination of Complainant's witnesses, as required by the Sixth Circuit." *Id.* at PageID.320.

Of course, it is true that "[a]ccused students must have the right to cross-examine adverse witnesses in the most serious of cases." *Univ. of Cincinnati*, 872 F.3d at 401. Accordingly, when the circumstances of a case pose a credibility contest—such as a case in which the determination of whether a student sexually assaulted another is determined by whether the fact finder concludes that the complainant or the accused student is more credible—accused students have the right to have "the opportunity to confront and cross-examine" the complainant, including through questions submitted and reviewed to school officials. *Id.*

The present case poses a slightly different set of circumstances than the one raised by *Univ. of Cincinnati*, 872 F.3d 393 (2017). Most notably, Plaintiff does not argue that he was unable to cross-examine the *Complainant*, just the Complainant's *witnesses*. Nor does it appear that this case posed the same kind of credibility contest as the one in *Univ. of Cincinnati*. For instance, in *Univ. of Cincinnati*, "[t]he Title IX Office

36

proffered no other evidence to sustain the University's findings and sanctions apart from Roe's hearsay statements." *Univ. of Cincinnati*, 872 F.3d at 401 (citation omitted). Here, however, the Complaint clearly indicates that other evidence was considered: the Complaint mentions photographs of bruises*, see* ECF No. 7, PageID.152, medical records, *see id.* at PageID.136, including medical records of a full exam, *see id.* at PageID.151, text messages, *see*, *e.g.*, *id.* at PageID.139, and multiple witnesses, *see id.* at PageID.145.

However, even assuming, for the purposes of this motion, that the circumstances of this case required Plaintiff to be given the opportunity to cross-examine Complainant's witnesses, Plaintiff appears to have had such an opportunity. Defendants state that at the hearing,

> Complainant, Plaintiff, and four witnesses testified. Each witness answered a series of questions from the Hearing Officer, after which the parties had an opportunity to cross-examine through their advisor. The Hearing Officer allowed nearly all questions, only making a handful of relevancy rulings disallowing some.
>
> Plaintiff's attorney advisor seized the chance to cross-examine Complainant. Mr. Smith asked over 90 cross-examination questions. The cross-examination consisted of varied topics including the night in question, her previous interactions with Plaintiff, her sexual history, her grades, her menstrual cycle, and her decision to report the allegations. The Hearing Officer deemed only one question not relevant. Only three questions were viewed as having already been asked

37

> and answered. Complainant answered every single question, except for one question about her grades.

ECF No. 33, PageID.419–20. Indeed, the hearing transcript demonstrates that Plaintiff's counsel was given the opportunity to cross-examine each witness and, in fact, did so. *See*, *e.g.*, ECF No. 38, PageID.793 (Plaintiff's counsel beginning cross examination of Complainant's witness); *id.* at PageID.870 ("[Plaintiff's counsel], it's your opportunity to question [the witness]."). And during the April 13, 2026 evidentiary hearing, Plaintiff's advisor, Michael Smith, confirmed that he had the opportunity to cross-examine each witness before the hearing officer.

Next, while it is true that interviewing Complainant's witnesses before Plaintiff was interviewed prevented investigators from probing the witnesses' narratives using information obtained from Plaintiff's interview, it is not clear that such a procedural deficiency amounts to a due process violation. As the Sixth Circuit has explained, while school disciplinary proceedings require "some level of due process" they "need not reach the same level of protection that would be present in a criminal prosecution." *Doe v. Univ. of Kentucky*, 860 F.3d 365, 370 (6th Cir. 2017). The University of Michigan is simply "not required to transform its classrooms into courtrooms in pursuit of a more reliable disciplinary outcome." *Univ. of Cincinnati*, 872 F.3d at 400 (citation omitted). After all, "[f]ormalizing hearing requirements would divert both resources and

attention from the educational process." *Id.* (citation omitted). Instead, the case law requires that the plaintiff "had an opportunity to respond, explain, and defend." *Id.* (citation omitted).

In any case, any purported deficiency in the interview process that resulted from its asymmetric timing could have been cured at the hearing, where Plaintiff had the ability to cross-examine each witness with the full knowledge of Plaintiff's side of the story.

Next, in his reply brief, Plaintiff argues—for the first time—that his right to cross-examine Complainant was not meaningful because after "Plaintiff's advocate questioned Complainant about her GPA, a strong motive for filing her a complaint … [s]he refused to answer those questions and Plaintiff's advocate was told she was allowed to refuse." ECF No. 44, PageID.967.

The hearing transcript reflects that Plaintiff's advisor, Smith, asked Complainant more than a dozen questions about her grades and whether she was on academic probation. *See* ECF No. 38, PageID.821–24. With the exception of a single question, Complainant answered every one of these questions—admitting that she was currently on academic probation, testifying that her GPA during the semester before October 2024 was "about a three," and that she had a GPA below a 2.0 prior to the winter semester of 2025. *Id.* The only question the Complainant declined to answer was her current GPA. *Id.* at PageID.823.

Complainant's refusal to answer a question about her GPA in October 2025—even assuming that such line of questioning is relevant to the determination of whether Plaintiff sexually assaulted Complainant in October 2024—is not a due process violation. Indeed, the Sixth Circuit has explicitly ruled that "permitting the complainants to refuse to answer some small number of questions" during a university investigatory proceeding is not a violation of the accused's due process rights. *Doe v. Michigan State Univ.*, 989 F.3d 418, 427 (6th Cir. 2021) ("*Michigan State Univ.*"). This conclusion held even if the specific questions that the witness was not forced to answer were relevant. *Id.* ("Regardless, if we were to find that knowledge of the specific questions that Roe 1 was not forced to answer was relevant, it would not change our conclusion that there was no denial of due process in Doe's case."). Here, the Court finds that permitting Complainant to decline to answer questions regarding her then-current GPA does not render Plaintiff's cross-examination meaningless so as to constitute a due process violation.

Moreover, during the April 13, 2026 evidentiary hearing, Plaintiff's advisor, Michael Smith, testified that he could have asked the Complainant whether her decision to file a complaint against Plaintiff was motivated by her academic performance or by her desire to get some kind of accommodation or assistance. The hearing transcript reflects that Smith asked no such questions. *See* ECF No. 38. Thus, Plaintiff had the opportunity to inquire into the Complainant's alleged motive without

reliance on her GPA. Additionally, Smith successfully asked Complainant more than a dozen other questions about her academic performance throughout her time at the University. Lastly, any risk of prejudice by Complainant's refusal to answer the question was minimized by the decisionmaker's ability to draw a negative inference from such a refusal. The ability of a decisionmaker to draw such a negative inference was acknowledged by Seney during her testimony and is codified in Title IX's implementing regulation, *see* 34 C.F.R. § 106.46 (f)(4).

In light of these circumstances, Complainant's refusal to answer a single question about her GPA in October 2025, a year after the incident occurred, did not render the cross-examination constitutionally inadequate. *See, e.g.*, *Michigan State Univ.*, 989 F.3d at 427 ("There is no compelling argument that, with all the process that Doe received, forcing Roe 1 to answer questions about her clothes and physical size was necessary to vindicate his constitutional rights.").[7]

Plaintiff further argues that "the University's refusal to obtain, compel Complainant to provide, or allow Plaintiff/Respondent to obtain

---

[7] Additionally, Seney testified on April 13, 2026 that students do not need to file a formal complaint in order to receive academic accommodations. Accordingly, the impeachment value of Complainant's academic performance as a purported motive for filing the complaint is minimal— assistance would have been available whether the complaint was filed or not.

evidence to test the veracity of Complainant's testimony, prevented any meaningful cross-examination from taking place." ECF No. 15, PageID.320–21. Plaintiff alleges that the investigator refused to obtain Complainant's academic records, medical records, and mental health records. ECF No. 7, PageID.135–36. Plaintiff argues that Complainant's academic transcripts "would have been immeasurably helpful to determine Complainant's credibility regarding her motive for filing her complaint, particularly in light of her pending academic probation for Fall 2024 term and admission she has been near probation for the Fall 2023 term, two out of three terms at the time." *Id.* at PageID.966.

However, a university's failure to obtain a specific piece of evidence or compel an individual to provide evidence is not a due process violation by itself. Nor does Plaintiff point to any case law in support of his claim. Instead, courts routinely highlight that "[a] school is an academic institution, not a courtroom or administrative hearing room." *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 88 (1978). For that reason, "Universities do not have subpoena power." *Univ. of Cincinnati*, 872 F.3d at 405.

Indeed, the Sixth Circuit has denied a due process claim from a plaintiff making an identical argument. In *Noakes*, Plaintiff argued that "[the University of Cincinnati] should have shared records of Roe's medical treatments and academic accommodations from after the alleged assault, which could have helped him impeach her." *Noakes*, 2024 WL

4579453, at *5. The Sixth Circuit rejected Noakes's argument, finding that "[p]ut simply, the law does not support his position that due process entitled him to Doe's records." *Id.*

The Sixth Circuit's opinion in *Noakes* directly impacts the question before the Court today and the Court comes to the same conclusion: the University's purported failure to obtain Complainant's records does not amount to a due process violation.

Of course, in some circumstances, a university's decision to withhold academic records can *contribute* to a finding that a due process violation occurred. For instance, in *Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645 (S.D. Ohio Nov. 7, 2016) ("*Ohio State Univ.*"), the plaintiff claimed that the university planned to expel the complainant, allowed the complainant to stay because she alleged sexual assault by the plaintiff, and withheld that information at his hearing. The plaintiff alleged that, as a result, he "had no way to know about critical evidence that would impeach his accuser's credibility" in "case where the panel's decision hinged on a credibility decision." *Id.* at 663. Thus, "Doe could not impeach her because he didn't have the evidence of the timing of her accommodation." *Id.* Based on those facts, the district court found that the evidence of the timing of complainant's accommodation was "critical impeachment evidence." *Id.*

Notably, however, the district court did not conclude that the university's decision not to release the academic records to plaintiff was

a due process violation. *Id.* at 662 ("But the right to mandatory disclosures of any impeachment evidence is not a clearly established constitutional right in the student disciplinary context."). In fact, the district court concluded that releasing the complainant's academic records to the plaintiff would violate federal law. *Id.* at 662 ("It appears that releasing Jane Roe's academic records to Doe—even redacted versions—would violate [Family Educational Rights and Privacy Act].").

Instead, the district court narrowly found that "[i]f the Administrators knew that Jane Roe lied about the timing of her accommodation at the hearing and permitted her testimony to stand unrebutted, that plausibly violated John Doe's right to a fundamentally fair hearing, regardless of whether the issue is construed as one of cross-examination or disclosure." *Id.* at 662. In other words, the court found that the plausible due process violation occurred when the university allowed false testimony by the complainant to stand unrebutted.

Here, however, the circumstances are plainly inapposite. First, there is no evidence in the record that Complainant lied about the timing of any accommodations or that the University let such a lie stand unrebutted. In fact, Complainant was not asked any questions about her accommodations. For this reason alone, the concern underlying the district court's opinion in *Ohio State Univ.* does not apply.

Second, Plaintiff's advisor had the opportunity—as he himself testified to during the April 13, 2026 hearing—to ask the Complainant

44

questions about her motivations in filing a complaint, including whether she filed the complaint in order to receive academic accommodations.

Third, unlike in *Ohio State Univ.*, here, Complainant's academic records were not "critical impeachment evidence." *Id.* Seney, director of gender equity and Title IX coordinator at the University, testified on April 13, 2026 that students do not need to file a formal complaint in order to receive an academic accommodation. Thus, the impeachment value of Complainant's academic records had only minimal value.

Indeed, absent the narrow set of circumstances in *Ohio State Univ.*, in which the district court found that "[i]f the Administrators knew that Jane Roe lied about the timing of her accommodation at the hearing and permitted her testimony to stand unrebutted," such circumstances would "plausibly" violate due process, *id.* at 662, courts routinely reject the argument that a university's failure to turn over an accuser's records during a school investigatory process is a violation of due process. For instance, in *Noakes*, the Sixth Circuit concluded that the district court's opinion in *Ohio State Univ.* was not persuasive because, "although [the complainant] may have received academic supports after filing her complaint, Noakes points to no evidence that she needed those supports beforehand and had motive to lie to receive them." *Noakes*, 2024 WL 4579453, at *6.

Similarly, during the April 13, 2026 evidentiary hearing and during the oral argument on the same day, Plaintiff raised, for the first time, the

argument that providing a mechanism to allow a respondent to compel a complainant to provide evidence is necessary under the due process clause.

The Sixth Circuit has rejected fact-specific versions of Plaintiff's argument. *See id.* Nor is the Court aware of any case law that supports Plaintiff's understanding of the due process clause. Thus, the Court sees no reason to depart from this binding case law.

Additionally, there are persuasive reasons counseling against holding that due process requires a compulsory evidence gathering process during a university's investigation of incidents of sexual misconduct. Such a requirement is likely impermissible under the Department of Education's implementing regulations under Title IX. Those rules consider coercive efforts against a person for refusing to participate in an investigation to be a form of retaliation. *See, e.g.*, 34 C.F.R. § 106.2 (defining "retaliation" as "intimidation, threats, coercion, or discrimination against any person" for "refus[ing] to participate in any manner in an investigation, proceeding, or hearing under this part"). Additionally, compelling complainant to provide the sort of evidence envisioned by Plaintiff would require complainants to waive other federal rights, such as the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, *see Ohio State Univ.*, 219 F. Supp. 3d at 662 ("Here, the accommodation Jane Roe received is part of her academic record at OSU. Disclosing this accommodation would likely violate

46

FERPA."). Requiring complainants to waive statutory rights in order to invoke their university's sexual misconduct investigatory procedures would curtail Title IX's protective scope and change the regulatory scheme envisioned by the Department of Education. Absent any authorities supporting Plaintiff's position, first articulated on April 13, 2026, the Court will not upend Title IX's regulatory scheme by holding that, to comply with procedural due process, universities must adopt compulsory mechanisms to require students to produce evidence requested by an opposing party.

Finally, for the first time during the oral argument on April 13, 2026, Plaintiff advanced a jurisdiction-type challenge to the disciplinary process. Plaintiff made the argument that, because the October 10, 2024 incident occurred in an off-campus apartment, the University's investigation exceeded the University's "jurisdiction" under its own policy. Accordingly, Plaintiff argued, absent "jurisdiction," the University's investigatory and disciplinary proceeding violated his due process rights. Defendants disagree, arguing that the Policy covers the October 10, 2024 incident.

This argument lacks merit. The University's Policy plainly covers the October 10, 2024 incident. Specifically, in the section of the University's Policy pertaining to its scope and applicability, the Policy states that even if the conduct occurred off campus and outside of a University program or activity, the "University retains discretion to

47

determine whether" the conduct "is within the University's jurisdiction." ECF No. 33-2, PageID.446. In any case, Plaintiff has not articulated how a university's investigation and disciplinary proceeding conducted outside of the "jurisdiction" of its policy would violate due process. *See Univ. of Cincinnati*, 872 F.3d at 407 ("[a] school's departure from its own hearing rules amounts to a due process violation only when the departure results in a procedure which itself impinges on due process right" (citation omitted)).

Considering the allegations in the Complaint and the evidentiary record before the Court, the Court cannot conclude at this stage that Plaintiff was denied a meaningful opportunity to be heard. He presented witnesses, submitted evidence and testimony, responded and requested changes to the preliminary report and the evidence file prior to a hearing, participated in a hearing in which he cross-examined the Complainant and her witnesses through his advisor, and pursued an appeal.

While Plaintiff raises some procedural irregularities and what appears to be an asymmetrical approach of the University to obtaining his testimony and the testimony of his witnesses compared to the Complainant's testimony and the testimony of her witnesses, Plaintiff's allegations do not clearly explain, at this point, how these irregularities amount to a constitutional violation.

"Review under *Mathews* asks only whether John Doe had an opportunity to respond, explain, and defend, not whether a jury could

constitutionally convict him using the same procedures." *Univ. of Cincinnati*, 872 F.3d at 400 (cleaned up). Plaintiff clearly had such an opportunity. Accordingly, Plaintiff has failed to "demonstrate[] a strong likelihood of success on the merits," *Handel's Enters., Inc.*, 765 F. App'x at 123, for his due process claim.

Next, while much of Plaintiff's Complaint and Motion for a Preliminary Injunction appears to attack the validity of the *outcome* of the University's Title IX investigatory process, such an argument is not a cognizable due process claim. Nor does Plaintiff bring a cause of action asserting a selective enforcement theory of Title IX. *See, e.g., Gischel v. Univ. of Cincinnati*, 302 F. Supp. 3d 961, 971–72 (S.D. Ohio Feb. 5, 2018), *on reconsideration in part,* No. 17-475, 2018 WL 9944971 (S.D. Ohio June 26, 2018). The Complaint cannot fairly be read as an attempt to plead the elements of such a theory, nor to sue under an erroneous outcome theory. *See, e.g., id.*

At bottom, Plaintiff's allegations challenge the fairness and sequencing of the University's process. But constitutionally required due process requires only a meaningful opportunity to be heard—not a perfectly balanced or error-free proceeding.

Accordingly, as to Plaintiff's sole cause of action, alleging violations of his Fourteenth Amendment procedural due process rights, Plaintiff has failed to show that he is likely to succeed on the merits. Thus, this "often … determinative" factor, *see City of Pontiac Retired Emps. Ass'n v.*

49

*Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014), weighs against injunctive relief.[8]

## B. Whether Plaintiff Would Suffer Irreparable Harm Absent an Injunction

"The second factor … asks whether the movant is likely to suffer irreparable harm in the absence of the injunction." *Univ. of Cincinnati*, 872 F.3d at 407.

The record before the Court shows that, absent injunctive relief, Plaintiff will be suspended from the University for two years and suffer reputational harm from having been found to have sexually assaulted another student. Case law supports the conclusion that such a consequence constitutes irreparable harm. *Doe v. Univ. of Cincinnati*, No. 15-600, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015) ("*Univ. of Cincinnati II*") ("courts have held that suspension from school can cause irreparable harm" (collecting cases)); *Univ. of Cincinnati*, 872 F.3d at 407 ("Were we to vacate the injunction, Doe would be suspended for a year and suffer reputational harm both on and off campus based on a finding

---

[8] While a preliminary injunction "issued where there is simply no likelihood of success on the merits *must be reversed*," *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010) (emphasis added), the Court will nevertheless cursorily address the remaining factors.

rendered after an unfair hearing. Accordingly, this factor weighs in favor of preliminary relief.").[9]

During the oral argument held on April 13, 2026, Defendants suggested that the Court's March 24, 2026 Order denying the TRO resolved this issue in Defendants' favor. Not so. The March 24, 2026 Order addressed the narrow question of whether Plaintiff had shown, with specific facts, that certain and immediate harm would result from denying a TRO that would allow him to return to classes until April 10, 2026. ECF No. 31, PageID.354–55. On this narrow question, the Court found that Plaintiff had not met his burden of proof. *Id.* at PageID.357 ("Plaintiff has not shown, with specific facts, that he is 'likely to suffer some future irreparable harm' that is both immediate and certain as a result of missing two weeks of courses." (citation omitted)). The question before the Court today, however, is different: Whether a full two-year suspension *and* the reputational harm associated with having been found to have sexually assaulted another student amounts to irreparable harm.

It is true that the Court's March 24, 2026 Order does suggest that it is not clear whether a delayed graduation by itself constitutes

---

[9] In any case, though Defendants claim that the mere interruption of an academic career can be remedied with monetary damages, Defendants do not appear to contest that a two-year suspension combined with the reputational harm associated with a finding of having sexually assaulted another student constitutes irreparable harm. *See* ECF No. 33, PageID.430–32.

irreparable harm. *Id.* at PageID.357–58. But that is not the question before the Court because Plaintiff also faces considerable reputational harm. Considering all the evidence presented, the Court concludes that Plaintiff has shown the presence of irreparable harm that would weigh in favor of preliminary relief.

C. **Whether Issuance of the Injunction Would Cause Substantial Harm to Others & Whether the Public Interest Would Be Served by the Issuance of the Injunction**

"The third factor we must consider is whether the issuance of the injunction would cause substantial harm to others." *Handel's Enters., Inc.*, 765 F. App'x at 125. The fourth factor we must consider is "whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 551 (citation omitted). Courts frequently consider these two factors together. *See, e.g.*, *Bonnell v. Lorenzo*, 241 F.3d 800, 826 (6th Cir. 2001).

Defendants argue that both the Complainant and the University would suffer substantial harm. ECF No. 33, PageID.432–33. The Court addresses each argument in turn.

First, Defendants argue that Complainant would suffer harm if the injunction was issued, such as by having to "limit her movement on campus, fearing that she may encounter Plaintiff." *Id.* at PageID.432–33.

52

Plaintiff argues that the injunctive relief sought would not harm any individuals:

> If Plaintiff were to return to the University to complete his Bachelor's and Master's degrees, Plaintiff does not have to step on campus to complete his coursework, he can participate online and complete coursework remotely. Plaintiff does not live in the same apartment complex as Complainant, he has moved. The likelihood of interacting or even seeing Complainant in that environment is moot.
>
> Additionally, Complainant and Plaintiff have two very different majors. Complainant is on academic probation for her Aerospace Engineering degree at the François-Xavier Building (FXB) on North Campus, whereas Plaintiff is getting a degree in Business Administration at the Ross School of Business in Central Campus. These two buildings are 2.8 miles apart and a 12-minute drive from each other. As a result, Plaintiff is unlikely to interfere with Complainant's right to education.
>
> Additionally, Plaintiff and Complainant have successfully avoided each other on Campus from the date of the mutual no-contact order through Plaintiff's February 18, 2026, suspension.

ECF No. 15, PageID.324.

Defendants dispute whether it would be possible for Plaintiff to graduate while completing his coursework remotely, limiting his time on campus. Along their response brief, Defendants submitted an affidavit of Kaci Kegler, Managing Director in the Office of Undergraduate Programs at the University of Michigan's Ross School of Business. *See* ECF No. 33-

13. Kegler attests that some of the courses Plaintiff seeks to re-enroll in cannot be completed remotely. *Id.* at PageID.572.

On this record, the Court concludes that an order allowing Plaintiff to return to his program would appear to require Plaintiff to spend some time on campus.

Given this fact, the Court finds that if an injunction were granted, Complainant would be exposed to some possible harm. Even if the risk of encountering Plaintiff is quite low, common sense and experience suggests that the Complainant would likely experience some discomfort, anxiety, or fear from knowing that the individual found to have sexually assaulted her is present on the same campus as her, and the possibility exists that they would encounter one another.

At the same time, this psychological harm is relatively insubstantial. First, Plaintiff's requested injunctive relief is limited to rejoining his scheduled classes for the current semester, allowing him to graduate in May 2026. ECF No. 15, PageID.302. Thus, the time period during which Complainant would face any psychological harm from sharing the University's campus with Plaintiff is brief and limited.

Second, the injunctive relief could be crafted as to minimize the risk of Plaintiff and Complainant encountering one another. This fact alone distinguishes this case from others in which courts have found that reinstating a student following a disciplinary finding of sexual misconduct would harm the complainant. *Marshall v. Ohio Univ.*, No. 15-

775, 2015 WL 1179955, at *10 (S.D. Ohio Mar. 13, 2015) ("placing Plaintiff and [the complainant] *into close proximity*" could potentially interfere with the right to pursue her education in a harassment free environment, "thereby causing significant harm to [complainant]" (emphasis added)).

Third, the fact that the University did not act with urgency in resolving the Title IX proceedings, taking 366 days to complete its investigation, *see* ECF No. 7, PageID.130, suggests that the University "is not concerned that [Plaintiff] poses a risk to other students." *Doe v. Univ. of Cincinnati*, 223 F. Supp. 3d 704, 712 (S.D. Ohio Nov. 30, 2016), *aff'd*, 872 F.3d 393 (6th Cir. 2017).

Thus, the record supports the conclusion that Complainant would suffer some harm from granting injunctive relief. However, such harm is not substantial enough so as to weigh against granting an injunction. Indeed, during the status conference held on April 9, 2026, Defendants agreed to stipulate to the fact that Complainant is unlikely to suffer significant harm if relief were granted.

Next, the Defendants argue that granting injunctive relief "would undermine the University's ability to investigate and remedy sexual harassment, particularly for upperclassmen." ECF No. 33, PageID.433. This, Defendants argue, would harm the public interest. *Id.*

By way of response, Plaintiff points out that, "the University fails to recognize they have failed to adhere to their own policy at every turn.

If the University and Defendant want to enforce their own disciplinary action without hinderance, the University needs to adhere to the guidelines they write." ECF No. 15, PageID.324.

On this question, the Defendants have the better argument. Allowing Plaintiff to return to classes and graduate—after he was duly suspended pursuant to the outcome of the University's Title IX disciplinary process, ECF No. 7, PageID.140, 144, and unable to demonstrate a likelihood on the merits that the disciplinary process violated his due process rights—would undermine the University's disciplinary process. This would weaken the University's ability to enforce its own rules.

In other words, granting a preliminary injunction to Plaintiff despite a finding that he is unlikely to succeed on the merits would suggest that the federal judiciary may be used to seek a reprieve from a disciplinary finding, even where the disciplinary process does not involve a violation of constitutional rights. This would undoubtedly undermine the University's ability to enforce its rules and thereby protect its students from sexual misconduct, a substantial harm to the University. This conclusion finds support in the testimony of Title IX Director Elizabeth Seney, who testified on April 13, 2026 that the University's Policy would be rendered meaningless if the University could not enforce it. She further testified that without the University's ability to impose sanctions, the ability of students to report misconduct would be damaged.

Finally, there is little evidence suggesting that granting injunctive relief would serve the public interest. As described above, granting the preliminary injunction would likely disturb the University's ability to enforce its disciplinary procedures. This "would not be in the public interest." *Univ. of Cincinnati II,* 2015 WL 5729328, at *3 ("granting a temporary restraining order would likely disturb the University's ability to enforce its disciplinary procedures, which would not be in the public interest").

Plaintiff contends that "it is always in the public interest to prevent the violation of a party's constitutional rights," *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998). Here, however, Plaintiff has not established a strong likelihood of showing that his rights were violated. Plaintiff thus fails in demonstrating that issuance of a preliminary injunction is in the public interest. *See, e.g., Marshall,* 2015 WL 1179955, at *10 ("Plaintiff has not established a strong likelihood of succeeding on his constitutional claims and the Court accordingly cannot reach the conclusion that the Policy in fact violates constitutional rights. As such, Plaintiff cannot show that issuance of a temporary restraining order is in the public interest."). Accordingly, this factor weighs in favor of denying the injunction. *Doe v. The Ohio State Univ.,* 136 F. Supp. 3d 854, 872 (S.D. Ohio Jan. 22, 2016) ("As with the harm-to-others factor, if the plaintiff is unlikely to prevail on his constitutional claim, this factor weighs in favor of denying the injunction."); *cf. Jones v. Caruso,* 569 F.3d

57

258, 278 (6th Cir. 2009) ("in First Amendment cases, the determination of where public interest lies is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge" (cleaned up)); *Overstreet*, 305 F.3d at 579 ("while the public clearly has interest in vindicating constitutional rights, it is unlikely that [plaintiff] can demonstrate that any constitutional rights are implicated on these facts" thus the public interest lies with the denial of [plaintiff's] request for an injunction").

Accordingly, the Court finds that the University would be substantially harmed and the public interest would not be served by granting an injunction. Thus, these two factors weigh against granting preliminary relief.

## D. Conclusion

The Court concludes that Plaintiff has not demonstrated a substantial likelihood of success on the merits. This factor is "often … determinative." *City of Pontiac Retired Emps. Ass'n*, 751 F.3d at 430; *accord Univ. of Cincinnati*, 872 F.3d at 399. Additionally, the Court has found that the "harm to others" and the "public interest" factors weigh against the issuance of an injunction. On the other hand, Plaintiff has demonstrated a likelihood that the denial of the preliminary injunction would cause him irreparable harm. Unfortunately, although a decision on the merits has not yet been made, if there is no constitutional

58

violation, then the kind of harm Plaintiff is suffering is not one that the federal law can remedy. *See Marshall*, 2015 WL 1179955, at \*10 ("[A]lthough Plaintiff may indeed suffer irreparable harm if OU's suspension is allowed to stand, the Court cannot find that the factors, when balanced against each other, weigh in his favor.").

Weighing these factors against each other, the Court concludes that a preliminary injunction should not be issued. *See, e.g., id.* (denying injunctive relief when only the irreparable harm factor weighed in favor of granting the injunction). Plaintiff's Motion for a Preliminary Injunction is therefore **DENIED**.

## IV.   CONCLUSION

For the following reasons, Plaintiff's Motion for a Preliminary Injunction (ECF No. 15) is **DENIED**.

**SO ORDERED**.

Dated: April 20, 2026

Terrence G. Berg
HON. TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE