# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**JOHN DOE,** *an individual,*

      Plaintiff,

v.

**UNIVERSITY OF MICHIGAN BOARD OF REGENTS OF THE UNIVERSITY OF MICHIGAN,** *a constitutional corporate body,* **ELIZABETH SENEY, TAMIKO STRICKMAN, ERIK WESSEL, LAURA BLAKE JONES, MICHAEL RYANS** and **SUZANNE QUINN MCFADDEN,**
*employees of the University of Michigan, sued in his or her personal and official capacities, jointly and severally,*

      Defendants.

Case No: 26-CV-10768
Hon. Terrence G. Berg

---

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

| **DEBORAH GORDON LAW** | **Miller, Canfield, Paddock and Stone, P.L.C** |
|---|---|
| Deborah L. Gordon (P27058) | |
| Elizabeth Marzotto Taylor (P82061) | Brian M. Schwartz (P69018) |
| Sarah Gordon Thomas (P83935) | Joel C. Bryant (P79506) |
| Attorneys for Plaintiff | Gabrielle Bayne (P88706) |
| 33 Bloomfield Hills Parkway, Suite 220 | Attorneys for Defendants |
| Bloomfield Hills, Michigan 48304 | 150 W. Jefferson Road, Suite 2500 |
| (248) 258-2500 | Detroit, MI 48226 |
| dgordon@deborahgordonlaw.com | (313) 963-6420 |
| emarzottotaylor@deborahgordonlaw.com | schwartzb@millercanfield.com |
| sthomas@deborahgordonlaw.com | bryant@millercanfield.com |
| | bayne@millercanfield.com |
| | fitch@millercanfield.com |

NOW COMES Plaintiff John Doe, by and through his attorneys, Deborah Gordon Law, and for his Motion for a Temporary Restraining Order and Preliminary Injunction.

1.      On November 4, 2025 Plaintiff was found to have violated a University Policy.

2.      On November 13, 2025, Plaintiff was sanctioned by the University. The sanctions included that he be immediately suspended from the University for two years, at which time Defendants would decide if he would be readmitted. This sanction constitutes irreparable harm.

3.      Plaintiff argues that the Policy at issue is "void for vagueness" as applied to him. It violated Plaintiff's right to 14th Amendment Due Process.

4.      Plaintiff hereby moves this Court for a temporary restraining order and a preliminary injunction pursuant to the authority of Fed. R. Civ. P. 65(a) and (b), immediately enjoining individual Defendant University and individual Defendants Seney, Quinn McFadden, Wessel, Ryan, and Blake Jones (collectively, "Defendants") to expunge all negative notations on Plaintiff's record associated with the finding of responsibility made against him; allow him to complete his remaining courses and obtain his Bachelor's degree; and enjoin Defendants against applying the University Policy on Sexual and Gender-Based Misconduct ("the Policy") to Plaintiff or any other student.

5.      The facts set forth in Plaintiff's Second Amended Complaint and Demand for Jury Trial ("SAC") ECF No. 87 are incorporated herein as if they were fully restated, as are the factual recitations and legal arguments set forth in Plaintiff's Brief in Support of His Motion for Temporary Restraining Order and Preliminary Injunction ("Brief in Support"), which is filed contemporaneously herewith.

6.      As more fully stated in the SAC and Brief in Support, Plaintiff has a strong likelihood of prevailing on the merits of his claims against Defendants for their violation of his procedural due process rights.

7.      As this Court has already held, unless Defendants are restrained or enjoined by order of this Court, the "full two-year suspension and reputational harm amount to irreparable harm", as a matter of law. Plaintiff will suffer immediate and irreparable injury, loss, and damages as set forth more fully in the SAC and Brief in Support.

8.      The granting of injunctive relief will not cause substantial harm to others. It is in the public interest to enjoin Defendants from violating fundamental due process norms.

9.      In accordance with E.D. Mich. Local R. 37.1, on July 28, 2026, Plaintiff John Doe sought concurrence for a Temporary Restraining Order and Preliminary Injunction. Such concurrence was not forthcoming

WHEREFORE this Court should enter a temporary restraining order and a preliminary injunction immediately expunging all negative notations on Plaintiff's

3

record associated with the finding of responsibility made against him; allowing him to complete his remaining courses and obtain his Bachelor's degree; and enjoining Defendants against applying the University Policy on Sexual and Gender-Based Misconduct ("the Policy") to Plaintiff or any other student.

Respectfully submitted,

Dated: July 28, 2026

**DEBORAH GORDON LAW**
**_/s/Deborah L. Gordon_**
Deborah L. Gordon (P27058)
Attorneys for Plaintiff
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2026, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing and service of said documents to all parties through their counsel of record.

**DEBORAH GORDON LAW**
**_/s/ Deborah L. Gordon_**
Deborah L. Gordon (P27058)
_Attorneys for Plaintiff_
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com

4

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**JOHN DOE,** *an individual,*

    Plaintiff,

v.

**UNIVERSITY OF MICHIGAN BOARD OF REGENTS OF THE UNIVERSITY OF MICHIGAN,** *a constitutional corporate body,* **ELIZABETH SENEY, TAMIKO STRICKMAN, ERIK WESSEL, LAURA BLAKE JONES, MICHAEL RYANS** and **SUZANNE QUINN MCFADDEN,** *employees of the University of Michigan, sued in his or her personal and official capacities, jointly and severally,*

    Defendants.

Case No: 26-CV-10768
Hon. Terrence G. Berg

---

**PLAINTIFF'S BRIEF IN SUPPORT OF HIS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

| **DEBORAH GORDON LAW** | **Miller, Canfield, Paddock and Stone, P.L.C** |
|---|---|
| Deborah L. Gordon (P27058) | |
| Elizabeth Marzotto Taylor (P82061) | Brian M. Schwartz (P69018) |
| Sarah Gordon Thomas (P83935) | Joel C. Bryant (P79506) |
| Attorneys for Plaintiff | Gabrielle Bayne (P88706) |
| 33 Bloomfield Hills Parkway, Suite 220 | Attorneys for Defendants |
| Bloomfield Hills, Michigan 48304 | 150 W. Jefferson Road, Suite 2500 |
| (248) 258-2500 | Detroit, MI 48226 |
| dgordon@deborahgordonlaw.com | (313) 963-6420 |
| emarzottotaylor@deborahgordonlaw.com | schwartzb@millercanfield.com |
| sthomas@deborahgordonlaw.com | bryant@millercanfield.com |
| | bayne@millercanfield.com |
| | fitch@millercanfield.com |

# TABLE OF CONTENTS

Index of Authorities ----------------------------------------------------------------------------- iv

  I.   OVERVIEW ------------------------------------------------------------------------------ 1

  II.   FACTS ---------------------------------------------------------------------------------- 1

    A. Background -------------------------------------------------------------------------- 2

    B. Complainant Sought a Romantic Relationship with Plaintiff; He Declined ---------------------------------------------------------------------------------- 3

    C. October 10, 2024 Encounter Resulting in Plaintiff's Two-Year Suspension ------------------------------------------------------------------------------ 3

    D. After October 10, Complainant Continued to Seek a Relationship with Plaintiff --------------------------------------------------------------------------------- 6

    E. Plaintiff is Found Guilty of Sexual Assault ------------------------------------------- 8

  III.   THE POLICY AS APPLIED TO PLAINTIFF DEPRIVED HIM OF DUE PROCESS --------------------------------------------------------------------- 10

    A. The Policy is Vague as Applied to Plaintiff's Actions --------------------------- 11

    B. The Policy's Vague Language Resulted in the Hearing Officer Ignoring the "Reasonable Person" Standard ----------------------------------------------- 14

    C. The Policy's Vague Language Resulted in the Hearing Officer's Written Determination Faling to Comport with the Policy -------------------------------- 15

  IV.   LAW AND ARGUMENT ------------------------------------------------------------ 18

    A. Legal Standard for Temporary Restraining Order -------------------------------- 18

    B. Plaintiff Has a Strong Likelihood of Success on the Merits --------------------- 20

1.  As Applied to Plaintiff, The Policy is So Vague That a Person of Ordinary Intelligence Cannot Readily Identify What Conduct It Requires and Prohibits ---------------------------------------------------------- 20

C.  The Policy Relies on General Terms that are Undefined ------------------------ 26

D.  The Hearing Officer Abandoned the Reasonable Person Analysis-------------- 28

E.  Plaintiff Will Suffer Irreparable Harm ----------------------------------------------- 32

F.  Whether the Issuance of the Injunction Would Cause Substantial Har, to Others and Whether the Public Interest Would be Served by an Injunction ----------------------------------------------------------------------------------- 33

iii

# INDEX OF AUTORITIES

## Cases

*AT&T Co. v. Winback & Conserve Program*,
   42 F.3d 1421 (3d Cir. 1994) ...................................................................... 34

*Belle Maer Harbor v. Charter Twp. of Harrison*,
   170 F.3d 553 (6th Cir. 1999) ........................................................... 21, 25, 26

*Bonnell v. Lorenzo*,
   241 F.3d 800 (6th Cir. 2001) ..................................................................... 33

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
   511 F.3d 535 (6th Cir. 2007) .............................................................. 20, 33

*Conn v. Gabbert*,
   526 U.S. 286 (1999) .................................................................................. 20

*Connally v. Gen. Constr. Co.*,
   269 U.S. 385 (1925 [1926]) ....................................................................... 21

*Connection Distrib. Co. v. Reno*,
   154 F.3d 281 (6th Cir. 1998) ..................................................................... 34

*Dambrot v. Cent. Michigan Univ.*,
   55 F.3d 1177 (6th Cir. 1995) .............................................................. 24, 26

*Doe v. Univ. of Cincinnati*,
   872 F.3d 393 (6th Cir. 2017) ............................................................... 19, 33

*Doe v. Univ. of Cincinnati*,
   No. 15-600, 2015 WL 5729328 (S.D. Ohio Sept. 30, 2015) ....................... 33

*Doe v. Univ. of Michigan*,
   721 F. Supp. 852 (E.D. Mich. 1989) ................................................. 22, 23, 26

*Ford Motor Co.*,
   264 F.3d at 508 ......................................................................................... 22

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,*
  23 F.3d 1071 (6th Cir. 1994).................................................................. 34

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972)..............................................................10, 11, 15, 21, 22

*Handel's Enters., Inc. v. Schulenburg,*
  765 F. App'x 117 (6th Cir. 2019) .......................................................20, 33

*Harris v. Forklift Systems, Inc.,*
  510 U.S. 17 (1993).................................................................................. 14

*Int'l Union of Painters & Allied Trades Dist. Council No. 6 v. Smith,*
  148 F.4th 365 (6th Cir. 2025) ............................................................... 19

*Kolender v. Lawson*
  461 U.S. at 353 (1983) .....................................................................15, 25, 26

*Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.,*
  69 F.4th 350 (6th Cir. 2023) ...............................................................21, 22

*Lanzetta v. New Jersey,*
  306 U.S. 451 (1939)................................................................................ 22

*McGlone v. Cheek,*
  534 F. App'x 293 (6th Cir. 2013) .......................................................... 21

*Motor Vehicle Bd. of Calif. v. Fox,*
  434 U.S. 1345 (1977) ............................................................................. 19

*N.A.A.C.P. v. City of Mansfield, Ohio,*
  866 F.2d 162 (6th Cir. 1989)................................................................. 20

*NetChoice, LLC v. Yost,*
  No. 25-3371, 2026 WL 1758907 (6th Cir. June 18, 2026) ........................... 21

*Ohio Republican Party v. Brunner,*
  543 F.3d 357(6th Cir. 2008)................................................................. 19

*PACCAR*,
  319 F.3d at 249 ................................................................................................ 19

*Platt*,
  894 F.3d at 246 ................................................................................................ 22

*Procter & Gamble Co. v. Bankers Trust, Co.*,
  78 F.3d 219 (6th Cir. 1996) ............................................................................ 18

*Smith ex rel. Smith v. Mount Pleasant Pub. Schs.*,
  285 F. Supp. 2d 987 (E.D. Mich. 2003) ............................................... 24, 25, 26

*United States v. Williams*,
  553 U.S. 285 (2008) ......................................................................................... 23

*Vill. of Hoffman Ests.*,
  455 U.S. at 499 ................................................................................................ 22

**Statutes**

42 U.S.C. § 1983 ................................................................................................ 20

**Rules**

Fed. R. Civ. P. 65(a) .......................................................................................... 18

## I.    OVERVIEW

Plaintiff seeks injunctive relief based on Defendant's violation of his 14th Amendment rights to due process.  Plaintiff was poised to graduate in a few months when, in early 2026, he was found to have violated the University's policy on "Sexual and Geder Based Misconduct."  This resulted in a devastating two-year suspension, a permanent record of misconduct and significant reputational harm which is ongoing. The due process deprivation arises from the University's policy as to "Consent" as applied here. The policy is clearly vague, depriving Plaintiff of fair warning.  The vagueness of the policy led to arbitrary enforcement by the Hearing Officer and findings that were subjective.  Of particular concern is the fact that a key component of the Policy, the question of whether a "Reasonable Person" would have know that the conduct at issue was not consensual was never analyzed or applied.

This case does not ask the Court to second-guess a university's credibility determination or to substitute its judgment for that of campus officials. Rather, it asks whether a public university may suspend a student for two years based on a policy that is so vague that a person of ordinary intelligence cannot readily identify what conduct it requires and prohibits.

## II.    FACTS

*All of the facts set forth below come from documented statements made by Complainant to the University. These include Complainant's Interview Transcript ("Comp."), Final Investigation Report ("F.I.R."), September 30, 2025 Hearing Transcript (Hearing Transcript), and Written Determination Regarding Responsibility ("W.D."). All of these documents were in the possession of the Hearing Officer at the time of the hearing.*

1

**Ex. 5,** W.D., 1-2. *So as to avoid any issues as to credibility, none of these facts are based on statements from Plaintiff.*[1]

## A.    Background

Plaintiff enrolled as a student at the University of Michigan in August 2022. He was scheduled to graduate with a degree in business administration from the University's Ross School of Business on May 2, 2026. Until the events at issue here, Plaintiff's record at the University was devoid of any academic, behavioral, or other misconduct. Complainant enrolled as a Student at the University of Michigan in August 2023. She is scheduled to graduate in May 2027. At the time of these events, both Plaintiff and Complainant were above the age of 18, the legal age of majority in Michigan.

In 2024, the University issued "The University of Michigan Policy on Sexual and Gender-Based Misconduct", which applied to all students. **Ex. 1**, ("Policy").

At all times relevant, both Complainant and Plaintiff resided in the same off-campus apartment building. **Ex. 5,** Written Determination Regarding Responsibility (W.D.), 6. In August 2024, Plaintiff and Complainant initially interacted at the apartment building swimming pool. **Ex. 2,** Complainant Interview Transcript ("Comp"). Complainant and Plaintiff subsequently "began texting one another and spending time together, including at one another's apartments." They were friendly. **Ex. 5,** W.D., 6.

---

[1] Plaintiff denied that many of the complained of acts ever occurred. The question was whether "Complainant's factual account" supported the Hearing Officer's finding.

2

**B.    Complainant Sought a Romantic Relationship with Plaintiff; He Declined**

Complainant began to pursue Plaintiff and said she wanted to "hang out" with him. **Ex. 2**, Comp., 3. In September 2024, Plaintiff told Complainant she could come to his apartment after a football game. She did so. They held hands that night. Complainant thought "maybe this could be romantic" and was upset when Plaintiff did not text her the next day. *Id.*, 3. A few days later, Complainant saw Plaintiff at the pool. Plaintiff explained that he did not "want to date or anything because he was going to study abroad." Complainant "got mad." *Id.*, 3. Plaintiff suggested that they could just be friends. *Id.*, 4. Complainant responded that she did not want to do that, and instead she wanted "to date him" and be in a relationship. *Id.*, 3-4; **Ex. 5,** W.D., 6. After realizing that Plaintiff would not agree to a relationship, in the next few weeks, Complainant "convinced" herself that she was okay with just being friends. **Ex. 2**, Comp., 5.

On September 27, 2024, Plaintiff went to Complainant's apartment. Complainant stated that she and Plaintiff "put on a movie, started talking, and kissed for the first time." **Ex. 3**, F.I.R., 2. Complainant "initiated the kissing" that night. *Id.*; **Ex. 4**, Hearing Transcript, 53. Plaintiff then lay down on the couch, and Complainant was lying on top of him. They "started kissing." After about two hours, they "went to sleep." **Ex. 3**, F.I.R., 2. Plaintiff stayed all night. **Ex. 2**, Comp., 7.

**C.    October 10, 2024 Encounter Resulting in Plaintiff's Two-Year Suspension**

3

On October 10, 2024, Plaintiff came to Complainant's apartment after calling her. Complainant's three roommates were present in the apartment. Complainant and Plaintiff voluntarily "went to her bedroom." **Ex. 3,** F.I.R., 2. Complainant stated that Plaintiff took off his shoes and lay on her bed. Complainant stated that "we both started kissing each other." **Ex. 4,** Hearing Transcript, 54. Complainant told Plaintiff she did "not want to have sex." **Ex. 3,** F.I.R., 2-3. Complainant subsequently stated that she was unfamiliar with what "having sex" meant. **Ex. 2,** Comp., 12. The definition of "having sex" is clearly ambiguous. There is no universal definition of the term. Complainant laid on top of Plaintiff. **Ex. 4**, Hearing Transcript, 54. This did not upset Complainant *Id.*, 55.

Complainant claimed Plaintiff then put his hands down the back of her pants and touched her buttocks. She said, "Don't do that", Plaintiff "stopped", and they continued kissing. **Ex. 2,** Comp., 9-10. This was not found to be a Policy violation. **Ex. 5**, W.D., 37-38.

Next, Plaintiff pulled Complainant's shirt up, and she lifted her arms "for him to pull [her] shirt off." **Ex. 4**, Hearing Transcript, 55. The Hearing Officer found that the removal of her shirt was not a Policy violation because lifting her arms "could have signaled to a reasonable person that the conduct was consensual." **Ex. 5,** W.D., 37. Complainant claims that she then covered her chest with her hands, but states that Plaintiff "touched her breasts and kissed them." **Ex. 3**, F.I.R., 3. The Hearing Officer spent a great deal of time in her Written Determination discussing "hickeys and bruises

4

on Plaintiff's chest" but made no finding of a Policy violation related to the hickeys or the kissing that led to them. **Ex. 5**, W.D., 27-29. This was not found to be a Policy violation. *Id.*

Complainant claimed that Plaintiff took her pants off, which she "went along with", and that while he did so, she made "eye contact" with him. **Ex. 4**, Hearing Transcript, 32-33; **Ex. 2,** Comp., 13-14. This was not found to be a Policy violation. **Ex. 5**, W.D., 27-29.

Complainant claimed that next, Plaintiff then put "his finger in [her] underwear." **Ex. 4,** Hearing Transcript, 32-33. She stated she did not "react to it." According to Complainant, she told Plaintiff, "I'm on my period" and "you're going to get blood all over your finger." *Id.*, 33; **Ex. 2,** Comp., 14. Complainant told the investigator that after Plaintiff withdrew his finger, she told him "Oh, there's no blood on it, **okay**". (Emphasis added). **Ex. 3**, F.I.R., 3; **Ex. 2,** Comp., 14. On its face, this statement was confirmation that the act was "okay". This one act was found to be a violation. It resulted in a two-year suspension.

Complainant stated after Plaintiff removed his finger, "[we] just kept kissing." **Ex. 2,** C. Int, 14. At the hearing, Complainant described the entire interaction as we were "making out." **Ex. 4**, Hearing Transcript, 40.

Shortly thereafter Plaintiff ended the interaction. According to Complainant, Plaintiff stopped kissing her "all of a sudden" and stated that he didn't think she wanted to continue ("you're not into this") and that he was leaving to go home. **Ex. 4**, Hearing

Transcript, 33. When Plaintiff said, "you're not that into it," Complainant denied this was the case and asked him, "What are you talking about?" *Id.* Complainant stated that she was "confused about him wanting to leave" and that she was "confused that all of a sudden he was stopping." **Ex. 2**, C. Int, 14. When asked if she wanted Plaintiff to spend the night, Complainant said no, but only because she had a "Calc II exam the next day, so I didn't want him to spend the night because I needed to go to bed." **Ex. 4,** Hearing Transcript, 35. The parties then engaged in a conversation about business school as compared to the engineering school. **Ex. 2,** Comp., 15-16. Plaintiff left the apartment. **Ex. 3**, F.I.R., 4.

When Complainant woke up the next morning, she did not believe that she had been sexually assaulted, or that anything was "not okay". **Ex. 2**, Comp., 17. It wasn't until many days later, after Plaintiff reiterated that he did not want a romantic relationship that she concluded that she had been sexually assaulted.

### D. After October 10, Complainant Continued to Seek a Relationship with Plaintiff

The next afternoon (October 10, 2024 at 3:06 p.m..) Complainant texted Plaintiff. **Ex. 3**, F.I.R., 90.  She stated that she "hope[d]" that she and Plaintiff "might have some sort of romantic relationship". She "wanted to keep him around because he was my first kiss". **Ex. 4**, Hearing Transcript, 39.

Two days later, on October 12, Complainant texted Plaintiff and urged him to meet her at an Ann Arbor bar. **Ex. 4**, Hearing Transcript, 38-39; **Ex. 2,** F.I.R., 90.

Plaintiff did not respond to the text. On October 15, Complainant was "drunk", and texted Plaintiff again, asking "if you could live in any time period, what would it be?" **Ex. 4**, Hearing Transcript, 39; **Ex. 2**, F.I.R., 91.

On October 17, 2024, Complainant went to Plaintiff's apartment without an invitation or notice. He was not at home. **Ex. 4**, Hearing Transcript, 36. On October 18, 2024, Complainant again went to Plaintiff's residence unannounced. Plaintiff was not home. **Ex. 4,** Hearing Transcript, 36-37. On both October 17 and 18, 2024, Complainant interacted with Plaintiff's roommates, who described her as "aggressively knocking and blocking the peephole on the door." Complainant does not dispute this. **Ex. 4**, Hearing Transcript, 37.

On October 18, at 8:24 AM, Plaintiff texted Complainant "[my roommate] told me you were at the place, I'm going to be out for a bit. Text me when you're free." Complainant responded, "just text me when you get back i can go down." **Ex. 3**, F.I.R., 91, [sic]. Concerned about Complainant's behavior, Plaintiff texted her on October 18, 2024, saying "my roommates told me what you did. You cannot come over here and invite yourself in like that. It's midterm season and that's unacceptable." **Ex. 3**, F.I.R., 92. Later on October 18, 2024, Plaintiff texted Complainant, stating "you free?" Complainant responded that she was and the two got together. **Ex. 3**, F.I.R., 92-93. On October 18, 2024, Plaintiff and Complainant talked and he again told her he did not want to be in a relationship. Complainant responded on October 19, 2024, stating:

7

"hi!!! ik I already said this but i am really sorry that i went crazy on [Plaintiff's roommates]. but i'm glad we were able to talk and i'm not upset anymore because i know where you were coming from! and i don't want you to think you have to distance yourself from me. i'm okay with the fact that you don't want a relationship i just like spending time with you if thats still what you want!" [sic]. **Ex. 3**, F.I.R., 93, (emphasis added).

Complaint stated that as of October 18 in her 'brain" she thought the digital penetration was "consensual". **Ex. 2,** Comp., 21.

On October 19, 2024, Plaintiff gently responded, telling Complainant that he did not intend to see her other than in passing: "I need a bit of time and space... not scheduling hang outs or anything for a while." **Ex. 3**, F.I.R., 93-94. On October 21, 2024, Complainant responded angrily to the text. She was upset, stating "I give up... have a nice life." **Ex. 3**, F.I.R., 94-96. She then "completely cut all contact with him." **Ex. 2,** C. Int, 22. Plaintiff did not respond. **Ex. 3**, F.I.R., 94-96.  Four months later, on February 18, 2025, Complainant filed the complaint of sexual assault. An investigation and hearing ensued.

### E.    Plaintiff is Found Guilty of Sexual Assault

On November 4, 2025, the Hearing Officer found that Plaintiff violated the University of Michigan's 2024 "Policy on Sexual and Gender-Based Misconduct" ("the Policy") because "it was more likely than not that Respondent penetration [sic] Complaint's vagina with his finger without Complaint's consent." **Ex. 5**, W.D., 38. This resulted in a formal finding of "Sexual Assault" which is now a part of Plaintiff's official University Record. Pursuant to the decision of Michael Ryan, Associate Director of the Office of

8

Student Conflict Resolution ("OSCR"), Plaintiff was suspended for two years, the highest-level penalty other than expulsion. **Ex. 8**, Sanctions, 1; **Ex. 10,** Procedures, 30.

Defendants' Student Procedures list eight, fact-intensive "Factors Considered in Sanctioning", including, "the nature of the conduct at issue"; "impact" on Complainant, the community or the University, including "protection of the University Community"; prior misconduct and disciplinary history; maintenance of a safe and respectful environment conducive to learning; the necessity of any specific action to eliminate the Prohibited Conduct and prevent its recurrence; and other mitigating, aggravating, or compelling circumstances, including as set forth in the parties' "sanctioning input statements". **Ex. 2,** Procedures. Defendants provided <u>no</u> analysis of the factors considered and how they applied to Plaintiff, if at all. None of the factors support the life-changing, and quasi-criminal two-year suspension and other sanctions. **Ex. 8**, Sanctions, 1.

Plaintiff appealed the Written Determination and sanctions that were imposed. On January 26, 2026, the "External Reviewer", the Honorable Lawrence F. Stengel (retired), issued his Appeal Decision. **Ex. 7**, Appeal Decision. He upheld the Written Determination as to the Policy violation. As to the Sanctions, unlike Defendants, he analyzed the factors to be applied and found that the two-year suspension was "out of proportion to the circumstances of the violation." ***Id.,*** 7-9. He overturned OSCR's sanction of a two-year suspension and instead imposed a one-year suspension. ***Id.,*** 9.

The Appeal Decision was returned to Defendant Laura Blake Jones, Vice President for Student Life (VPSL). She did not accept that the diminution of the suspension, stating, in part:

> "It is my assessment that the suspension period of two years was reasonable and appropriate to provide adequate time for the completion of reflection that I believe would allow the Respondent to fully understand the harm that was caused… I am modifying the External Reviewer's recommendation by sustaining the period of suspension to be two years extending through November 1, 2027." **Ex. 9,** Jones App. Rev., 2.

In reversing the External Reviewer's decision, the VPSL again did not take into account or comment on the "Factors Considered in Sanctioning" set forth in the 2024 Procedures.

## III.   THE POLICY AS APPLIED TO PLAINTIFF DEPRIVED HIM OF DUE PROCESS

The United States Supreme Court has held that

> "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. [Footnote 3] Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. [Footnote 4] A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104; 109-119 (1972).

The Policy is vague and ambiguous. A student of ordinary intelligence would be unable to discern the parameters of what is consensual and what is not. Indeed, at the

10

time of the encounter, Complainant herself did not form the opinion that she had been subject to "sexual assault". **Ex. 2**, Comp., 18-21; **Ex. 4**, Hearing Transcript, 39, 153. Worse, as *Grayned* warned, the Hearing Officer decided the outcome in a subjective, *ad hoc* manner.

### A.     The Policy is Vague as Applied to Plaintiff's Actions

The University Consent Policy states:

"Some forms of PROHIBITED CONDUCT as defined above involve the issue of Consent.  For purposes of this Policy, <u>Consent is a clear and unambiguous agreement, expressed outwardly through mutually understandable words or actions, to engage in Sexual Activity.</u>

For purposes of this section, Sexual Activity refers to any conduct of a sexual nature for which Consent is required under this Policy (i.e., Sexual Contact, as defined above and behaviors identified in the definition of Sexual Exploitation, above, that require Consent).  <u>A person who initiates Sexual Activity is responsible for obtaining Consent for that conduct.</u>  Consent cannot be obtained by Force or in circumstances involving Incapacitation, as defined below.

In evaluating whether Consent was given under this Policy, the issue is:

- <u>Did the person initiating Sexual Activity know that the conduct in question was not consensual?</u>

- <u>If not, would a REASONABLE PERSON who is unimpaired by alcohol or drugs have known that the conduct in question was not consensual?</u>

If the answer to either of these questions is "Yes," Consent was absent.

<u>Consent is not to be inferred from silence, passivity, or a lack of resistance, and relying on non-verbal communication alone may not be sufficient to determine Consent.</u>

Consent is not to be inferred from an existing or previous dating or sexual relationship.  Even in the context of a relationship, there must be mutual

11

Consent to engage in any Sexual Activity each time it occurs. In cases involving prior or current relationships, the manner and nature of prior communications between the parties and the context of the relationship may have a bearing on the presence of Consent.

Consent to engage in a particular Sexual Activity at one time is not Consent to engage in a different Sexual Activity or to engage in the same Sexual Activity on a later occasion.

Consent can be withdrawn by any party at any point. An individual who seeks to withdraw Consent must communicate, through clear words or actions, a decision to cease the Sexual Activity. Once Consent is withdrawn, the Sexual Activity must cease immediately."

**Ex. 1**, Policy, 16-17 (emphasis added). The Policy defines "Reasonable Person" as a "person of average care, intelligence and judgement known in the circumstances." *Id.*, 22.

It is notable that the Policy intentionally does not use language requiring direct communication, such as "yes means yes", "no means no", any other variation that might be "clear and unambiguous" and understandable to both parties. Such language would dispose of the guess work and different perceptions between partners that the Policy gives rise to. In fact, the Policy does not require *any* verbal communication. The rule that "clear and unambiguous" agreement, expressed outwardly through mutually understandable words or actions" is itself inherently ambiguous. It leaves everything to the eye of the beholder (here, a "Reasonable Person") and ultimately to the subjective discretion of the decision maker, as can be clearly seen in this case. If direct words are not used, as here, how is one to know whether there is "an agreement" that is "mutually understood'? There is no description or example of what a mutually understandable

12

"action" would be. This results in guesswork. The Policy states that the "agreement" should be expressed "outwardly" through words or actions. "Outwardly"[2] is not only vague and undefined, but the definition describes something that is the reverse of what would be consensual: "in a way that relates to how people, situations, or things seem to be, rather than how they are inside: Outwardly, he seemed happy enough," https://dictionary.cambridge.org/us/dictionary/english/outwardly.

The Hearing Officer's finding against Plaintiff is an excellent example of this ambiguity in the Policy. At the time of digital penetration, Complaint was not "passive" or "silent". She spoke to Plaintiff, stating he would "get blood on his finger." Upon removal of his finger, she said "Oh there's no blood. Okay." A "Reasonable Person" could logically conclude that there was consent, in that he was being forewarned about blood. This understanding was confirmed with the word "okay." On April 9, 2025, at her interview with the University Complainant stated that she told Respondent that she was on her period in the "hope" that "he would stop him from doing anything further" (emphasis added). **Ex. 2**, Comp., 14; **Ex. 4,** Hearing Transcript, 33. The Hearing Officer adopted her statement as to what was "hoped" instead of what was expressed, as part of her finding of sexual assault. **Ex. 5**, W.D., 10. This proves that the Policy is not workable. According to Complainant, she withheld her true feelings from Plaintiff.

---

[2] A word that would provide an understandable rule is "explicitly" defined as "information that is stated clearly, directly, and in full detail so that there is no doubt of hidden meaning" https://www.merriam-webster.com/dictionary/explicit.

Crucially, a reasonable person cannot read minds, and the Policy does not allow for a party's unspoken thought process to be given dispositive weight in determining whether Consent was present.

**B.    The Policy's Vague Language Resulted in the Hearing Officer Ignoring the "Reasonable Person" Standard**

The Policy includes a section which sets forth a materially different standard: if the person initiating sexual activity did not know there was no consent, the issue is would a "Reasonable Person" have known the conduct was not consensual? **Ex. 1,** Policy, 16. This shifts the inquiry to whether an average person would have recognized the conduct in question was non-consensual, even if there was no "outward, unambiguous consent." The "reasonable person" standard is found throughout sexual harassment cases as to employment in determining whether there was harassment. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993).

This is an objective test used to ensure harassment claims aren't judged solely on Complainant's later, subjective interpretation of the encounter. It provides an objective measure of what a reasonable respondent would have understood from Complainant's outward conduct at the time of the encounter. That objective inquiry exists to ensure that responsibility is not imposed solely based on Complainant's subjective perception or the decision-maker's retrospective interpretation.

The Hearing Officer did not apply the Policy's Reasonable Person analysis to the claim of digital penetration. Her section "**VII., Conclusions regarding the**

14

**Application of the Policy to the Facts and Rationale for Result as to Each Allegation"** fails to address this standard, resulting in the Hearing Officer exercising discretion beyond what the Policy itself authorizes. **Ex. 5,** W.D., 37-38. The resulting decision illustrates the very danger against which due process and the vagueness doctrine are directed: discipline imposed without application of the objective standard the University adopted to cabin official discretion.

### C. The Policy's Vague Language Resulted in the Hearing Officer's Written Determination Failing to Comport with the Policy

In addition to failing to apply the "Reasonable Person" standard, much of the Written Determination is unsupported by the Policy. The Policy does not specify whether the Hearing Officer is analyzing *the parties'* perception of their communications during sex or at some other time, or the Hearing Officer's own perception of the communications, either on an objective or subjective basis. In this case, the Hearing Officer subjectively perceived, months after the encounter, that Complainant did not expressly consent to digital penetration in a way that the Hearing Officer subjectively believed was "clear", "unambiguous", and "mutually understandable". *Grayned* and its progeny prohibit this, finding that "a vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis with the dangers of arbitrary and discriminatory application." *Grayned* at 109. This is precisely the concern identified in *Kolender v. Lawson*— a policy that lacks "minimal guidelines" and therefore permits arbitrary enforcement. 461 U.S. at 353-54 (1983).

15

The Hearing Officer's findings as to sexual assault were in sharp contrast to her other findings. As set forth above, none of the other acts were found to violations. For example, the Hearing Officer found that Complainant raising her arms to assist Plaintiff in removing her shirt signaled consent. This is no different than Complainant advising Plaintiff that she was on her period and that he might get blood on this finger if he touched her. On their face, these words do not indicate that Plaintiff was declining digital penetration, or that she withdrew Consent. Moreover, her subsequent, immediate statements that, "Oh, there's no blood on it, **okay**", disclaiming that she was "not into it", and expressing disappointment that Plaintiff was "stopping" and intended to leave supports a finding that there was Consent. It is highly unlikely that, under an objective, reasonable person standard, these statements could be interpreted to mean "no", "do not proceed", or that consent was withdrawn. The Hearing Officer refused to even consider the import of these verbal communications because, they were spoken, at least in part, after penetration occurred. **Ex. 5**, W.D., 38. This was clearly a subjective determination by the Hearing Officer, as the Policy does not contain any temporal limitation on verbal indicators of consent.

Without any support in the Policy, the Hearing Officer inexplicably justified her finding of responsibility with statements Complainant made earlier in the evening as to other sexual acts. **Ex. 5**. W.D., 38. For example, the Hearing Officer reasoned that, earlier in the evening Complainant said she did not want to have sex that night. This statement says nothing about whether Complainant consented to the Plaintiff touching

16

her vagina with his finger. Second, the Policy allows parties to change their mind about consent at any time during a sexual encounter. For example, a statement by Complainant at the outset of the encounter that "I want to have sex", would have been irrelevant as to other, later sexual activity.

The Hearing Officer further found that when earlier in the evening, Complainant put her hands over her chest, this signaled that, sometime later, "there may be a reason Respondent should not be doing what he was doing" when he touched her vagina. **Ex. 5**, W.D., 38. These are two separate acts occurring at different points in time.  But if the Policy, objectively, allows decisionmakers to reach back to communications about earlier, distinct acts, to be consistent the Hearing Officer should have considered whether when Complainant lifted her arms to assist in removing her shirt, and subsequently engaged in consensual kissing and touching, these actions could have been evidence of consent to later digital penetration.

The Hearing Officer also determined that the mere fact that Plaintiff purportedly knew that "Complainant was sexually inexperienced" was evidence he engaged digital penetration. **Ex. 5,** W.D., 38. The Policy contains no language directing decisionmakers to assess parties' knowledge of their partners' level of sexual experience in determining whether consent is present. Nor does the Policy require any special level of communication during sex based on a party's knowledge that their partner is "inexperienced."

17

As to the key issue of whether there was consent as to digital penetration, the Hearing Officer failed to consider evidence that at the time, Complainant herself did not believe the act was without consent. **Ex. 2,** Comp., 14-22; **Ex. 4**, Hearing Transcript, 38-39, 153; **Ex. 5**, W.D., 8. This included Complainant's questioning why Plaintiff was leaving and "why he was stopping." **Ex. 2**, Comp., 14. She denied his claim that she was "just not into it." **Ex. 4**, Hearing Transcript, 33-34.

The record reflected that Complainant admitted that she did not perceive a lack of consent at the time. The next day, she recounted she "didn't know if it was sexual assault or not." **Ex. 2**, Comp., 17. As late as October 18, Complainant believed "it was consensual" and that "it [was] a misunderstanding". *Id.* Complainant even stated in the September 2025 Hearing that when she spoke with Plaintiff on October 18, eight days after the alleged assault, she "was in denial about the fact that it was assault". **Ex. 4**, Hearing Transcript, 38.

## IV.   LAW AND ARGUMENT

### A.   Legal Standard for a Temporary Restraining Order

The Sixth Circuit has explained that "the purpose of a [temporary restraining order] under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Trust, Co.*, 78 F.3d 219, 227 (6th Cir. 1996) (citing Fed. R. Civ. P. 65(a)). The standard of issuing a temporary restraining order is the same as for a preliminary injunction; however, the temporary restraining order standard places an emphasis on the element of irreparable harm given that the

18

purpose of a temporary restraining order is to maintain the status quo. *See Motor Vehicle Bd. of Calif. v. Fox*, 434 U.S. 1345, 1347 n.2 (1977); *see also Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (stating that a court considers the same factors when determining whether to issue a temporary restraining or a preliminary injunction).

Courts consider four factors when determining whether to grant a preliminary injunction:

(1) whether the movant has a strong likelihood of success on the merits;

(2) whether the movant would suffer irreparable injury without the injunction;

(3) whether issuance of the injunction would cause substantial harm to others;

and (4) whether the public interest would be served by issuance of the injunction.

*Int'l Union of Painters & Allied Trades Dist. Council No. 6 v. Smith*, 148 F.4th 365, 371 (6th Cir. 2025).

The Sixth Circuit has "often cautioned that these are factors to be balanced, not prerequisites to be met." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) (citation omitted) ("*Univ. of Cincinnati*"). In the case of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor. *Id.* The weight a district court gives to each of the four factors and resulting decision to grant or deny preliminary injunctive relief is examined under the abuse of discretion standard. *PACCAR*, 319 F.3d at 249; *see also N.A.A.C.P. v. City of Mansfield, Ohio*, 866

19

F.2d 162, 166 (6th Cir. 1989) (noting that a "district judge's weighing and balancing of the equities should be disturbed on appeal only in the rarest of cases").

###### B.      Plaintiff Has a Strong Likelihood of Success on the Merits

The first factor that the Court must consider is whether Plaintiff demonstrated a strong likelihood of success on the merits. *Handel's Enters., Inc. v. Schulenburg*, 765 F. App'x 117, 121 (6th Cir. 2019). To meet his burden, Plaintiff "must show more than a mere possibility of success." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007). This standard is amply satisfied here.

Plaintiff's SAC alleges five causes of action, but for the purposes of this Motion and Brief, Plaintiff relies on the likelihood of success of Count I, Defendants' violations of Plaintiff's Fourteenth Amendment Procedural Due Process Rights of Property and Liberty, brought under 42 U.S.C. § 1983, alleging that the Policy is void for Vagueness.

Section 1983 creates a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights. *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). To state a prime facie case under § 1983, a plaintiff must allege that (1) the action occurred "under color of law," and that (2) the action was a deprivation of a constitutional right or a federal statutory right. As stated in the SAC, Plaintiff has sufficiently alleged that the individual Defendants acted under color of law, and Plaintiff's causes of action are for deprivations of his constitutional rights.

######    1.   As Applied to Plaintiff, The Policy is So Vague That a Person of Ordinary Intelligence Cannot Readily Identify What Conduct It Requires and Prohibits

20

As set forth above, the vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement by officials. *McGlone v. Cheek*, 534 F. App'x 293, 297 (6th Cir. 2013) (citing *Grayned*, *supra*).

With respect to the first goal, an enactment that forbids or requires the performance of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. *Connally v. Gen. Constr. Co.,* 269 U.S. 385, 391 (1925 [1926]). As to the second goal, if arbitrary and discriminatory enforcement is to be prevented, enactments must provide explicit standards for those who apply them. A vague enactment impermissibly delegates basic policy matters to officials for resolution on an *ad hoc* and subjective basis. *Grayned,* 408 U.S. at 108–09. Plaintiff has described above the facts detailing why the Policy is void for vagueness as applied.

Because Plaintiff does not bring a facial challenge here, he need not show that the Policy "reaches a substantial amount of constitutionally protected conduct" or that it "is impermissibly vague in all of its applications.*" Belle Maer Harbor v. Charter Tp. of Harrison*, 170 F.3d 553, 557 (6th Cir., 1999). A school's policy is unconstitutionally vague as applied to a given case when it either (1) fails to inform ordinary people what conduct is prohibited, or (2) authorizes or even encourages arbitrary and discriminatory enforcement. *Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 360 (6th Cir. 2023) (internal citations omitted). *NetChoice, LLC v. Yost*, No. 25-3371, 2026 WL 1758907, at *16 (6th Cir. June 18, 2026).

21

The level of specificity required depends on context. There is substantially more room for imprecision in enactments bearing only civil, or employment, consequences, than would be tolerated in a criminal code. *Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 360–61 (6th Cir. 2023). However, a civil enactment such as this one, that contains quasi-criminal penalties, including a formal government record that Plaintiff sexually assaulted another individual, is subject to more stringent review. *Ford Motor Co.*, 264 F.3d at 508; *see also Vill. of Hoffman Ests.*, 455 U.S. at 499–500 (holding that an ordinance's "quasi-criminal" character may warrant a relatively strict test).

The Court must look to the Policy's language to assess whether it provides sufficient notice of what it proscribes. *Platt*, 894 F.3d at 246. "[M]athematical certainty" is not required, and "flexibility and reasonable breadth" are not fatal. *Id.* at 246–47 (quoting *Grayned*, 408 U.S. at 110). Nor is the vagueness principle designed to convert into a constitutional dilemma the practical difficulties in drafting school policies. *Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 361 (6th Cir. 2023).

However, the Policy must give adequate warning of the conduct it prohibits and must set out explicit standards for those who apply it. *Doe v. Univ. of Michigan*, 721 F. Supp. 852, 866 (E.D. Mich. 1989). The Policy may not require students to speculate about its meaning at the peril of their property and liberty interests in their education and reputation. *Id.* (citing *Lanzetta v. New Jersey,* 306 U.S. 451, 453 (1939)). The U.S.

22

Supreme Court has struck down statutes that contain "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008).

In *Doe v. Univ. of Michigan*, 721 F. Supp. 852, 856, 867 (E.D. Mich. 1989), this Court found that a university anti-harassment policy was unconstitutionally vague where it sanctioned statements and conduct that were "stigmatizing and victimizing" and that "involve[d] an express or implied threat to an individual's academic efforts, employment, participation in University sponsored extra-curricular activities or personal safety." The Court held that the terms "stigmatize" and "victimize" were unconstitutionally vague, in that they were "general and elude precise definition". *Univ. of Michigan*, 721 F. Supp. at 867.

Next, the Court held that the policy was impermissibly vague as to what kind of conduct would constitute a "threat" to an individual's academic efforts. For example, this language might refer to an unspecified threat of future retaliation by the speaker; or it might equally plausibly refer to the threat to a victim's academic success because the stigmatizing and victimizing speech is so inherently distracting. *Id.* This ambiguity deprived students of notice of what conduct exposed them to sanctions.

Finally, the Court held that the policy provided no inherent guidance as to how decision-makers were to determine whether a stigmatizing or victimizing comment had the purpose or reasonably foreseeable effect of interfering with an individual's academic efforts. *Id.* The policy was unconstitutionally vague because the University never

25

articulated any principled way to distinguish sanctionable from protected speech, forcing students of common understanding to guess at whether a comment about a controversial issue would later be found to be punishable. *Id.*

Similarly, in *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1184 (6th Cir. 1995) the Sixth Circuit struck down as unconstitutionally vague a university discrimination and harassment policy that forbade:

> "any intentional, unintentional, physical, verbal, or nonverbal behavior that subjects an individual to an intimidating, hostile or offensive educational, employment or living environment by ... (c) demeaning or slurring individuals through ... written literature because of their racial or ethnic affiliation; or (d) using symbols, [epithets] or slogans that infer negative connotations about the individual's racial or ethnic affiliation."

*Dambrot*, 55 F.3d at 1182.

The Court reasoned that deciding what conduct would be considered "negative" or "offensive", was necessarily a subjective determination, as different people find different things offensive. *Id.* at 1184. The policy did not provide fair notice of what speech would be a violation, because it wholly delegated to university officials the task of defining what was "offensive". *Id.* The Court found that this "unrestricted delegation of power" rendered the policy unconstitutionally vague. *Id.*

In *Smith ex rel. Smith v. Mount Pleasant Pub. Schs.*, 285 F. Supp. 2d 987, 994–95 (E.D. Mich. 2003), this Court held that a school policy mandating substantial punishment for students who committed "verbal assault", which it defined as "verbally ... threaten[ing] the well-being ... or dignity of persons on school property" was

24

unconstitutionally vague. The Court reasoned that Mount Pleasant Public School's policy did not provide any guidance for what constituted a threat to "well-being" or "dignity", and that these terms invited subjective interpretation that was unlikely to be uniform in all circumstances, and therefore impermissibly vested "virtually unbridled discretion in the administrators charged with its application and enforcement. *Smith ex rel. Smith*, 285 F. Supp. 2d at 996.

In *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999), the Sixth Circuit held that an ordinance stating that an operator of a boat bubbling system may maintain an area of open water around a protected object "not to exceed five … feet, or as determined by the inspecting officer to be a reasonable radius" was unconstitutionally vague. The Court reasoned that there was no commonly accepted meaning for the term "reasonable" that would provide a decisionmaker with guidance on determining whether the ordinance was violated. *Id.* at 558. A dictionary definition for "reasonable" such as "fair, proper, just, moderate, suitable under the circumstances" was ultimately susceptible to a myriad of interpretations. The Court held that this vested government officials with a degree of discretion in enforcement that was unconstitutional. *Id.*

Likewise, in *Kolender v. Lawson*, the Supreme Court held that a statute that required persons to provide "credible and reliable" identification to law enforcement officers was unconstitutionally vague. 461 U.S. at 353-54. The terms "credible and reliable" gave officers "virtually complete discretion" to determine whether an individual's

identification was sufficient. *Id.* at 358, 360. The Policy as applied to Plaintiff suffers from the same flaws as those in the above cases.

### C.  The Policy Relies on General Terms That Are Undefined

As in *University of Michigan* ("stigmitize", "victimize"), *Dambrot* ("negative", "offensive"), *Smith ex rel Smith* ("well-being", "dignity"), *Belle Maer Harbor* ("reasonable") and *Kolender* ("credible", "reliable"), the Policy relies almost exclusively on general terms that are either wholly undefined or that elude precise, objective definition.

The Policy does not state whether students must engage in words or actions during sex that are, subjectively, "clear", "unambiguous", and "mutually understandable" to (1) the parties to sex in the moment or at some other time; or (2) a Hearing Officer, either subjectively or objectively. The Policy is silent as to whether the Hearing Officer was to decide if:

- The parties subjectively viewed their conduct and actions as clear, unambiguous, and mutually understandable agreement during the encounter?

- The parties subjectively viewed their conduct and actions as clear, unambiguous, and mutually understandable agreement at some other time after the encounter?

- The Hearing Officer subjectively viewed the parties' conduct as clear, unambiguous, and mutually understandable agreement? Or

26

- The Hearing Officer determined that the facts objectively displayed clear, unambiguous, and mutually understandable agreement?

The Hearing Officer gave no indication of how she interpreted any of these terms. She provided no reasoning as to what threshold of "clarity", "unambiguity", or "mutual understandability" she was looking for. Left without these crucial, explicit standards, the Hearing Officer made a subjective determination based on her own opinion of the facts. Her finding as to digital penetration being a Policy violation is in sharp contrast to her findings of the other sexual acts that occurred that evening where she found that there were no Policy violations.

Instead, the Hearing Officer relied on the facts that the Hearing Officer subjectively believed were indications that Plaintiff would not have consented to digital penetration, regardless of whether these facts pertained to the touch in question. The Hearing Officer reached back to different points in the encounter such as when Complainant: "covered her chest with her arms," "told Respondent she was on her period"; "previously told Respondent "Stop" and "Don't do that" in response to his earlier act of putting his hands in her pants"; "told Respondent she did not want to have sex that night"; and that "Respondent knew Complainant was sexually inexperienced". **Ex. 5**, W.D. 38. The Hearing Officer held that, in her subjective view, "these facts" indicated that "there is nothing in the record that suggests there was clear and unambiguous agreement for digital penetration." *Id.* In sharp contrast to the Hearing Officer, the appellate External Reviewer held that "consent was withdrawn".

**Ex. 7**, Appeal Decision from External Reviewer, 8. The External Reviewer made no finding of when "withdrawal" occurred under the Policy, what actions signaled "withdrawal", or even what specific sexual activity was at issue in the withdrawal. *Id.* The Policy's lack of guidance led to subjective, divergent findings in this case.

The Policy does not put students on notice that they are responsible for having sex in a way that will convince a Hearing Officer, subjectively, that consent was present. Nor does it put students on notice that university officials may parse their sexual encounters for every time their partners decline a touch, and then use these points to hold that any other touch is non-consensual. The Policy's failure to define "clear" "unambiguous" and "mutually understandable" left the Hearing Officer in this case to subjectively determine that, because Complainant declined different touches earlier in the encounter and was "sexually inexperienced" that she did not consent to digital penetration.

### D.    The Hearing Officer Abandoned the Reasonable Person Analysis

Left without explicit standards on how to search the record for evidence of Plaintiff's intent or how to determine what would have been apparent to "a Reasonable Person", the Hearing Officer abandoned this aspect of the Policy. The Hearing Officer did not analyze whether Plaintiff, in fact, knew that digital penetration was "nonconsensual". Nor did the Hearing Officer analyze whether the facts showed that "a Reasonable Person unimpaired by alcohol or drugs would have known that digital penetration was nonconsensual". As set forth above, the Hearing Officer instead set

forth facts supporting her subjective belief that the Plaintiff had not consented or would not have consented to digital penetration.

The Hearing Officer's finding as to digital penetration is in sharp contrast with her conclusions about other sexual acts that allegedly occurred that night. None of the following were found by the Hearing Officer to have occurred without consent and as such, were not Policy violations:

- "[C]onsensual" kissing; **Ex. 5**, W.D., 6.

- Plaintiff put "both hands in her pants and touched her buttocks." Complainant said "Stop" and "Don't do that" and he "complied".  *Id.*, 9.

- "Respondent removed Complainant's shirt, and when he did so, she raised her arms to assist, despite feeling uncomfortable".

- Respondent "removed Complainant's pants."

Moreover, if separate acts that occurred earlier were relevant, it would have been just as easy to conclude that Complainant raising her arms to assist in removing her shirt indicated consent to digital penetration later. The Hearing Officer gave great weight to: "when Complainant had previously told Respondent 'Stop' and 'Don't do that,' in response to his earlier act of putting his hand in her pants, beneath her underwear, and touching her buttocks." *Id.* According to Complainant, Plaintiff stopped touching her when she said "Stop" and "Don't do that". As set forth above, this earlier act is not relevant to what a Reasonable Person would have understood as

to digital penetration later. If this act is relevant, it could also be used to show that throughout the encounter the parties made and relied on verbal statements like "Stop" and "Don't do that" to communicate whether there was Consent. A reasonable person therefore would not have known that touching was nonconsensual when Complainant made no similar statement as to digital penetration.

The Hearing Officer also relied on the fact that: "Complainant told [Plaintiff] she did not want to have sex that night, and that Respondent knew Complainant was sexually inexperienced." *Id.* The Policy does not allow for either of these findings. As set forth above, when Complainant stated she "did not want to have sex" she was unclear on what that meant. If Complainant herself was unclear on her meaning, a reasonable person could not have derived useful information from the statement. This is particularly true when after saying she "did not want to have sex" she engaged in a series of consensual sexual activities that were not Policy violations. Nor does the Policy allow for consideration of each party's level of prior sexual experience. Prior sexual experience or lack thereof is irrelevant to what occurs at the time of a sexual encounter, or what a reasonable person might know about whether they are engaging in nonconsensual conduct.

The Hearing Officer ignored other important evidence. After the act occurred, the parties continued to kiss. Plaintiff then said he was going home because "you're not that into this." Complainant protested, stating "what are you talking about?" She was "confused about him wanting to leave" and she "did not want him to leave." **Ex. 4,**

30

Hearing Transcript, 33-34. This was further confirmation that both parties had understood there was consent. Complainant was "confused that all of a sudden he was stopping." **Ex. 3**, F.I.R., 4.  Complainant admitted that at that time and for days later she had not formed the opinion that she had been sexually assaulted**. Ex. 2**, Comp., 17. In that the Policy's key question is whether a Reasonable Person would have known that  the conduct was not consensual, Complainant's statements answer that question. At the time of the event and for the next eight days, Complainant did not think she had been sexually assaulted. Moreover, Complainant's continual desire to see Plaintiff and have a relationship with him was relevant to what had occurred. The Hearing Officer did not consider any of these facts. Had the Hearing Officer applied an objective, "Reasonable Person" standard rather than making subjective conclusions, a different outcome would have been reached. The Policy's vague language opened the door to subjective, unprincipled conclusions being drawn from the facts of this case.

The Policy goes on to state that "silence, passivity, or a lack of resistance" cannot be used to "infer" the presence of Consent. This calls into question for students and factfinders whether a party's participation in sexual activity, without more, is ever relevant to a determination of wrongdoing. Where two parties engage in sexual activity using non-verbal communication, factfinders are not told what to look for to determine the presence of "Consent" or one party's knowledge that their conduct was "nonconsensual".

31

The Policy next states that "relying on non-verbal communication alone may not be sufficient to determine Consent". This directly contradicts the Policy's earlier statement that "Consent is" manifested through "words or actions". Students are left to guess whether they can ever rely on their partner's actions to communicate consent. Factfinders are likewise not told if consent can ever be communicated non-verbally. Assuming that some non-verbal communication could suffice, the Policy gives no examples, context, or any principled way for students or factfinders to distinguish what non-verbal communications could satisfy the Policy.

For example, in this case, the Complainant went along with Plaintiff when he removed her pants, made eye contact with him, and continued kissing him. Apparently intuiting that he would proceed to touch her vagina, she forewarned him that she was on period. The Hearing Officer, as set forth above, did not analyze the trajectory of the non-verbal communications leading to digital penetration. Instead, she relied on facts from earlier in the encounter.

The Hearing Officer strongly implied that to avoid sanctions, Plaintiff should have obtained an express verbal "yes" before engaging in digital penetration, even though this is not required under the Policy. W.D. at 38. The Policy does not tell students that they must elicit an express verbal "yes" from their partner for any sexual activity. Nor does it provide examples of specific fact patterns that might require them to do so to avoid sanctions. This language is also impermissibly vague.

### E.    Plaintiff Will Suffer Irreparable Harm

"The second factor … asks whether the movant is likely to suffer irreparable harm in the absence of the injunction." *Univ. of Cincinnati*, 872 F.3d at 407. The record of this case remains that, absent injunctive relief, Plaintiff will be suspended from the University for two years and suffer reputational harm from having been found to have sexually assaulted another student. ECF No. 77, PageID.1599. Likewise, the question before the Court remains whether, "a full two-year suspension *and* the reputational harm associated with having been found to have sexually assaulted another student amounts to irreparable harm". ECF No. 77, PageID.1600 (emphasis in original). Relying on *Doe v. Univ. of Cincinnati*, No. 15-600, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015) ("*Univ. of Cincinnati II*") and *Univ. of Cincinnati*, 872 F.3d at 407, this Court has already answered in the affirmative, holding that, "the Court concludes that Plaintiff has shown the presence of irreparable harm that would weigh in favor of preliminary relief." ECF No. 77, PageID.1601.

### F. Whether the Issuance of the Injunction Would Cause Substantial Harm to Others and Whether the Public Interest Would be Served by an Injunction

"The third factor we must consider is whether the issuance of the injunction would cause substantial harm to others." *Handel's Enters., Inc.*, 765 F. App'x at 125. The fourth factor we must consider is "whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 551 (citation omitted). Courts frequently consider these two factors together. *See*, *e.g.*, *Bonnell v. Lorenzo*, 241 F.3d 800, 826 (6th Cir. 2001).

33

This Court has already found that, based on the same record that exists here, there is no risk of harm to any individual, including Complainant, that weighs against granting an injunction. ECF No. 77, PageID.1604. On the same record that exists here, the Court reasoned that any risk of psychological harm to Plaintiff is "relatively insubstantial", because the time period at issue is "brief and limited" and "injunctive relief could be crafted as to minimize the risk of Plaintiff and Complainant encountering one another." ECF No. 77, PageID.1603. The Court further found that the fact that the University "did not act with urgency" in resolving the allegations against Plaintiff "suggests that the University is not concerned that Plaintiff poses a risk to other students." *Id.* at PageID.1604. This is consistent with the fact that there was no allegation or finding of violence, force, coercion, or any threats thereof in the case against Plaintiff. Finally, the Court relied on the University's stipulation "to the fact that Complainant is unlikely to suffer significant harm if relief were granted." *Id.* at 1604.

The fourth and final factor is dependent on a determination of the likelihood of success on the merits of Plaintiff's constitutional challenge because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). The public interest almost always favors the applicant for injunctive relief if the applicant demonstrates both a likelihood of success on the merits and irreparable injury. *AT&T Co. v. Winback & Conserve Program*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). In this case, Plaintiff has demonstrated

34

a strong likelihood of success on the merits, given that the Policy is unconstitutionally vague. Further, Plaintiff has shown that he will suffer irreparable harm if the requested injunctive relief is not granted. Moreover, because it is always in the public interest to prevent a violation of Plaintiff's constitutional rights, the public interest would be served by granting the relief Plaintiff seeks in this case.

Dated: July 28, 2026                    Respectfully submitted,

                                        **DEBORAH GORDON LAW**
                                        **/s/ Deborah L. Gordon**
                                        Deborah L. Gordon (P27058)
                                        *Attorneys for Plaintiff*
                                        33 Bloomfield Hills Parkway, Suite 220
                                        Bloomfield Hills, Michigan 48304
                                        (248) 258-2500
                                        dgordon@deborahgordonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2026, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing and service of said documents to all parties through their counsel of record.

                                        **DEBORAH GORDON LAW**
                                        **/s/ Deborah L. Gordon**
                                        Deborah L. Gordon (P27058)
                                        *Attorneys for Plaintiff*
                                        33 Bloomfield Hills Parkway, Suite 220
                                        Bloomfield Hills, Michigan 48304
                                        (248) 258-2500
                                        dgordon@deborahgordonlaw.com