UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DOE, *an individual*

Plaintiff,

v.

UNIVERSITY OF MICHIGAN, et al.,

Defendants.

Case No. 2:26-cv-10768

District Judge Terrence G. Berg
Magistrate Judge Kimberly G. Altman

---

Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
DEBORAH GORDON LAW
*Attorneys for Plaintiff*
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com

Brian M. Schwartz (P69018)
Joel C. Bryant (P79506)
Gabrielle M.A. Bayne (P88706)
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
*Attorneys for Defendants*
150 W. Jefferson Road, Suite 2500
Detroit, MI 48226
(313) 963-6420
schwartzb@millercanfield.com
bryant@millercanfield.com
bayne@millercanfield.com

---

**DEFENDANTS' RESPONSE**
**TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii
STATEMENT OF ISSUES PRESENTED........ v
CONTROLLING OR MOST APPROPRIATE AUTHORITY ........ vi
I. Introduction........ 1
II. Statement of Relevant Facts ........ 2
A. The University's Sexual Misconduct Policy and Procedures ........ 2
B. Students, Including Plaintiff, Receive Training on Prohibited Conduct........ 4
C. Investigations and Hearings Under the Policy ........ 4
D. Plaintiff is Accused of Sexual Assault ........ 6
1. October 10, 2024........ 6
2. The Investigation and Hearing........ 7
E. Procedural History........ 12
III. Argument ........ 13
A. Standard of Review ........ 13
B. Plaintiff Cannot Receive Preliminary Injunctive Relief Because He Seeks to Modify, Not Preserve, the Status Quo and Because He Seeks All the Relief He Can Obtain After a Full Trial on the Merits........ 15
C. Plaintiff Has Not Shown He is Entitled to Preliminary Injunctive Relief ........ 15
1. Plaintiff is Unlikely to Succeed on the Merits........ 15
a. Plaintiff Received Adequate Due Process........ 15
b. Plaintiff Fails to Demonstrate a Substantial Likelihood of Success on his Claim that the Policy is Unconstitutionally Vague ........ 17
2. Plaintiff Will Not Suffer Irreparable Harm........ 27
3. There Will Be Harm to Complainant and the Public Interest if an Injunction is Issued........ 29
4. The Balance of Harms Weighs in the University's Favor........ 31
D. The Relief Sought is Improper........ 33
IV. Conclusion ........ 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553 (6th Cir. 1999) .......... 24

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986) .......... vi, 19

*Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001) .......... 14, 29

*Brown v. Chicago Bd. of Educ.*, 824 F.3d 713 (7th Cir. 2016) .......... 22

*Brown v. City of Albion, Michigan*, 136 F.4th 331 (6th Cir. 2025) .......... vi, 22, 24

*Cacchillo v. Insmed, Inc.*, 638 F.3d 401 (2d Cir. 2011) .......... 14

*Colten v. Kentucky*, 407 U.S. 104 (1972) .......... 18, 19

*Cox v. Jackson*, 579 F. Supp. 2d 831 (E.D. Mich. 2008) .......... vi, 14, 15

*Dambrot v. Central Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995) .......... 18

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) .......... 30

*Doe v. Baum*, 227 F. Supp. 3d 784 (E.D. Mich. 2017), *rev'd on other grounds*, 903 F.3d 575 (6th Cir. 2018) .......... 21

*Doe v. Louisiana State Univ.*, No. 20-00379, 2020 WL 4193473 (M.D. La. July 21, 2020) .......... vi, 15

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018) .......... 26

*Doe v. Ohio State Univ.*, 136 F. Supp. 3d 854 (S.D. Ohio 2016) .......... 28

*Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017) .......... 16

*Doe v. Univ. of Cincinnati*, No. 1:15-CV-600, 2015 WL 5729328 (S.D. Ohio Sept. 30, 2015) .......... 28, 29

*Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989) .......... 18

*Doe v. Univ. of the S.*, 687 F. Supp. 2d 744 (E.D. Tenn. 2009) .......... vi, 23, 25

*Stiles ex rel. DS v. Grainger Cty*, 819 F.3d 834 (6th Cir. 2016) ............................30

*F.W. Kerr Chem. Co. v. Crandall Assoc., Inc*., 815 F.2d 426 (6th Cir. 1987) ........................................................................................13

*Flaim v. Medical Coll. of Ohio*, 418 F.3d 629 (6th Cir. 2005)..........................vi, 16

*Ford Motor Co. v. Texas Dept. of Transp*., 264 F.3d 493 (5th Cir. 2001) ........................................................................................19

*Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256 (6th Cir. 1968) ............................13

*Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620 (6th Cir. 2000) ........................................................................................14

*Goss v. Lopez*, 419 U.S. 565 (1975) ..........................................................................16

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ..........................................vi, 24

*Hill v. Colorado*, 530 U.S. 703 (2000) ..............................................................20, 21

*Jones v. Caruso*, 569 F.3d 258 (6th Cir. 2009).......................................................29

*Kerwin on behalf of Nat'l Lab. Rels. Bd. v. Trinity Health Grand Haven Hosp*., 174 F.4th 942 (6th Cir. 2026) ...............................................vi, 28

*Kolender v. Lawson*, 461 U.S. 352 (1983).........................................................18, 24

*Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist*., 69 F.4th 350 (6th Cir. 2023) ..........................................................19, 20, 24

*Lucero v. Detroit Pub. Sch.*, 160 F. Supp. 2d 767 (E.D. Mich. 2001) ....................27

*Marshall v. Ohio Univ*., No. 2:15-cv-775, 2015 WL 1179955 (S.D. Ohio Mar. 13, 2015) ........................................................................ vi, 25, 29

*McNeilly v. Land*, 684 F.3d 611 (6th Cir. 2012)......................................................14

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) .......................................*passim*

*NetChoice, LLC v. Yost*, 180 F.4th 268 (6th Cir. 2026) ............................. vi, 21, 26

*North America Soccer League LLC v. United States Soccer Fed'n*, 883 F.3d 32 (2d Cir. 2018) ...........................................................................15

*Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566 (6th Cir. 2002)....13, 27, 28

*Poulard v. Trs. of Indiana Univ.*, No. 2:16 CV 115, 2018 WL 4680010 (N.D. Ind. Sept. 28, 2018) ....25

*Ramik v. Darling Int'l, Inc.*, 161 F. Supp. 2d 772 (E.D. Mich. 2001)....14

*Rock & Roll Hall of Fame & Museum v. Gentile Prods.*, 134 F.3d 749 (6th Cir. 1998)....13

*Rose v. Locke*, 423 U.S. 48 (1975)....19, 21

*Seal v. Morgan*, 229 F.3d 567 (6th Cir. 2000)....vi, 16

*Smith ex rel. Smith v. Mount Pleasant Pub. Schs.*, 285 F. Supp. 2d 987 (E.D. Mich. 2003) ....18

*Swider v. MacAuley*, No. 1:25-CV-531, 2025 WL 1367142 (W.D. Mich. May 12, 2025) ....21

*Tuilaepa v. California*, 512 U.S. 967 (1994).... vi, 19, 27

*United States v. Kettles*, 970 F.3d 637 (6th Cir. 2020)....18

*United States v. Williams*, 553 U.S. 285 (2008) ....18

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) ....14

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)....27

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985) ....27

**Statutes**

18 U.S.C. § 2242(2)(A)....20

**Rules**

L.R. 7.1(h)(2) ....13

## Statement of Issues Presented

Should the Court deny Plaintiff's motion for a preliminary injunction because he cannot satisfy his burden of demonstrating that any of the relevant factors warrant the extraordinary remedy of preliminary injunctive relief?

**Controlling or Most Appropriate Authority**

*Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986)

*Brown v. City of Albion, Michigan*, 136 F.4th 331 (6th Cir. 2025)

*Cox v. Jackson*, 579 F. Supp. 2d 831 (E.D. Mich. 2008)

*Doe v. Louisiana State Univ.*, No. 20-00379, 2020 WL 4193473 (M.D. La. July 21, 2020)

*Doe v. Univ. of the S.*, 687 F. Supp. 2d 744 (E.D. Tenn. 2009)

*Flaim v. Medical Coll. of Ohio*, 418 F.3d 629 (6th Cir. 2005)

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)

*Kerwin on behalf of Nat'l Lab. Rels. Bd. v. Trinity Health Grand Haven Hosp*., 174 F.4th 942 (6th Cir. 2026)

*Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 WL 1179955 (S.D. Ohio Mar. 13, 2015)

*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021)

*NetChoice, LLC v. Yost*, 180 F.4th 268 (6th Cir. 2026)

*Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000)

*Tuilaepa v. California*, 512 U.S. 967 (1994)

Opinion and Order, ECF No. 77

## I. Introduction

Plaintiff was accused of engaging in inappropriate sexual conduct that potentially violated the University of Michigan's Policy on Sexual and Gender-Based Misconduct (the "Policy"). The University did not rush to judgment. Instead, satisfying its constitutional obligations, it used a comprehensive set of procedures, including a live hearing with the right to cross-examination, allowing it to evaluate competing narratives. During the investigation and hearing process, Plaintiff never argued that the definition of consent was vague, or that he did not understand it. Nor did he argue that he thought he had consent to digitally penetrate Complainant's vagina. Instead, he denied the act of penetration ever happened, which the Hearing Officer found was not credible when she concluded that Plaintiff violated the Policy. An External Reviewer considering Plaintiff's appeal agreed. As a result, Plaintiff is subject to various sanctions, including a two-year suspension.

Plaintiff disagrees with the result, seeks to avoid the consequences of his actions, and requests that the Court modify the status quo. As with his first preliminary injunction request, much of his motion challenges the outcome, as opposed to a violation of constitutional rights. However, this lawsuit cannot be used as a vehicle to retry the disciplinary proceedings to obtain Plaintiff's desired result. Nor does Plaintiff satisfy his burden of demonstrating that the extraordinary remedy of preliminary injunctive relief is appropriate. First, he does not establish a

substantial likelihood of success on the merits. He received constitutionally adequate process and the policy language he challenges provides sufficient notice to an ordinary person that consent to engage in a particular sexual activity with another person is required before engaging in that act. Plaintiff's attack on the policy language is ultimately irrelevant since he has never argued that he had consent to remove Complainant's pants and digitally penetrate her vagina. Instead, he has consistently denied it ever happened.

Plaintiff also cannot establish the remaining factors. He provides no evidence that he would suffer irreparable harm in the absence of an injunction given that the harms alleged are either speculative or economic. Third, there will be harm to the Complainant and the public if this injunction is granted as it would second-guess the University's disciplinary judgments and undermine its ability to investigate and remedy sexual misconduct. Finally, the balance of harms weighs in the University's favor. The Court should deny Plaintiff's motion.

## II. Statement of Relevant Facts

### A. The University's Sexual Misconduct Policy and Procedures.

The University's Policy on Sexual and Gender-Based Misconduct (the "Policy") governs claims of alleged sexual assault. (Policy at 3-4, ECF No. 33-2,

PageID.445-446.)[1] Adopted to meet the University's obligations under Title IX, the Policy "is consistent with the Title IX Regulations and related guidance, as well as the University's mission and commitment to ensuring a safe and non-discriminatory campus environment." (*Id.* at 1, PageID.443.)

The Policy contains an extensive section describing "Prohibited Conduct." (*Id.* at 4-19, PageID.446-461.) Among other things, it prohibits "Sexual Contact occurring without Consent." (*Id.* at 9, PageID.451.) It then defines "Sexual Contact," which, as relevant here, includes "[v]aginal … penetration or contact by a … finger." (*Id.*) Plaintiff does not allege that the definition of Sexual Contact is vague.

"Consent" is defined in detail over three pages. (*Id.* at 16-19, PageID.458-461.) "Consent is a clear and unambiguous agreement, expressed outwardly through mutually understandable words or actions, to engage in Sexual Activity." (*Id.* at 16, PageID.458.) "Sexual Activity" refers to "any conduct of a sexual nature for which Consent is required" and specifically includes "Sexual Contact." (*Id.*) The Policy makes it clear that "[a] person who initiates Sexual Activity is responsible for obtaining Consent for that conduct." (*Id.*) To help guide the decision-maker, the Policy explains the Consent analysis as:

- Did the person initiating Sexual Activity know that the conduct in question was not consensual?

[1] Since the record has not changed, Defendants cite to the documents submitted in response to the initial preliminary injunction, where applicable, as well as exhibits Plaintiff attached to the second motion.

- If not, would a Reasonable Person who is unimpaired by alcohol or drugs have known that the conduct in question was not consensual?

If the answer to either of these questions is "Yes," Consent was absent. (*Id*.)

A "Reasonable Person" is defined as "a person using average care, intelligence, and judgment in the known circumstances." (*Id.* at 22, PageID.464.)

Individuals cannot assume consent is present. The Policy explains that "Consent is not to be inferred from silence, passivity, or lack of resistance, and relying on non-verbal communication alone may not be sufficient to determine Consent." (*Id.* at 16, PageID.458.) Additionally, consent to engage one activity does not confirm that consent is present for all types of activities. (*Id.* at 17, PageID.459.) Consent can also be withdrawn at any time. (*Id.*)

**B. Students, Including Plaintiff, Receive Training on Prohibited Conduct.**

Students receive training on the Policy prior to their enrollment. (Ex 1, Pehlke Dec, ¶¶ 3-4.) That training explains the definition of consent, including that engaging in sexual contact without consent is a Policy violation. (*Id.*) Plaintiff received training on the Policy. (*Id.*, ¶ 5; Ex 2, Training Certificate.)

**C. Investigations and Hearings Under the Policy.**

**Investigation.** After the parties receive notice, the investigator meets with the Complainant, Respondent, and witnesses. (Procedures at 16-17, ECF No. 33-3, PageID.506-507.) Each person interviewed receives a draft of their statement and an

opportunity to comment. (*Id.*) A preliminary investigation report is prepared and distributed to the parties. (*Id.* at 20, PageID.510.) The parties may provide feedback, submit additional evidence or information, and request additional investigation. (*Id.*) After receiving the parties' comments, the investigator issues a final investigation report that contains "all information from the preliminary report, as supplemented by the relevant feedback submitted," along with "any additional information gathered[,] as applicable." (*Id.* at 21, PageID.511.) The parties have another opportunity to comment on the final investigation report before the hearing. (*Id.*)

**Hearing.** An impartial Hearing Officer is appointed to oversee the hearing and "make the decision as to whether or not the Respondent violated the Policy using a preponderance of the evidence standard." (*Id.* at 21-22, PageID.511-512.) Hearing Officers receive training on the Policy and "how to conduct a process that is fair and impartial." (Policy at 21, ECF No. 33-2, PageID.463.) Both the Complainant and Respondent have the right to be present at the hearing, with an advisor of their choice. (Procedures at 21-22, ECF No. 33-3, PageID.511-512.)

After introductory remarks by the Hearing Officer, the Complainant and Respondent may make opening statements. (*Id.* at 24, PageID.514.) The Hearing Officer asks initial questions to the parties and witnesses, after which each party's advisor is permitted to cross-examine. (*Id.* at 24-25, PageID.514-515.)

The Hearing Officer then completes a written determination that includes,

among other things, the section of the policy alleged to have been violated, a description of procedural steps taken, findings of fact, the conclusion regarding the application of the policy to the facts, the rationale for the determinations, and the appeal options. (*Id.* at 26-27, PageID.516-517.) If the Respondent is found to be responsible for a Policy violation, the Office of Student Conflict Resolution ("OSCR") Associate Director (or designee) makes a sanctioning determination. (*Id.* at 28, PageID.518). "In keeping with the University's commitment to foster an environment that is safe, inclusive, and free from discrimination and harassment, the University has a wide latitude in the imposition of sanctions and implementation of remedies tailored to the facts and circumstances of the Prohibited Conduct, the impact of the conduct on the Complainant and University Community, and accountability for the Respondent." (*Id*. at 27, PageID.517.)

**Appeals.** Either party may appeal the Policy violation finding and the sanctions. (*Id*. at 32-33, PageID.522-523.) An External Reviewer conducts the appeal review and provides its determination to the University's Vice President for Student Life ("VPSL") or their designee, who may accept or modify the External Reviewer's determinations. (*Id*. at 33-35, PageID.523-525.)

### D. Plaintiff is Accused of Sexual Assault.

#### 1. October 10, 2024.

Plaintiff and Complainant are undergraduate students. (Hearing Outcome,

ECF No. 34 [Sealed].) On October 10, 2024, at around midnight, Plaintiff called Complainant to ask if she was awake and if he could come over. (*Id*. at 6.) Complainant described Plaintiff as "drunk" upon his arrival. (*Id*.) As consistently reported by Complainant, they started off consensually kissing before Plaintiff "eventually put his hands on her buttocks under her clothes, removed her shirt and pants, removed his own shirt, and finally, digitally penetrated her vagina." (*Id*. at 6.) Complainant told Plaintiff to "Stop" and "Don't do that" when he first began putting his hands into her pants, beneath her underwear, and touched her buttocks. (*Id*. at 9.) Despite Complainant's lack of consent to the touching, Plaintiff did it again; he then took his shirt off and then her pants off. (*Id*. at 9-10.) Complainant explained that "she 'just went along with it' at this point because she had previously said 'no" to Respondent [Plaintiff] and he did not listen to her, and because Respondent [Plaintiff] is bigger than her and she was afraid he would hurt her." (*Id*. at 10).

**2. The Investigation and Hearing.**

Complainant filed a formal complaint with the University's Office of Equity, Civil Rights & Title IX ("ECRT"). (*Id.* at 2-3). Both Plaintiff and Complainant participated in recorded interviews and had the opportunity to submit feedback.

During Plaintiff's interview, he did not state that he believed he had obtained consent to digitally penetrate Complainant's vagina. (*See* Ex 3, Pl's Statement [Sealed]; Ex 4, Pl's Interview Transcript [Sealed].). Nor did he state that the Policy's

definition of consent was vague or that he did not understand it. (*See* Ex 3; Ex 4). Instead, Plaintiff denied both (a) that Complainant's clothes ever came off and (b) that he engaged in digital penetration:

> [Plaintiff:] I want to make this very clear, at no point did any of her clothes come off, and I never touched her vagina. (Ex 4, Transcript at 2 [Sealed].)
>
> ***
>
> [Interviewer:] Can you help me understand, you said that just one of the allegations that [Complainant] made was that you allegedly touched her vagina, are you denying that happened?
>
> [Plaintiff:] Fully.
>
> [Interviewer:] Totally denying, sorry, for the transcript.
> (*Id.* at 19).
>
> ***
>
> [Plaintiff:] [S]he was fully clothed the full time. (*Id.*)

(*See also id.* at 5 ("I've never even touched you anywhere near there."). *See also* Ex 3, Plaintiff's Statement at 4-5).

After all witness interviews were conducted, Plaintiff and Complainant were simultaneously sent the Preliminary Investigation Report and a link to an electronic evidence folder. (Final Investigative Report at 22, ECF No. 37 [Sealed].) Each had until August 25, 2025 to provide feedback and each seized upon this opportunity. (*Id*.) Plaintiff did not raise any issues about consent or the inaccuracy of his denial that he engaged in the conduct. (*Id.*, Attachment 14.) A Final Investigation Report was issued on September 8, 2025, which reflected Plaintiff's steadfast denial that he ever touched Complainant's vagina. (Final Investigative Report at 8, ECF No. 37

[Sealed] ("[h]e denied touching Complainant's vagina").)

The matter was referred to a hearing, which was conducted by Hearing Officer Jessica L. Galanos of Bricker Graydon over a full day on September 30, 2025. (Hearing Transcript, ECF No. 38 [Sealed].) Both parties made opening statements. (*Id*. at 6-9.) Complainant, Plaintiff, and four witnesses testified. (*See generally, id*.) During the hearing, Plaintiff consistently denied that Complainant's pants came off and that he digitally penetrated her. (*Id.* at 8 (referring to "her false allegation that I penetrated her with my finger"), 147, 153, 157; Hearing Outcome at 7, 10, 28, ECF No. 34 [Sealed]).

On November 4, 2025, the Hearing Officer issued a 42-page determination. (Hearing Outcome, ECF No. 34 [Sealed].) She reviewed the disputed facts and, applying the preponderance of the evidence standard, concluded that "at some point during the encounter with [Plaintiff], Complainant's pants were removed." (*Id.* at 23.) The Hearing Officer also thoroughly analyzed "the overarching issue of whether [Plaintiff] penetrated Complainant's vagina with his finger during the October 10 incident." (*Id.* at 28.) After "examin[ing] a number of issues [Plaintiff] has raised regarding Complainant's credibility on the issue of digital penetration," (*id.* at 28), she found that "Complainant's statements to others about digital penetration, combined with [her roommate's] observation of Complainant pulling up her pants and the presence of bruising on Complainant's neck and chest, provides significant

support for the credibility of Complainant's factual account over Respondent's factual account," (*id.* at 33.) Thus, she concluded "that it is more likely than not that Respondent used his fingers to penetrate Complainant's vagina on October 10, 2024." (*Id.*)

After reviewing the Policy language (including the definition of "consent"), the Hearing Officer reached her conclusions regarding whether there was a Policy violation. (*Id.* at 37-38.) She noted that while some of the initial interactions (kissing, removal of shirt) could be interpreted as providing consent, "the material question is whether Respondent had consent to digitally penetrate Complainant's vagina." (*Id.* at 37.). The Hearing Offer did not automatically conclude that there was a lack of consent based on Plaintiff's denial of engaging in the physical act. Instead, she considered the evidence surrounding digital penetration, which necessarily required focusing on Complainant's version of events:

> If the parties agreed that digital penetration took place and the Respondent asserted that he had consent for that particular activity, the investigator and Hearing Officer would have asked Respondent to explain what action by Complainant signaled to him that he has "clear and unambiguous agreement" for digital penetration. Because Respondent denied that digital penetration took place, and because that denial is less credible than Complainant's allegation to the contrary, the record does not include any information outside of Complainant's account that might support a finding of consent for digital penetration. Thus, it is necessary to determine whether Complainant's factual account supports a finding that consent was present for digital penetration. (*Id.* at 37-38.)

"Taking all [the] facts together," the Hearing Officer wrote, "there is nothing in the

record that suggests there was 'clear and unambiguous agreement' for digital penetration." (*Id.* at 38.) Going further, the Hearing Officer explained that "[w]hile verbal consent is not required," "[t]he record is devoid of information to support a finding that Complainant gave consent to digital penetration, either through words or physical actions, *before it actually occurred*." (*Id.* (emphasis added).) Thus, the Hearing Officer concluded that Plaintiff digitally penetrated Complainant's vagina, without consent, in violation of the Policy. (*Id.* at 37-38.)

Sanctions were assessed, including a two-year suspension, structured reading and reflection, an active psychoeducation program, alcohol education, and a review and reintegration process. (SAC ¶ 345, ECF No. 87, PageID.1733.) A no contact order was also issued.

Plaintiff appealed the Policy violation finding and the sanctions, again "den[ying] that he penetrated Complainant's vagina." (*Id.*, ¶ 151, PageID.1699; Pl's Ex 6, Appeal at 3, ECF No. 89-5 [Sealed].) The External Reviewer, retired federal judge Lawrence F, Stengel, determined that Plaintiff "has not articulated any procedural irregularity that occurred during this process let alone an irregularity that materially impacted the outcome of this matter." (Appeal Outcome at 6, ECF No. 39 [Sealed].) The External Reviewer recommended reducing the two-year suspension to a one-year suspension. (*Id*. at 9.) In accordance with the Procedures, the VPSL's designee modified the recommendation and confirmed the two-year suspension.

(SAC ¶ 200, PageID.1707; Pl's Ex 9, VPSL Review at 2, ECF No. 89-8.) Plaintiff was unenrolled from classes in February 2025 and began serving his 2-year suspension. (SAC ¶ 21, PageID.1680.)

**E. Procedural History.**

Plaintiff filed his original Complaint on March 6, 2026 and his Amended Complaint on March 13, 2026. (ECF No. 1; ECF No. 7.) Both the original and Amended Complaint included a single-count procedural due process claim, alleging that Plaintiff did not receive adequate process during the investigation and the hearing. On March 24, 2026, the Court denied Plaintiff's request for a temporary restraining order. (ECF No. 31.) On April 20, 2026, after a two-day evidentiary hearing, the Court denied Plaintiff's motion for a preliminary injunction. (ECF No. 77.) The Court found that Plaintiff had not established a substantial likelihood of success on the merits, and that the "harm to others" and "public interest" factors weighed against the issuance of an injunction. (*Id.*, PageID.1607-08.) It also found that Plaintiff demonstrated the potential for irreparable harm. (*Id.*)

Plaintiff then abandoned his original procedural due process claim. On June 3, 2026, he filed the SAC, asserting five new claims. (ECF No. 87.) The SAC did not indicate that he was seeking preliminary injunctive relief. (ECF No. 87.) Aside from a strategic decision to change legal theories and counsel, the facts related to the

investigation, hearing, and the sanctions have not changed.[2] Exercising no urgency, on July 28, 2026—approximately 5.5 months after his appeal was denied, 3.5 months after the Court denied his original motion, and almost 2 months after filing his SAC, Plaintiff filed his second motion for preliminary injunctive relief. (ECF No. 94.)

## III. Argument

### A. Standard of Review.

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his … burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In evaluating a motion for a preliminary injunction, the court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Rock & Roll Hall of Fame & Museum v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998). The movant bears the burden of establishing each of these elements by clear and convincing evidence. *See Garlock, Inc. v. United Seal, Inc.*,

[2] Since there has been no change in the law or the facts, there is no need to revisit any challenge to the disciplinary proceedings, since the motion is in effect an *ad hoc*, untimely motion for reconsideration. E.D. Mich. L.R. 7.1(h)(2); *F.W. Kerr Chem. Co. v. Crandall Assoc., Inc.*, 815 F.2d 426, 428 (6th Cir. 1987) ("a successive motion [must] state new facts warranting reconsideration of the prior decision").

404 F.2d 256, 257 (6th Cir. 1968). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). "A preliminary injunction is reserved for only the most egregious case, and should not be extended to cases which are doubtful or do not come within well-established principles of law." *Bonnell v. Lorenzo*, 241 F.3d 800, 826 (6th Cir. 2001). Additionally, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion because a preliminary injunction is an extraordinary remedy." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (internal quotation omitted).

The primary purpose of emergency injunctive relief is "to preserve the relative positions of the parties" until a merits determination can be made. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Ramik v. Darling Int'l, Inc.*, 161 F. Supp. 2d 772, 778 (E.D. Mich. 2001). There are "three types of particularly disfavored preliminary injunctions: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Cox v. Jackson*, 579 F. Supp. 2d 831, 855 n.8 (E.D. Mich. 2008) (internal marks omitted). When a movant seeks to alter the status quo the burden of proof is more stringent. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011).

Courts define the status quo as "the last actual, peaceable uncontested status which preceded the pending controversy." *North America Soccer League LLC v. United States Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018).

**B. Plaintiff Cannot Receive Preliminary Injunctive Relief Because He Seeks to Modify, Not Preserve, the Status Quo and Because He Seeks All the Relief He Can Obtain After a Full Trial on the Merits.**

Not only is Plaintiff seeking to return to the University, but he is seeking to overturn a suspension implemented almost six months ago. Although Plaintiff sought to overturn that suspension a few months ago, the Court denied his request on April 20, 2026. The status quo when Plaintiff filed this motion is his current designation as a suspended student. *See Doe v. Louisiana State Univ.*, No. 20-00379, 2020 WL 4193473, at *6 (M.D. La. July 21, 2020) ("because Plaintiff had already been suspended when he filed suit, preservation of the status quo will not aid him . . . the relief requested would upset the status quo not preserve it").[3] Finally, because Plaintiff seeks the same relief that he could obtain after a trial on the merits, such preliminary injunctive relief is improper. *Cox*, 579 F. Supp. at 855 n.8

**C. Plaintiff Has Not Shown He is Entitled to Preliminary Injunctive Relief.**

**1. Plaintiff is Unlikely to Succeed on the Merits.**

**a. Plaintiff Received Adequate Due Process.**

"Schools, of course, have an unquestionably powerful interest in maintaining

[3] Unpublished cases are attached as Exhibit 6.

the safety of their campuses and preserving their ability to pursue their educational mission." *Seal v. Morgan,* 229 F.3d 567, 574 (6th Cir. 2000). These interests are directly implicated by efforts to ensure students are protected from sexual misconduct, efforts mandated by Title IX. Title IX and its regulations also detail various procedural safeguards for respondents, with which the University fully complies. As the Supreme Court has stated, "schools [are] vast and complex. Some modicum of discipline and order is essential if the educational function is to be performed. . . . Suspension is considered not only to be a necessary tool to maintain order but a valuable educational device." *Goss v. Lopez*, 419 U.S. 565, 580 (1975).

Courts have emphasized that federal court review of university disciplinary actions is "circumscribed" and "limited to determining whether the procedures used … were constitutional." *Flaim v. Medical Coll. of Ohio*, 418 F.3d 629, 638 (6th Cir. 2005). All that is required is "some kind of notice" and "some kind of hearing." *Goss*, 419 U.S. at 579. A student facing suspension is entitled to "notice of the charges, an explanation of the evidence against the student, and an opportunity to present his side of the story before an unbiased decision maker." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399-400 (6th Cir. 2017). Here, although Plaintiff initially raised a procedural due process claim related to the investigation and hearing, following this Court's denial of his first motion for a preliminary injunction, he abandoned that theory.

**b. Plaintiff Fails to Demonstrate a Substantial Likelihood of Success on his Claim that the Policy is Unconstitutionally Vague.**

Plaintiff's "void for vagueness" claim ignores the plain language of the Policy. He attempts to manufacture ambiguities that do not exist, demands a level of specificity that is not constitutionally required, and fails to show that the application of the Policy to the allegations asserted against him violates his constitutional rights.

At the outset, any vagueness or ambiguity in the definition of "consent" in the Policy is immaterial. Plaintiff is not asserting a facial challenge. Instead, he argues that the definition is vague "as-applied" to him. (ECF No. 94, PageID.2549.) But he never alleged during the proceedings that the definition of "consent" was vague. Regardless, his subjective understanding of the definition (which, as discussed below, is irrelevant under the applicable standard) had no effect on the outcome of the proceedings. As discussed above, throughout the investigation, hearing, and appeal, Plaintiff did not argue that he believed he had consent to digitally penetrate Complainant's vagina. Instead, he completely denied that he removed her pants and that digital penetration occurred.[4] Because Plaintiff denied engaging in digital penetration, he cannot simultaneously claim the Policy failed to provide notice that such conduct was prohibited. *See Meriwether v. Hartop*, 992 F.3d 492, 518 (6th Cir.

---

[4] Plaintiff has now admitted that "he removed her pants." (ECF No. 97, PageID.2589.)

2021). *See also United States v. Kettles*, 970 F.3d 637, 650 (6th Cir. 2020) ("Hypothetical vagueness is not enough"). Thus, he cannot establish a likelihood of success that an unconstitutionally vague definition affected the outcome.

His claim is also legally flawed. A policy is unconstitutionally vague only if it either "fails to inform ordinary people what conduct is prohibited" or "allows for arbitrary and discriminatory enforcement." *Meriwether*, 992 F.3d at 518 (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). A rule need only provide fair warning of prohibited conduct. *Colten v. Kentucky*, 407 U.S. 104, 110 (1972).[5]

Context matters. There is "substantially more room for imprecision in regulations bearing only civil, or employment, consequences, than would be tolerated in a criminal code." *Meriwether*, 992 F.3d at 518 (internal quotations omitted). That standard is even more relaxed in the educational setting. As the Supreme Court explained, "[g]iven the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a

[5] *Doe v. Univ. of Mich.*, 721 F. Supp. 852 (E.D. Mich. 1989), *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995), and *Smith ex rel. Smith v. Mount Pleasant Pub. Schs.*, 285 F. Supp. 2d 987 (E.D. Mich. 2003), cited by Plaintiff, do not apply here. Those cases involved First Amendment vagueness challenges. *United States v. Williams*, 553 U.S. 285, 304 (2008) (noting plaintiffs have an easier burden in First Amendment context). And none involved challenges to comparable, easily understood words like "consent."

criminal code." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986).[6] In other words, "'The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing [school policies.]'" *Kutchinski as next friend to H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 361 (6th Cir. 2023) (quoting *Colten*, 407 U.S. at 110, alteration in original).

Because "the proper degree of definition" is often "not susceptible of mathematical precision," vagueness review is "quite deferential." *Tuilaepa v. California*, 512 U.S. 967, 973 (1994). Indeed, the Constitution's "prohibition against excessive vagueness does not invalidate every [policy] which a reviewing court believes could have been drafted with greater precision." *Rose v. Locke*, 423 U.S. 48, 49 (1975). Moreover, because the analysis turns on the "particular facts at issue," "a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Meriwether*, 992 F.3d at 518 (internal quotations omitted). Similarly, "[a] statute is not unconstitutionally vague merely because [an] … individual can raise uncertainty about its application to the facts of their case." *Ford Motor Co. v. Texas Dept. of*

---

[6] *Bethel School District* requires the rejection of Plaintiff's characterization of the investigation and hearing as "quasi-criminal," somehow requiring a higher level of scrutiny. (ECF No. 94, PageID.2579). Regardless, Plaintiff's arguments would fail even if the Court were analyzing a criminal statute. *See* note 7.

*Transp.*, 264 F.3d 493, 509 (5th Cir. 2001). As the Sixth Circuit has explained, "schools are not held to the utmost specificity in drafting their disciplinary rules." *Kutchinski*, 69 F.4th at 361.

A review of the Policy's plain language confirms that Plaintiff is not likely to succeed on the merits because the detail is more than adequate for a university disciplinary policy. "Consent" is defined as "a clear and unambiguous agreement, expressed outwardly through mutually understandable words or actions, to engage in Sexual Activity." (Policy, ECF No. 33-2, PageID.458-59.) The Policy further explains that consent cannot be inferred from silence, passivity, lack of resistance, and that consent may be withdrawn at any time. (*Id*.) Accordingly, Plaintiff's assertions that the Complainant was "clearly able to use her words" and "did not say 'stop' or anything similar" are beside the point. (SAC ¶ 58, PageID.1685.) The Policy expressly rejects the notion that the absence of verbal objection, resistance, or protest establishes consent. The Policy, and the terms described, are ordinary concepts that students can readily understand and apply.[7]

Indeed, in *Hill v. Colorado*, 530 U.S. 703 (2000), the Supreme Court considered a vagueness challenge to a statute that applied "to a person who

[7] The Policy would survive heightened scrutiny in the criminal context. *See, e.g.*, 18 U.S.C. § 2242(2)(A) (making it criminal for one who "engages in a sexual act with another person if that other person is – (A) incapable of appraising the nature of the conduct.")

'knowingly' approaches within eight feet of another, ***without that person's consent***, for the purpose of engaging in oral protest, education, or counseling." *Id.* at 732 (emphasis added, quotation omitted). It held that "[t]he likelihood that anyone would not understand any of those common words seems quite remote." *Id.*; *see also NetChoice, LLC v. Yost*, 180 F.4th 268, 294 (6th Cir. 2026) ("If the words in the statute are commonly understood, they need not be defined"). *Doe v. Baum*, 227 F. Supp. 3d 784, 799 (E.D. Mich. 2017), *rev'd on other grounds*, 903 F.3d 575 (6th Cir. 2018) (rejecting vagueness challenge). Plaintiff "may disagree with this definition but that disagreement provides no basis for concluding that the statute is unconstitutionally vague." *Swider v. MacAuley*, No. 1:25-CV-531, 2025 WL 1367142, at *7 (W.D. Mich. May 12, 2025).

Most of Plaintiff's arguments ignore the Supreme Court's admonition that a policy is not vague merely because it "could have been drafted with greater precision." *Rose*, 423 U.S. at 49. For example, Plaintiff advocates for a "yes means yes" standard that is not constitutionally required.[8] (ECF No. 94, PageID.2569.) But the lack of bright line rules does not mean that the high threshold of obtaining "a clear and unambiguous agreement" before engaging in sexual conduct is impermissibly vague.

---

[8] Plaintiff's preferred policy language would not help him, since he did not receive an affirmative "yes" from Complainant.

Next, Plaintiff's assertion that "clear and unambiguous" is "inherently ambiguous" and "undefined" is both circular and nonsensical. A policy "need not define every term to survive a vagueness challenge." *Brown v. Chicago Bd. of Educ.*, 824 F.3d 713, 716–17 (7th Cir. 2016). "[W]hen the common meaning of a term makes clear what conduct is prohibited, failure to further define the term will not render the statute void for vagueness." *Brown v. City of Albion, Michigan*, 136 F.4th 331, 345 (6th Cir. 2025). Regardless, something is "unambiguous" when it is "expressed in a way that makes it completely clear what is meant."[9] Far from being vague, the definition confirms that Plaintiff needed to be "completely clear" that he had received consent before digitally penetrating Complainant.

Plaintiff's related language-parsing argument about the term "outwardly," by cherry-picking one dictionary definition, fares no better. "Outwardly" is defined as "out the outside; externally."[10] Moreover "expressed outwardly" cannot be viewed in a vacuum. Instead, it modifies the phrase "clear and unambiguous agreement" and

---

[9] https://dictionary.cambridge.org/dictionary/english/unambiguous. Other dictionary definitions, not surprisingly, have similar language. Black's Law Dictionary (12th ed. 2024) (defining "unambiguous" as "having only one reasonable and definite meaning; conveying a clear and explicit sense when reasonably interpreted; highly unlikely to be misconstrued by a reasonable person" and "leading to only one reasonable conclusion; clear and compelling"); https://www.dictionary.com/browse/unambiguous ("not ambiguous, or unclear; distinct; unequivocal").

[10] https://www.merriam-webster.com/dictionary/outwardly. *See also* https://www.dictionary.com/browse/outwardly ("on the outside or outer surface; externally).

precedes the phrase "mutually understandable words or actions." And the Policy clearly states that consent "cannot be informed from silence, passivity," rendering Plaintiff's argument that "outwardly" refers to something on the "inside," (ECF No. 94, PageID.2570), nonsensical.

Any assertion that the Policy is vague because it does not specify the timeframe for when the Hearing Officer is analyzing the "parties' perception of their communications during sex or at some other time" or based on the Hearing Officer's "own perceptions either on an objective or subjective basis" ignores the plain language of the Policy, common sense, and the law. (ECF No. 94, PageID.2572.) As discussed above, the Policy applies a "reasonable person" standard and requires consent "to engage" (i.e., before engaging) in a particular sexual activity. (Policy at 16, ECF No. 33-2, PageID.458.) Thus, Plaintiff's focus that Complainant may have said the word "okay" ***after*** Plaintiff digitally penetrated her vagina (which Plaintiff denies ever happening) cannot logically provide prior consent.[11] (ECF No. 94, PageID.2570.) In any event, Complainant was steadfast that she never consented and this Court cannot second-guess the credibility determinations of the Hearing Officer. *Doe v. Univ. of the S.*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009) ("the law does not allow this Court to retry the University's disciplinary proceeding").

[11] The full quote was, "oh there's no blood, okay." (Final Investigative Report at 3, ECF No. 37 [Sealed].) In other words, "okay" follows confirmation about a lack of blood. It does not indicate that consent was provided to digitally penetrate.

Plaintiff's related red-herring argument, that the Policy is vague because the Hearing Officer made a "subjective" determination that there was a lack of consent also fails. (ECF No. 94, PageID.2572.) Some subjectivity is inherent when a human applies the facts at hand to a written policy. The void-for-vagueness doctrine does not require fully objective analysis because "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972); *Kutchinski*, 69 F.4th at 361 (affirming dismissal of vagueness challenge to the term "gross misbehavior," stating that "[m]ore imprecise or subjective prohibitions have survived our review"). Otherwise, nearly every single criminal statute would be invalidated. Indeed, "[w]hen determining whether a law invites arbitrary enforcement, the primary question is whether it provides explicit standards guiding [its] enforcement." *Brown*, 136 F.4th at 345 (quotations omitted). Where, as here, the decision-maker faithfully applies the Policy language, there is no constitutional violation even if some subjective analysis is required, particularly where the Policy "contains no broad invitation to subjective or discriminatory enforcement."[12] *Grayned*, 408 U.S. at 113. *See also id.* at 114

[12] The detailed Policy here contrasts sharply with the *criminal* statutes at issue in the cases cited by Plaintiff, several of which (such as in *Grayned*) were upheld. *See, e.g., Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (upholding facial challenge to criminal statute which provided "no standard" and "vests virtually complete discretion in the hands of the police"); *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553 (6th Cir. 1999) (same).

("enforcement requires the exercise of some degree of police judgment, but, as confined, that degree of judgment here is permissible"); *Marshall v. Ohio Univ.*, No. 2:15-cv-775, 2015 WL 1179955, *6 (S.D. Ohio Mar. 13, 2015) (university sexual harassment policy not unconstitutionally vague where it included an objective and subjective standard); *Poulard v. Trs. of Indiana Univ.*, No. 2:16 CV 115, 2018 WL 4680010, at *6 (N.D. Ind. Sept. 28, 2018) ("a lack of discretion by decision-makers is not required for a statute to avoid unconstitutional vagueness").

Plaintiff's assertion that the Hearing Officer failed to use the "Reasonable Person" standard (a standard that Plaintiff agrees is appropriate, ECF No. 94, PageID.2571), is both wrong and irrelevant. Initially, Plaintiff cannot sustain a void-for-vagueness challenge by challenging the result of the hearing or arguing that the Hearing Officer got it wrong. *Univ. of the S.*, 687 F. Supp. 2d at 755. But this is precisely what most of his brief does.[13] A void-for-vagueness challenge considers whether the policy informs a person of what conduct is prohibited. *Meriwether*, 992 F.3d at 518. Whether the Hearing Officer properly applied the Policy is not at issue.

---

[13] For example, Plaintiff argues that it would have been "just as easy to conclude" that consent for one act (raising hands) "indicated consent to digital penetration later." (ECF No. 94, PageID.2586.) Elsewhere, Plaintiff argues that the Hearing Officer "ignored other important evidence" and "did not analyze the trajectory of the non-verbal communications." (*Id.*, PageID.2587, 2589. *See also id.*, PageID.2574 ("the Hearing Officer should have considered…"). And Plaintiff spends pages discussing events that occurred after October 17, 2024, attempting to discredit Complainant's report that she was sexually assaulted and blame Complainant. (*Id.*, PageID.2563-2565.)

Even so, a "mere failure by the University to follow its own internal guidelines does not give rise to a procedural-due-process violation." *Doe v. Miami Univ.*, 882 F.3d 579, 603 (6th Cir. 2018). More fundamentally, the Hearing Outcome confirms that the Hearing Officer faithfully cited and applied the correct standard, concluding that consent was present for some events (e.g., consensual kissing, lifting up the shirt), but not for others (taking pants off, digital penetration).[14] (Hearing Outcome at 35-38, ECF No. 34 [Sealed].)

Despite Plaintiff's assertions otherwise, the Policy does not invite arbitrary enforcement. It employs an appropriate standard by asking whether a reasonable person would have understood the conduct to be consensual under the circumstances. "[M]en of common intelligence" would understand that they need consent before digitally penetrating another person. *NetChoice*, 148 F.4th at 298. An educated college senior even more so. Here, the Hearing Officer properly applied the plain language of the Policy and the fact that decisionmakers must exercise

[14] Plaintiff ignores the Policy and the record when stating that it is "highly unlikely" that certain statements "could be interpreted to mean … that consent was withdrawn." (ECF No. 94, PageID.2573). Plaintiff never alleged he had consent to engage in digital penetration and consent to engage in one activity (kissing) does not provide blanket authorization to engage in any and all sexual acts. Additionally, his argument that the Hearing Officer did not consider these statements ignores her written findings and statements at the hearing. (Hearing Outcome at p. 38, n.32, ECF No. 34 [Sealed]; Hearing Transcript at p. 5, ECF 38 [Sealed].) Again, the Court cannot revisit the factual findings simply because Plaintiff disagrees with the result.

judgment when applying that standard does not render it unconstitutionally vague.[15] *See Tuilaepa*, 512 U.S. at 973.

**2. Plaintiff Will Not Suffer Irreparable Harm**.

A showing of irreparable harm is a prerequisite to injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."). "To constitute irreparable harm, an injury must be certain, great, and actual." *Lucero v. Detroit Pub. Sch.*, 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001). "Irreparable harm cannot be speculative; 'the injury complained of [must be] of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Id*. (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (alteration in original)). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578.

The Court's prior Order stated that the issue was "[w]hether a full two-year suspension *and* the reputational harm associated with having been found to have sexually assaulted another student amounts to irreparable harm." (ECF No. 77,

[15] Focusing on irrelevant facts, Plaintiff argues that the sanctions were imposed without analyzing the relevant factors. (ECF No. 94, PageID.2566-67). There is no constitutional requirement to provide a written analysis of the sanctioning factors. Regardless, Plaintiff's void-for-vagueness claim does not challenge the clarity of the sanctioning factors.

PageID.1600). The Court then assumed that "Plaintiff also faces considerable reputational harm." (*Id.*, PageID.1601). But there is no supporting evidence. While he cites "reputational harm," (ECF No. 94, PageID.2590), he is proceeding under a pseudonym. He makes no assertion that the University disclosed the details of his suspension to anyone, nor does he allege that he was required to. In other words, while a suspension plus reputational harm "can cause irreparable harm," *Doe v. Univ. of Cincinnati*, No. 1:15-CV-600, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015), in the absence of any admissible evidence, Plaintiff has not satisfied his burden of proving and not merely pleading irreparable harm. *Doe v. Ohio State Univ.*, 136 F. Supp. 3d 854, 871 (S.D. Ohio 2016) (quoting *Overstreet*, 305 F.3d at 578-79) ("Because Doe has not shown he is likely to succeed on the merits of his constitutional claims, he is not entitled to a presumption of irreparable harm.")

Finally, "[a]n unreasonable delay in filing for injunctive relief will weigh against a finding of irreparable harm." *Kerwin on behalf of Nat'l Lab. Rels. Bd. v. Trinity Health Grand Haven Hosp.*, 174 F.4th 942, 958 (6th Cir. 2026) (four-month delay "suggests that there is, in fact, no irreparable injury"). Here, Plaintiff compounded his delay but not bringing this motion until 5.5 months after his appeal was denied, 3.5 months his initial motion was denied, and almost 2 months after he filed his SAC.

### 3. There Will Be Harm to Complainant and the Public Interest if an Injunction is Issued.

"[A]llegations of sexual harassment inherently address a matter of public concern . . . because of the public interest in knowing that such goings on are properly investigated and not allowed to continue in any given arena." *Bonnell*, 241 F.3d at 826. Consequently, "granting [injunctive relief] would likely disturb the University's ability to enforce its disciplinary procedures, which would not be in the public interest." *Univ. of Cincinnati*, 2015 WL 5729328, at *3; *Marshall*, 2015 WL 1179955, at *10 ("[U]niversity officials should be afforded some level of deference…. Issuing a temporary restraining order in this case, and in others similar to it, would likely interfere with OU's ability to enforce its disciplinary standards."). Moreover, because Plaintiff is unlikely to succeed on the merits of his claim, this factor supports denying the injunction. *See Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009) ("[I]f the regulation in question is likely to be deemed constitutional, the public interest will not be harmed by its enforcement.").

This Court has already found that "if an injunction were granted, Complainant would be exposed to some possible harm." (ECF No. 77, PageID.1603). And while the Court had noted that Complainant's psychological harm was "relatively insubstantial," that was based on Plaintiff's limited request to "rejoin[] his scheduled classes for the current semester." (*Id.*) The requested relief in Plaintiff's current motion, however, is much broader. He seeks to completely undo the investigation,

wipe the slate clean, and force the University to allow him to complete his undergraduate and graduate degrees.

Plaintiff cannot demonstrate a lack of harm to others by relying on the fact that he received robust due process.[16] Once accused of misconduct, Plaintiff has due process rights. The University appropriately respected those rights by not imposing discipline *before* providing constitutionally adequate process.[17] In other words, during that time, the proceedings were ongoing and there was no finding of a policy violation. Now, after receiving robust process, there is a finding that Plaintiff violated the policy, with appropriate sanctions issued. Plaintiff cannot use that process (including the presumption of innocence) as a sword. That the University did not rush to judgment does not demonstrate a lack of harm to other students.

Granting injunctive relief would have drastic and far-reaching consequences. **First**, Plaintiff seeks to have the Court second-guess the University's disciplinary judgments, something it should not do. *See Stiles ex rel. DS v. Grainger Cty*, 819 F.3d 834, 849 (6th Cir. 2016); *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629,

[16] The Court's prior focus on the length of the investigation as indicating the University is not concerned about the harm to other students was, respectfully, misplaced. (ECF No. 77, PageID.1604). Among other things, "[b]ased on the record evidence," the Court stated it "cannot agree that the University investigators were the primary cause in the delay." (*Id.*, PageID.1556).

[17] At the same time, when the University provides notice of the allegations, it advised Plaintiff that the Policy prohibits retaliation against anyone who made a report. (Notice to Plaintiff, ECF No. 35 [Sealed]).

643 (1999). **Second,** and perhaps most importantly, an injunction would undermine the University's ability to investigate and remedy sexual harassment, particularly for upperclassmen. As the Court previously concluded, on this issue, "Defendants have the better argument:"

> Allowing Plaintiff to return to classes and graduate—after he was duly suspended pursuant to the University's Title IX disciplinary process, and unable to demonstrate a likelihood of success on the merits that the disciplinary process violated his due process rights—would undermine the University's disciplinary process. This would weaken the University's ability to enforce its own rules.

(ECF No. 77, PageID.1605.) The Court added that this "would undoubtedly undermine" the University's ability "to protect its students from sexual misconduct." (*Id.*) Citing the unrebutted testimony of Elizabeth Seney, the Court explained that "the University's Policy would be rendered meaningless if the University could not enforce it" and that "the ability of students to report misconduct would be damaged." (*Id.*; *See* Ex 5, 4/13/26 Tr. at 114:15 to 115:1) This is because in the absence of appropriate sanctions, claimants might be less apt to report Policy violations, making the campus less safe for students. Plaintiff does not address these findings in his opening brief and therefore has waived any argument to the contrary.

Granting the relief requested would harm the public interest.

**4. The Balance of Harms Weighs in the University's Favor.**

On an identical record, the Court has already found that "there is little evidence suggesting that granting injunctive relief would serve the public interest."

(ECF No. 77, PageID.1606). Nothing has changed, particularly where Plaintiff still fails to establish a strong likelihood of showing that his constitutional rights were violated. (*Id.*)

The potential harm of denying Plaintiff's request for injunctive relief is economic. It is also speculative. Contrastingly, the harm to the University and Complainant would be immeasurable. Summarily casting aside sanctions imposed would undermine the integrity of the University's disciplinary process.

Contrary to Plaintiff's claim, there was no constitutional violation. At the outset, Plaintiff was provided with adequate due process. And he never argued that the definition of consent was vague such that he did not understand it, or that he had consent to engage in digital penetration. Instead, he argued that the events never happened, an argument that the Hearing Officer found was not credible based on all the evidence. Plaintiff's current arguments represent his latest attempt to avoid the consequences of his actions.

Plaintiff's suspension is only temporary. Following his suspension or if he is successful at the end of this case, he is capable of re-enrolling to earn his degree. Plaintiff is also wholly responsible for his current situation, including any delay in receiving his degrees. His conduct led to his suspension. And his failure to diligently pursue the legal theory in his current motion led to the passage of time. The Court should reject his delayed request to intervene. Thus, the balance of harms weighs in

favor of the University.

## D. The Relief Sought is Improper.

In addition to failing to satisfy the standards for preliminary injunctive relief, the relief Plaintiff seeks is improper. As noted above, Plaintiff seeks the same relief he is seeking at the end of the case: complete exoneration. Plaintiff is not entitled to a judicial determination vacating the student conducting proceedings. Instead, to the extent that Plaintiff argues that the Policy was somehow misapplied, the most he is entitled to is reevaluation of his actions, under a clarified standard.[18]

## IV. Conclusion

For these reasons, Defendants request that the Court deny Plaintiff's request for preliminary injunctive relief.

Dated: August 13, 2026

Respectfully submitted,

*<u>/s/ Brian M. Schwartz</u>*

Brian M. Schwartz (P69018)
Joel C. Bryant (P79506)
Gabrielle M.A. Bayne (P88706)
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
*Attorneys for Defendants*
150 W. Jefferson Road, Suite 2500
Detroit, MI 48226
(313) 963-6420
schwartzb@millercanfield.com
bryant@millercanfield.com
bayne@millercanfield.com

[18] Plaintiff also seeks an injunction "against applying the [Policy] to Plaintiff or any other student," (ECF No. 94, PageID.2549), ignoring that he is bringing an as-applied challenge, not a facial challenge. He also lacks standing to pursue claims on behalf of other, unspecified students.

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2026, I electronically filed the foregoing document with the Clerk of the Court using the ECF/CM system that will send notification of such filing upon all parties of record.

*/s/ Brian M. Schwartz*
Brian M. Schwartz (P69018)