UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **JOHN DOE,**<br>Plaintiff,<br><br>vs.<br>**UNIVERSITY OF MICHIGAN et al.,**<br>Defendants. | **2:26-CV-10768-TGB-KGA**<br><br>**OPINION & ORDER DENYING MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (ECF NO. 94)** |

Before the Court is Plaintiff's second motion for a temporary restraining order (TRO) seeking to reverse his two-year suspension imposed by the University of Michigan (the "University") based on its finding that he committed sexual misconduct, *Doe v. Univ. of Michigan*, No. 26-10768, 2026 WL 1068095, at *1 (E.D. Mich. Apr. 20, 2026) ("*Doe I*"). After the Court denied the first round of TRO motions, Plaintiff hired new counsel, amended his complaint, and two months later filed another motion for a temporary restraining order and preliminary injunction, ECF No. 94. That motion is now before the Court.

For the following reasons, Plaintiff's motion is **DENIED**.

# I. BACKGROUND

Plaintiff filed a Second Amended Complaint on June 3, 2026. ECF No. 87. Both parties agree that there have been no material changes in the facts underlying the University's disciplinary proceeding since the Court issued its April 20, 2026 Order, and both parties agreed during a July 29, 2026 status conference that the record is unchanged. The Court therefore incorporates by reference its account of the factual and procedural background set forth in the April 20, 2026 Order. The Court assumes familiarity with this factual and procedural background.

## A. Factual Background

### *1. Challenged Policy Provisions*

The University Policy on Sexual and Gender-Based Misconduct (the "Policy") prohibits, among other conduct, "Sexual Contact [which] occurs without Consent." ECF No. 33-2, PageID.451. "Sexual Contact includes . . . Vaginal . . . penetration or contact by a . . . finger." *Id.*

The Policy devotes three-and-a-half pages to the "issue of consent." *Id.* at PageID.458–61. The Policy provides that "Consent is a clear and unambiguous agreement, expressed outwardly through mutually understandable words or actions, to engage in Sexual Activity." *Id.* at PageID.458. The Policy states that

> Sexual Activity refers to any conduct of a sexual nature for which Consent is required under this Policy (i.e., Sexual Contact, as defined above and behaviors identified in the

> definition of Sexual Exploitation, above, that require Consent). A person who initiates Sexual Activity is responsible for obtaining Consent for that conduct. Consent cannot be obtained by Force or in circumstances involving Incapacitation, as defined below.

*Id.* The Policy then provides

> In evaluating whether Consent was given under this Policy, the issue is:
>
> - Did the person initiating Sexual Activity know that the conduct in question was not consensual?
> - If not, would a REASONABLE PERSON who is unimpaired by alcohol or drugs have known that the conduct in question was not consensual?
>
> If the answer to either of these questions is "Yes," Consent was absent.
>
> Consent is not to be inferred from silence, passivity, or a lack of resistance, and relying on non-verbal communication alone may not be sufficient to determine Consent.
>
> Consent is not to be inferred from an existing or previous dating or sexual relationship. Even in the context of a relationship, there must be mutual Consent to engage in any Sexual Activity each time it occurs. In cases involving prior or current relationships, the manner and nature of prior communications between the parties and the context of the relationship may have a bearing on the presence of Consent.
>
> Consent to engage in a particular Sexual Activity at one time is not Consent to engage in a different Sexual Activity or to engage in the same Sexual Activity on a later occasion.
>
> Consent can be withdrawn by any party at any point. An individual who seeks to withdraw Consent must communicate, through clear words or actions, a decision to

> cease the Sexual Activity. Once Consent is withdrawn, the Sexual Activity must cease immediately.

*Id.* at PageID.458–59.

The Policy defines a "Reasonable Person" as "a person using average care, intelligence, and judgment in the known circumstances." *Id.* at PageID.464.

Defendants have submitted evidence that Plaintiff has completed training regarding the definition of consent. ECF No. 101-2, ¶¶ 1–5; ECF No. 103 (filed under seal).

*2. Hearing Officer's Determination*

On November 4, 2025, Hearing Officer Jessica Galanos issued a 42-page Written Determination Regarding Responsibility. ECF No. 34 (filed under seal). Applying a preponderance-of-the-evidence standard, Galanos concluded that "The available evidence **does** support a determination, by a preponderance of the evidence, that Respondent engaged in Sexual Assault on October 10, 2024, in violation of the Policy." *Id.* at PageID.601 (emphasis original).

As recounted by Galanos, the parties had different factual accounts of the incident:

> According to Complainant, the parties initially stood near her bedroom door talking, before Respondent laid down on her bed and invited her to do the same. Complainant reported that the parties proceeded to kiss while in her bed, and that Respondent eventually put his hands on her buttocks under her clothes, removed her shirt and pants, removed his own

> shirt, and finally, digitally penetrated her vagina. Complainant also alleged that Respondent kissed her neck, chest, and breasts causing bruising or hickeys on her neck and chest. Complainant said that shortly after digital penetration occurred, Respondent said something to the effect of, "I don't think you're into this," asked for his shirt back, and began to leave the apartment.
>
> . . .
>
> Respondent denied that he removed Complainant's clothes, touched Complainant's buttocks, digitally penetrated her vagina, or left hickeys on her chest and neck. Instead, Respondent reported that the interaction began while the parties were standing and consensually kissing by the door to Complainant's room. Respondent said that he removed his shirt to be more comfortable after Complainant tugged at it while they were kissing, and that he put his hand on the small of Complainant's back under her shirt until she told him not to do so. Respondent said that after Complainant told him not to touch her back, and told him she did not want to have sex that night, the parties moved to Complainant's bed where they cuddled for another 20 to 30 minutes.

*Id.* at PageID.605–06 (citation omitted). Galanos concluded that "it is more likely than not that Respondent used his fingers to penetrate Complainant's vagina on October 10, 2024." *Id.* at PageID.632.

Regarding the issue of consent, Galanos wrote that

> The next question is whether consent was present. The Policy defines consent as "a clear and unambiguous agreement, expressed outwardly through mutually understandable words or actions, to engage in Sexual Activity," and specifies that consent cannot be "inferred from silence, passivity, or lack of resistance," and that relying on "non-verbal communication alone may not be sufficient" to conclude that consent is

present. The Policy further asks two questions to evaluate whether consent was present: (1) Did the person initiating Sexual Activity know that the conduct in question was not consensual; and, (2) If not, would a REASONABLE PERSON who is unimpaired by alcohol or drugs have known that the conduct in question was not consensual? The Policy states that if the answer to either of these questions is "Yes," then consent was absent from the encounter.

The parties agree that when they were initially kissing upon entering Complainant's bedroom, Complainant told Respondent she did not want to have sex when Respondent tried to touch her body under the clothing. According to Complainant's factual account, which is more credible than Respondent's, Respondent removed Complainant's shirt, and when he did so, she raised her arms to assist, despite feeling uncomfortable. This act of raising her arms to assist Respondent in removing her shirt could have signaled to a reasonable person that the conduct was consensual. Thus, while Complainant was not obligated to verbally say "No," or resist, the act of aiding Respondent in this endeavor could reasonably be interpreted as permission for Respondent to remove her shirt.

However, the material question is whether Respondent had consent to digitally penetrate Complainant's vagina. If the parties agreed that digital penetration took place, and Respondent asserted that he had consent for that particular activity, the investigator and Hearing Officer would have asked Respondent to explain what action by Complainant signaled to him that he had "clear and unambiguous agreement" for digital penetration. Because Respondent denied that digital penetration took place, and because that denial is less credible than Complainant's allegation to the contrary, the record does not include any information outside of Complainant's account that might support a finding of consent for digital penetration. Thus, it is necessary to determine whether Complainant's factual account supports a finding that consent was present for digital penetration.

As outlined above, Complainant engaged in consensual kissing and signaled to Respondent that she consented to the removal of her shirt (even if that signal was unintended). However, Complainant said that after Respondent removed her shirt, she covered her chest with her arms and told Respondent she was on her period to try to dissuade him from digital penetration. While these actions may not represent an explicit rejection of digital penetration, that is not the question under the Policy. Instead, the question is whether these actions represent "a clear and unambiguous agreement, expressed outwardly through mutually understandable words or actions" that Respondent could penetrate Complainant's vagina with his fingers. Under the circumstances here, Complainant's actions did not outwardly express consent to digital penetration. Because consent to engage in one activity does not amount to consent to engage in another activity, and because Complainant covered her chest and signaled that there may be a reason Respondent should not be doing what he was doing (i.e., her period), the evidence does not support a determination that there was clear and unambiguous agreement for digital penetration. This is particularly true when Complainant had previously told Respondent "Stop" and "Don't do that," in response to his earlier act of putting his hand in her pants, beneath her underwear, and touching her buttocks. Additionally, it is undisputed that Complainant told Respondent she did not want to have sex that night, and that Respondent knew Complainant was sexually inexperienced. Taking all of these facts together, there is nothing in the record that suggests there was "clear and unambiguous agreement" for digital penetration. While verbal consent is not required by the Policy, the person who initiates a particular sexual activity is responsible under the Policy for obtaining consent. The record is devoid of information to support a finding that Complainant gave consent to digital penetration, either through words or physical actions, before it actually occurred.

> Based on this analysis, the elements of the definition of Sexual Assault are supported by a preponderance of the evidence because it is more likely than not that Respondent penetration Complainant's vagina with his finger without Complainant's consent. Therefore, a preponderance of the evidence supports a finding that Respondent engaged in Sexual Assault in violation of the Policy.

*Id.* at PageID.636–37.

*3. Appeal Decision*

Plaintiff "appeal[ed] the determination of responsibility on the basis of procedural irregularity and the presence of new evidence and appeal[ed] the sanction as clearly inappropriate and out of proportion to the conduct for which Respondent was found responsible." ECF No. 39, PageID.936 (filed under seal).

On January 26, 2026, retired federal judge Honorable Lawrence F. Stengel issued an appellate decision upholding the finding of sexual assault, but reducing the suspension to one year. *Id.* at PageID.942. As relevant to Plaintiff's present claims, Judge Stengel concluded

> Respondent asserts that there are several mitigating circumstances that counsel against the imposition of these sanctions. I agree. Of particular relevance to fashioning an appropriate sanction, I consider that this offense did not include force, coercion, threats, or incapacitation. I also consider that this event occurred between two adults who knew each other and who engaged in consensual sexual relations before consent was withdrawn.

*Id.* at PageID.941.

### B. Procedural Background

In Plaintiff's first amended complaint, dated March 13, 2026, he brought suit under § 1983, alleging violations of his Fourteenth Amendment procedural due process rights. ECF No. 7.

On March 20, 2026, Plaintiff filed a Motion for a Preliminary Injunction. ECF No. 15. Defendants responded, ECF No. 33, and Plaintiff replied, ECF No. 44.

On April 10, 2026 and April 13, 2026, the Court held a two-day evidentiary hearing on Plaintiff's March 20, 2026 Motion for a Preliminary Injunction.

On April 20, 2026, the Court issued a 59-page order, denying Plaintiff's Motion for a Preliminary Injunction. *Doe I*, 2026 WL 1068095, at *24. As relevant here, the Court concluded "that Plaintiff has not demonstrated a substantial likelihood of success on the merits"; that the "'harm to others' and the 'public interest' factors weigh against the issuance of an injunction"; and that "Plaintiff has demonstrated a likelihood that the denial of the preliminary injunction would cause him irreparable harm." *Id.* at *23. "Weighing these factors against each other, the Court conclude[d] that a preliminary injunction should not be issued." *Id.*

On June 3, 2026, Plaintiff filed a Second Amended Complaint alleging following counts: (I) Violation of the Fourteenth Amendment's due process clause, brought under § 1983, because the Policy is void for

vagueness; (II) Violation of the Fourteenth Amendment's due process clause, brought under § 1983, because Defendants' "Review and Evaluation Meeting" fails to provide procedural due process; (III) Violation of the Fourteenth Amendment's Equal Protection Clause, brought under § 1983, because Defendants discriminated against Plaintiff because of his sex; (IV) Violation of the Fourteenth Amendment's Equal Protection Clause, brought under § 1983, because the penalties enforced against Plaintiff were arbitrary and capricious; and (V) under Title IX, 20 U.S.C. § 1681, *et seq.*, because Defendants reached an erroneous outcome against him because of his sex. ECF No. 87.

On July 28, 2026, Plaintiff filed the present motion for temporary restraining order and preliminary injunction. ECF No. 94. Defendants responded, ECF No. 101, and Plaintiffs replied, ECF No. 107.

On July 29, 2026, the Court held a status conference during which the parties agreed to a joint resolution of the questions of whether a temporary restraining order should be issued and whether a preliminary injunction should be issued. The parties also agreed to waive a hearing on the motion if the Court decides a hearing is not necessary.

On August 3, 2026, Defendants filed a Motion to Dismiss Plaintiff's Second Amended Complaint. ECF No. 99.

## II. LEGAL BACKGROUND

Plaintiff filed this motion pursuant to Federal Rule of Civil Procedure 65, requesting that the Court grant a temporary restraining order and a preliminary injunction, enjoining the University, Board of Regents of the University of Michigan, Elizabeth Seney, Tamiko Strickman, Laurie McCauley, Erik Wessel, Laura Blake Jones, Michael Ryans, and Suzanne Quinn McFadden (together, the "Defendants") "to expunge all negative notations on Plaintiff's record associated with the finding of responsibility made against him; allow him to complete his remaining courses and obtain his Bachelor's degree; and enjoin Defendants against applying [the Policy] to Plaintiff or any other student." ECF No. 94, PageID.2549.

Courts consider four factors when determining whether to grant a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Int'l Union of Painters & Allied Trades Dist. Council No. 6 v. Smith*, 148 F.4th 365, 371 (6th Cir. 2025) (quoting *Ohio v. Becerra*, 87 F.4th 759, 768 (6th Cir. 2023)). The standard for issuing a temporary restraining order is the same as for a preliminary injunction. *See Ne. Ohio Coal. for*

*Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). Thus, the Court will analyze them together.

The Sixth Circuit has "often cautioned that these are factors to be balanced, not prerequisites to be met." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) (citation omitted) ("*Univ. of Cincinnati*"). At the same time, the Sixth Circuit has "also held that a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed. And in the case of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Id.* (cleaned up); *see also U.S. Sportsmen's All. Found. v. Ctrs. for Disease Control and Prevention*, 167 F.4th 813, 818 (6th Cir. 2026) ("If the plaintiff fails to show a likelihood of success on the merits, the court may deny the injunction without any further consideration.").

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

## III. DISCUSSION

### A. Whether Plaintiff Has a Strong Likelihood of Success on the Merits

The first factor that the Court must consider is whether Plaintiff "has demonstrated a strong likelihood of success on the merits." *Handel's Enters., Inc. v. Schulenburg*, 765 F. App'x 117, 121 (6th Cir. 2019) (citation omitted). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000). To meet his burden, Plaintiff "must show more than a mere possibility of success." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (citation omitted).

Although Plaintiff pleads four new counts in his Second Amended Complaint, "for the purposes of this Motion and Brief, Plaintiff relies on the likelihood of success of Count I, Defendants' violations of Plaintiff's Fourteenth Amendment Procedural Due Process Rights of Property and Liberty . . . alleging that the Policy is void for Vagueness." ECF No. 94, PageID.2577. Accordingly, the Court will only address whether Plaintiff is likely to succeed on his first count, alleging a violation of the Fourteenth Amendment's Due Process Clause, brought under § 1983, because the Policy is void for vagueness. ECF No. 87, ¶¶ 216–53.

#### *1. Allegations contained in Count I*

The relevant allegations of Count I are as follows:

The standards set by the Policy as to "Consent" and "Withdrawal of Consent" are so vague that a person of ordinary intelligence cannot readily identify what conduct is required and prohibited by these terms.

The Policy is so vague that it does not place students on fair notice or give fair warning of what conduct puts them at risk of serious discipline, such as suspensions and expulsion from the University.

As a result, issues of "Consent" and "Withdrawal of Consent" are impermissibly resolved by the government on an ad hoc and subjective basis, in an arbitrary and discriminatory manner.

The Policy does not define or explain how to determine "who initiates Sexual Activity".

As a result, the University resolves this question on a subjective and discriminatory basis, as it did in this case, led chiefly by their belief that men are the initiators and controllers of sexual activity, and that women play a passive role in sex.

The terms "clear", "unambiguous", "expressed outwardly", and "mutually understandable" are not defined, the Policy does not give examples of what conduct satisfies or is prohibited under these terms, and fails to provide any ascertainable standard for determining when and how they can be met.

The Policy's statement that: "In evaluating whether Consent was given … the issue is: Did the person initiating Sexual Activity know that the conduct in question was not consensual? If not, would a Reasonable Person who is unimpaired by alcohol or drugs have known that the conduct in question was not consensual? […]" does not clarify or define the terms used in the previous "definition" of "Consent" and contradicts the earlier definition.

The differences between sexual communication that is "clear" "unambiguous" and "mutually understandable", and the "Reasonable Person" standard renders the Policy vague.

The Policy's language on inferring consent from non-verbal communication during sex is also unconstitutionally vague.

The Policy is vague as to whether students are in fact permitted to rely on non-verbal indicators of consent, and does not define or provide examples of what non-verbal indicators are sufficient or insufficient.

The Policy similarly does not define or provide examples of what verbal indicators of consent are sufficient to be "clear" "unambiguous" and "mutually understandable". It does not provide examples or define what level of enthusiasm or certainty is required in verbal communication during sex.

The Policy does not define or provide examples of when participants in sexual activity are required to elicit an express verbal "Yes" to avoid punishment.

The Policy implies, but does not expressly require, a continuous duty to confirm and re-confirm consent, potentially before Sexual Activity occurs, but fails to define or provide examples of how this is to be accomplished, including whereas in the instant case, participants in Sexual Activity do not discuss each touch that occurs in an encounter in advance.

The definitions of "Consent" and "withdrawal of Consent" are also vague because they allow students to engage in Sexual Activity, and then, at some later or unknown time, (1) decide that consent was not present; or (2) withdraw their consent.

The Policy's definition of "Sexual Assault" is vague in that it does not define whether a student must intentionally engage in Sexual Activity with the knowledge that they did not have consent in order to commit "Sexual Assault".

> In combination, this vague language makes it impossible for students engaged in sexual activity to know, in real time, what conduct is prohibited and will expose them to severe discipline.
>
> As set forth above, the vague language in the Policies resulted in Defendants making subjective, arbitrary, and conflicting findings as to why "Consent" was not present.
>
> As set forth above, here, Plaintiff did not know and had no reason to know that Plaintiff had not consented, nor did the Hearing Officer or External Reviewer have explicit guidelines on how to make this determination after the fact.
>
> The Policy is vague on its face, and as applied to the facts in this case. The Policy fails to provide explicit standards for those who enforce it to prevent arbitrary and discriminatory enforcement.
>
> The Policy further violates the Due Process Clause by investing private persons, including Hearing Officers and External Reviewers, with a standardless delegation of power to determine whether students have engaged in Sexual Assault, and may therefore be deprived of their public education and reputation.
>
> The Policy's vague language impermissibly confers University fact-finders and decision-makers with unstructured and virtually unlimited discretion to find guilt and accordingly deprive students of their public education and reputation.

*Id.* ¶¶ 222–44 (paragraph numeration and footnote omitted)

2. *Discussion of Law*

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A statute or policy is void for

vagueness if it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." *Connally v. Gen. Constr. Co.,* 269 U.S. 385, 391 (1926).

"The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498 (1982). As the Sixth Circuit has explained

> When the statute regulates economic conduct, a less stringent vagueness test applies. By contrast, a greater degree of precision is required of criminal statutes because the consequences of imprecision are more severe. Perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. Consequently, when the First Amendment is implicated, a more stringent vagueness test applies.

*Condon v. Wolfe*, 310 F. App'x 807, 820–21 (6th Cir. 2009) (cleaned up). Although Plaintiff characterizes the penalties as "quasi-criminal," ECF No. 94, PageID.2579, that characterization is not supported by the law. *See Jackson v. Dorrier*, 424 F.2d 213, 217 (6th Cir. 1970) ("To hold that the relationship between parents, pupils and school officials must be conducted in an adversary atmosphere and accordingly the procedural rules to which we are accustomed in a court of law would hardly best serve the interests of any of those involved." (citation omitted)); *Bethel*

*Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986) ("[T]he school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions."). "A school's policy is unconstitutionally vague when it either (1) fails to inform ordinary people what conduct is prohibited, or (2) allows for arbitrary and discriminatory enforcement." *Kutchinski ex rel. H.K. v. Freeland Cmty. Sch. Dist.*, 69 F.4th 350, 360 (6th Cir. 2023) (quoting *Meriwether v. Hartop*, 992 F.3d 492, 517–18 (6th Cir. 2021)).

Here, the vagueness challenge brought by Plaintiff does not involve the exercise of First Amendment rights. ECF No. 87, ¶¶ 216–53.

> Although a vagueness analysis in the context of first amendment rights may involve consideration of hypothetical facts not specifically before the court, "it is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."

*United States v. Krumrei*, 258 F.3d 535, 537 (6th Cir. 2001) (quoting *United States v. Powell,* 423 U.S. 87, 92, 96 (1975)). Accordingly, Plaintiff "bears the burden of establishing that the [policy] is vague as applied to his particular case, not merely that the [policy] could be construed as vague in some hypothetical situation." *Id.* (citing *United States v. Avant,* 907 F.2d 623, 625 (6th Cir. 1990)).

Thus, the question is not whether the Policy might prove difficult to apply in hypothetical encounters that could possibly occur between

other students or involving different facts. The question is whether the Policy gave this Plaintiff notice that the particular conduct alleged here was prohibited. It did.

The Policy prohibits "Sexual Contact [which] occurs without Consent." ECF No. 33-2, PageID.451.

"Sexual Contact includes . . . Vaginal . . . penetration or contact by a . . . finger." *Id.* Plaintiff does not argue that this definition is unclear. *See* ECF No. 94. The Hearing Officer, Galanos, found that "it is more likely than not that Respondent used his fingers to penetrate Complainant's vagina on October 10, 2024." ECF No. 34, PageID.632. Accepting the factual finding of the Hearing Officer, it is clear that under the plain definition of the term contained in the Policy, "sexual contact" occurred between Plaintiff and Complainant.

The Policy prohibits sexual contact that occurs without consent. It further provides that "[a] person who initiates Sexual Activity is responsible for obtaining Consent for that conduct." ECF No. 33-2, PageID.458. Galanos implicitly found that Plaintiff initiated Sexual Activity. *See* ECF No. 34, PageID.636. This unremarkable finding follows plainly from Galanos's conclusion that Plaintiff used his finger to penetrate Complainant's vagina.

In the Second Amended Complaint, Plaintiff alleges that the Policy's requirement that "[a] person who initiates Sexual Activity is responsible for obtaining Consent for that conduct" is unclear because

"[t]he initiation of sexual activity can change throughout an interaction, moment by moment, and the identity of the party who executes a sexual act is not necessarily dispositive of the question of who initiated it." ECF No. 87, ¶ 135. As a result of this unclarity, Plaintiff argues "the University resolves this question on a subjective and discriminatory basis, as it did in this case, led chiefly by their belief that men are the initiators and controllers of sexual activity, and that women play a passive role in sex." *Id.* ¶ 228.

Without debating Plaintiff's contention that initiation of sexual activity can shift from one person to another, the Court here must focus on the facts established by the record, which include the Hearing Officer's finding that Plaintiff used his finger to penetrate Complainant's vagina. The plain meaning of "initiate sexual activity" clearly and unambiguously covers the act of using one's finger to penetrate another's vagina. If, on the other hand, Galanos had found that Complainant used Respondent's finger to penetrate her own vagina, or independently encouraged him to do so, Complainant would have been the initiator. But the policy as written gives adequate notice that if a person takes the action which Plaintiff took here, in the context described here, that person would know he was initiating sexual activity with Complainant.

Thus, Plaintiff, as the initiator of the sexual activity, was "responsible for obtaining Consent for that conduct." ECF No. 33-2, PageID.458.

The Policy defines Consent as "a clear and unambiguous agreement, expressed outwardly through mutually understandable words or actions, to engage in Sexual Activity." *Id.* The Policy also states that "Consent is not to be inferred from silence, passivity, or a lack of resistance, and relying on non-verbal communication alone may not be sufficient to determine Consent." *Id.*

Under this Policy, each sexual act requires its own Consent. *See id.* at PageID.459 ("Consent to engage in a particular Sexual Activity at one time is not Consent to engage in a different Sexual Activity.").

Ordinary people reading these provisions together would understand a straightforward rule: before initiating a particular sexual act, the initiator must obtain agreement to that particular sexual act through outward expressions of words and actions.

Galanos applied that rule to Plaintiff's conduct as shown in the evidence during the hearing as follows:

> If the parties agreed that digital penetration took place, and Respondent asserted that he had consent for that particular activity, the investigator and Hearing Officer would have asked Respondent to explain what action by Complainant signaled to him that he had "clear and unambiguous agreement" for digital penetration. Because Respondent denied that digital penetration took place, and because that denial is less credible than Complainant's allegation to the contrary, the record does not include any information outside of Complainant's account that might support a finding of consent for digital penetration. Thus, it is necessary to

> determine whether Complainant's factual account supports a finding that consent was present for digital penetration.

ECF No. 34, PageID.636–37 (filed under seal). In other words, in the hearing Plaintiff never identified anything Complainant said or did that he understood to be a clear and unambiguous communication of agreement to digital penetration because Plaintiff's position was that no such act occurred.

Accordingly, after surveying the evidence, Galanos concluded that "[t]he record is devoid of information to support a finding that Complainant gave consent to digital penetration, either through words or physical actions, before it actually occurred." *Id.* at PageID.637.

The Policy requires a clear and unambiguous agreement to initiate a sexual act. Plaintiff points to no pre-initiation statement or action, nor did Galanos identify any, that expressed Complainant's agreement to be digitally penetrated by Plaintiff. Under the plain meaning of the Policy's terms, these facts show that Plaintiff did not obtain a clear and unambiguous agreement from Complainant to be digitally penetrated. Thus, under the terms of the Policy, the Hearing Officer found that Plaintiff did not obtain Complainant's consent for him to digitally penetrate her.

Simply put, as applied to the facts found by Galanos, the Policy is not impermissibly vague. In other words, considering the clear language of the policy, an ordinary person would easily understand that an

individual in Plaintiff's position would violate that policy if he digitally penetrated Complainant without *any indication* that Complainant agreed to that particular sexual contact.

Thus, the Court concludes that the Policy is not "vague as applied to his particular case." *Krumrei*, 258 F.3d at 537.

The Court has carefully considered Plaintiff's arguments to the contrary and they do not change this outcome. Plaintiff spends substantial portions of his brief essentially relitigating Galanos's decision. First, he argues that Galanos's Written Determination failed to comport with the Policy which he finds vague. ECF No. 94, PageID.2572–75. He highlights that her "findings as to sexual assault were in sharp contrast to her other findings." *Id.* at PageID.2573. Second, he argues that Galanos failed to apply the reasonable person standard. *Id.* at PageID.2585–89. There too, he argues that her "finding as to digital penetration is in sharp contrast with her conclusions about other sexual acts that allegedly occurred that night." *Id.* at PageID.2586.

Plaintiff is right that "a single 'conclusory assertion' in his Amended Complaint that the policy 'gives officials unbridled discretion in enforcement does not cut it.'" ECF No. 107, PageID.3307 (quoting *Meriwether v. Hartop*, 992 F.3d 492, 518 (6th Cir. 2021)). But his argument sways too far in the opposite direction. His attempts to define how the reasonable person standard should have been applied or to show

how subjective and inconsistent Galanos's findings are do little to reveal the alleged vagueness in the Policy.

His proffered cases similarly reveal quite little about why the University's Policy is vague. Several of the cases involve policies targeting much broader categories of behavior. For instance, the policy at issue in *Doe v. Univ. of Michigan*, 721 F. Supp. 852, 856 (E.D. Mich. 1989), targets harassment across campus generally. And the policy in *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1184 (6th Cir. 1995) is similarly broad, considering it targets any racial or ethnic harassment that could create an "intimidating, hostile or offensive educational, employment, or living environment."

The University Policy involves a far narrower context: sexual misconduct. Specifically, it defines the permissible conduct that enrolled students are expected to do and avoid to ensure that consent is present when engaging in sexual activity. Thus, it is in the context of sexual misconduct that the University defines consent, in substantial detail. Although Plaintiff may argue that this definition leaves open some level of interpretation by decision-makers, "we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).

Plaintiff's citation to *Belle Maer Harbor v. Charter Township of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999) is equally unavailing. There, a criminal ordinance authorized an inspecting officer to punish based on

what *he* thought was reasonable. *Id.* In that case, the officer had no distinguishable standards by which he was to implement the ordinance. Here, the Policy contains useful definitions and standards, which Galanos applied to the facts of this case.

Consequently, as to Plaintiff's sole cause of action, alleging violations of his Fourteenth Amendment procedural due process rights, Plaintiff has failed to show based on the available record that he is likely to succeed in proving that the University's Policy is unconstitutionally vague. Thus, this "often . . . determinative" factor, *see City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (citation omitted), weighs against injunctive relief.[1]

**B. Whether Plaintiff Would Suffer Irreparable Harm Absent an Injunction**

"The second factor . . . asks whether the movant is likely to suffer irreparable harm in the absence of the injunction." *Univ. of Cincinnati*, 872 F.3d at 407.

The Court has previously held, regarding this factor, that a two-year suspension such as this would cause Plaintiff to suffer irreparable harm absent an injunction. As shown by the record, absent injunctive relief, Plaintiff will be suspended from the University for two years and

[1] While a preliminary injunction "issued where there is simply no likelihood of success on the merits *must be reversed*," *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010) (emphasis added), the Court will nevertheless address the remaining factors.

suffer reputational harm from having been found to have sexually assaulted another student. Case law supports the conclusion that such a consequence constitutes irreparable harm. *Doe v. Univ. of Cincinnati*, No. 15-600, 2015 WL 5729328, at *3 (S.D. Ohio Sept. 30, 2015) ("*Univ. of Cincinnati II*") ("courts have held that suspension from school can cause irreparable harm" (collecting cases)); *Univ. of Cincinnati*, 872 F.3d at 407 ("Were we to vacate the injunction, Doe would be suspended for a year and suffer reputational harm both on and off campus based on a finding rendered after an unfair hearing. Accordingly, this factor weighs in favor of preliminary relief.").

Defendants argue that Plaintiff will not suffer irreparable harm without injunctive relief because he suffers no risk of reputational harm. ECF No. 101, PageID.3182. In support of this position, Defendants posit that the University has not "disclosed the details of his suspension to anyone, nor does [Plaintiff] allege that he was required to." *Id.* Further, Plaintiff is pursuing his claim under a pseudonym, meaning the record will not reflect his identity either. *Id.* First, it is worth noting that this argument presumes there is a need to protect Plaintiff's reputation by preventing public knowledge of Plaintiff's suspension and finding of sexual misconduct. This is close to an admission that public knowledge would harm Plaintiff. But second, Defendants have failed to point to any case that supports this argument. Instead, the cases cited by both parties acknowledge that this reputational harm exists even in cases where the

plaintiff files anonymously. *See Univ. of Cincinnati II*, 2015 WL 5729328, at *3; *Univ. of Cincinnati*, 872 F.3d at 407; *see also Roe v. Univ. of Cincinnati*, No. 1:18-CV-312, 2018 WL 9944938 (S.D. Ohio Aug. 21, 2018) (acknowledging that anonymous plaintiff can suffer from damage to "her academic and professional reputation"). Finally, while the Court agrees that Plaintiff's decision to file this motion two months after his Second Amended Complaint dampens the sense of emergency associated with the impending or immediate nature of the harm, it does not lessen the seriousness and gravity of that harm.

Considering all the evidence presented, the Court concludes that Plaintiff has shown the presence of irreparable harm that would weigh in favor of preliminary relief.

### C. Whether Issuance of the Injunction Would Cause Substantial Harm to Others & Whether the Public Interest Would Be Served by the Issuance of the Injunction

"The third factor we must consider is whether the issuance of the injunction would cause substantial harm to others." *Handel's Enters., Inc.*, 765 F. App'x at 125. The fourth factor we must consider is "whether the public interest would be served by the issuance of the injunction." *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 551 (citation omitted). Courts frequently consider these two factors together. *See*, *e.g.*, *Bonnell v. Lorenzo*, 241 F.3d 800, 826 (6th Cir. 2001).

Defendants argue that both the Complainant and the University would suffer substantial harm. ECF No. 101, PageID.3183. The Court addresses each argument in turn.

Regarding the Complainant, the Court has already held that the potential psychological harm from Plaintiff returning to campus would be insubstantial. *Doe I*, 2026 WL 1068095, at *22. Defendants argue that the requested relief goes beyond the former in that Plaintiff seeks not to finish a semester but both his undergraduate and graduate degrees. ECF No. 101, PageID.3183–84. But the Court sees no mention in Plaintiff's motion of any request to pursue a graduate degree but only "to complete his remaining courses and obtain his Bachelor's degree." ECF No. 94, PageID.2549. Thus, the harm to Complainant remains minimal.

Still, Defendants correctly highlight that Plaintiff's request would essentially "wipe the slate clean." ECF No. 101, PageID.3184. The status quo consists of Plaintiff having been disciplined for his sexual misconduct according to the University's proceedings. Even if Plaintiff disagrees with the outcome, it still stands until held otherwise.

Such drastic relief certainly "would undermine the University's ability to investigate and remedy sexual harassment, particularly for upperclassmen." ECF No. 33, PageID.433. Although the case has not substantively changed, outside of the new legal theories Plaintiff presents, injunctive relief would essentially entirely reverse the University's disciplinary proceeding. Since Plaintiff has failed to show

that he is likely to succeed on the merits, a ruling in his favor "would suggest that the federal judiciary may be used to seek a reprieve from a disciplinary finding, even where the disciplinary process does not involve a violation of constitutional rights." *Doe I*, 2026 WL 1068095, at *22. Thus, while harm to the Complainant is minimal, the harm to the University's ability to enforce its policies would be significant if the full relief sought were to be granted.

Based on the facts presented by both parties, the Court finds no reason to change its conclusion that granting the injunction would present a harm to the University, but not to others.

The Court also finds no reason to conclude that injunctive relief would be in the public interest. As stated above, and in the previous Order, injunctive relief would inhibit the University's efforts to enforce its disciplinary procedures. *See Doe I*, 2026 WL 1068095, at *23. That outcome would not be in the public interest. Plaintiff's argument that the public interest is in his favor relies on his position that he has demonstrated a strong likelihood of success on the merits, but the Court has not accepted this position. ECF No. 94, PageID.2591–92. Consequently, this factor weighs in favor of denying the injunction.

Accordingly, the Court finds that the University would be substantially harmed and the public interest would not be served by granting an injunction. Thus, these two factors weigh against granting preliminary relief.

### D. Conclusion

The Court concludes that Plaintiff has not demonstrated a substantial likelihood of success on the merits. This factor is "often . . . determinative." *City of Pontiac Retired Emps. Ass'n*, 751 F.3d at 430 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir.2012)); *accord Univ. of Cincinnati*, 872 F.3d at 399. Additionally, the Court has found that the "harm to others" and the "public interest" factors weigh against the issuance of an injunction. On the other hand, Plaintiff has demonstrated a likelihood that the denial of the preliminary injunction would cause him irreparable harm. Unfortunately, as the Court has stated, although a decision on the merits has not yet been made, if there is no constitutional violation, then the kind of harm Plaintiff is suffering is not one that federal law can remedy. *See Marshall v. Ohio Univ.*, No. 2:15–cv–775, 2015 WL 1179955, at *10 (S.D. Ohio Mar. 13, 2015) ("[A]lthough Plaintiff may indeed suffer irreparable harm if OU's suspension is allowed to stand, the Court cannot find that the factors, when balanced against each other, weigh in his favor.").

Weighing these factors against each other, the Court concludes that a preliminary injunction should not be issued. *See*, *e.g.*, *id.* (denying injunctive relief when only the irreparable harm factor weighed in favor of granting the injunction). Plaintiff's Motion for a Preliminary Injunction is therefore **DENIED**.

## IV. CONCLUSION

For the following reasons, Plaintiff's Motion for a Preliminary Injunction (ECF No. 94) is **DENIED**.

**SO ORDERED**.

Dated: September 9, 2026

s/Terrence G. Berg
HON. TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE